1  **THERESA A. GOLDNER, COUNTY COUNSEL**
**By: ANDREW C. THOMSON, Deputy (SBN 149057)**
2  **Kern County Administrative Center**
**1115 Truxtun Avenue, Fourth Floor**
3  **Bakersfield, CA 93301**
**Telephone 661-868-3800**
4  **Fax 661-868-3805**
5
6  **Attorneys for Defendants County of Kern, KCSO,**
**Martin, DeLaGarza, Perkins, Melton and Wong**
7

8                     **UNITED STATES DISTRICT COURT**

9                     **EASTERN DISTRICT OF CALIFORNIA**

10

11  **ADRIANA LEDESMA, an individual;** )   **CASE NO. 1:14-CV-01634-DAD-JLT**
**JESSICA LEDESMA, an individual;** )
12  **MARISSA LEDESMA,  an individual by** )  **COUNTY DEFENDANTS' NOTICE OF**
**and through her Guardian Ad Litem** )   **MOTION AND MOTION FOR SUMMARY**
13  **Raquel Sierra; RONNIE MATHEW** )   **JUDGMENT, OR ALTERNATIVELY**
**LEDESMA,  an individual by and** )   **SUMMARY ADJUDICATION OF ISSUES;**
14  **through his Guardian Ad Litem** )   **MEMORADNUM OF POINTS AND**
**Christina Garcia; CHRISTINA** )   **AUTHORITIES; SEPARATE STATEMENT**
15  **HERRERA,** )   **OF UNDISPUTED MATERIAL FACTS;**
                          **Plaintiffs,** )   **REQUEST FOR JUDICIAL NOTICE;**
16  **vs.** )   **EVIDENCE VOLUME; DECLARATIONS**
                          )   **OF KARENA (DELAGARZA)AQUINO**
17  **KERN COUNTY, KERN COUNTY** )   **AND ANDREW C. THOMSON**
**SHERIFF'S DEPARTMENT;** )
18  **WARREN MARTIN; KARENA DE LA** )  **[FRCP Rule 56; USDC Eastern District of**
**GARZA; DWAYNE PERKINS; JAMES** )   **California, Local Rule 260]**
19  **MELTON; CHRISTOPHER WONG;** )
**AND DOES 1-200, inclusive,** )   **Date:   September 20, 2016**
20                          )   **Time:   9:30 a.m.**
                          **Defendants.** )   **Ctrm:  5**
21                          )   **Trial Date: January 24, 2017**
                          )   **Judge:   Hon. Dale A. Drozd**
22  _____ )

23  TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD:

24             PLEASE TAKE NOTICE that on September 20, 2016, at 9:30 a.m., or as soon thereafter

25  as the matter may be heard in Courtroom 5 of the United States District Court in and for the

26

27

28

                                    1
_____
County Defendants' Motion for Summary Judgment, etc.

1   Eastern District of California, located at 2500 Tulare Street, Fresno, California, or any other

2   Courtroom so assigned, Defendants County of Kern (hereinafter "County") and its integral

3   agency the Kern County Sheriff's Office (hereinafter "KCSO"), Warren Martin (hereinafter

4   "Martin"), Karena DeLaGarza (hereinafter "DeLaGarza"), Dwayne Perkins (hereinafter

5   "Perkins"), James Melton (hereinafter "Melton") and Christopher Wong (hereinafter "Wong")

6   (hereinafter County, KCSO, Martin, DeLaGarza, Perkins, Melton and Wong are collectively

7   identified as "Defendants") (hereinafter Martin, DeLaGarza, Perkins, Melton and Wong are

8   collectively identified as "Individual Defendants"), and pursuant  to Federal Rules of Civil

9   Procedure (hereinafter "FRCP), Rule 56 and USDC Eastern District of California, Local Rule

10  260, will move the Court for Summary Judgment or, in the Alternative Summary Adjudication

11  as to each cause of action (hereinafter "COA"), in favor of each Defendant against Plaintiffs

12  Adriana Ledesma (hereinafter "Adriana"), Jessica Ledesma (hereinafter "Jessica"), Marissa

13  Ledesma (hereinafter "Marissa"), Ronnie Mathew Ledesma (hereinafter "RML") a minor

14  through his Guardian Ad Litem Christina Garcia, and Christina Herrera (hereinafter "Herrera"),

15  (hereinafter collectively "Plaintiffs").

16      Defendants move for Summary Judgment or, alternatively, Summary Adjudication, as

17  follows:

18      1.   During the Incident the actions of the Individual Defendants were objectively

19  reasonable in light of the circumstances facing the Individual Defendants.

20      2.   Since the actions of the Individual Defendants were objectively reasonable,

21  Individual Defendants have no liability for a violation of the 4th and/or 14th Amendment rights

22  of Plaintiffs.

23      3.   There was no violation of any 5th and/or 8th Amendment right of Plaintiffs and/or

24  Decedent.

25      4.   Since the actions of the Individual Defendants were objectively reasonable there

26  is no pendent state liability for assault, battery or negligence.

27      5.   Since the actions of the Individual Defendants were objectively reasonable there

28  is no pendent state liability for a violation of Civil Code §§ 51, 51.7 52 and/or 52.11.

County Defendants' Motion for Summary Judgment, etc.

6.      Individual Defendants are entitled to qualified Immunity.

7.      There is no evidence of, or basis for, Monell liability since:

    a)      County had no unconstitutional policy which resulted in a constitutional violation;

    b)      County had no unofficial policy and/or practice related to excessive force or inadequate training which resulted in a constitutional violation;

    c)      there was no County ratification of an constitutional violation.

8.      County has no pendent state liability for negligent hiring, training and retention since the Individual Defendants actions were objectively reasonable.

9.      Kern County Sheriff's Office, as an integral agency of the County has no independent liability, either Federal (Monell) or State (negligent hiring, training and retention).

This Motion for Summary Judgment or, Alternatively, Summary Adjudication will be based on this Notice and Motion, the attached Memorandum of Points and Authorities, the attached Separate Statement of Undisputed Facts, the attached Evidence Volume in Support, the attached request for Judicial Notice, Declarations of Karena (DeLaGarza) Aquino and Andrew C. Thomson, and any and all such other pleadings, papers and records on file herein, any supplemental and/or Reply memorandum of points and authorities or declarations which may be filed by Defendants, and any and all such other oral or documentary evidence as may be presented at the hearing on this Motion.


Dated: August 5, 2016                    **THERESA A. GOLDNER, COUNTY COUNSEL**


By /s/ Andrew C. Thomson

    Andrew C. Thomson, Deputy
    Attorneys for Defendants County of Kern,
    Kern County Sheriff's Office, Martin, DeLaGarza,
    Perkins, Melton and Wong

County Defendants' Motion for Summary Judgment, etc.

TABLE OF CONTENTS ..................................................................................... i-ii

TABLE OF AUTHORITIES ........................................................................... iii-vii

POINTS AND AUTHORITIES ............................................................................ 1

    I.      INTRODUCTION ............................................................................... 1

    II.     SUMMARY OF ARGUMENT ............................................................ 1

    III.    FACTUAL BACKGROUND ............................................................... 2

    IV.    PLAINTIFFS' COMPLAINT .............................................................. 8

          A.     Deprivation of Civil Rights under Color of Law ....................... 8
          B.     Deprivation of Civil Rights under Color of Law (*Monell* Claim) ............. 9
          C.     Wrongful Death and for Personal Injury/Survival
              [C.C.P. §§377.601, 377.301] for a. Assault & Battery;
              b. Negligence; and c. Negligent Hiring, Training & Retention ................ 9
          D.     Violation of State Civil Rights [Civil Code §§ 51, 51.7, 52 & 52.11] .... 10

    V.     STANDARDS FOR SUMMARY JUDGMENT ................................. 10

    VI.    INDIVIDUAL DEFENDANTS ACTS WERE
            OBJECTIVELY REASONABLE ................................................. 12

          A.     4th Amendment ............................................................... 15
          B.     14th Amendment ............................................................. 16
          C.     5th and 8th Amendments .................................................. 16

    VII.   NO VIOLATION OF STATE CIVIL RIGHTS BY
            INDIVIDUAL DEFENDANTS ................................................... 17

          A.     Only Unruh Act (Civil Code §51) is in Plaintiffs' Tort Claims ............. 17
          B.     Unruh and Ralph Acts, §§ 51, 51.7 .......................................... 18
          C.     Bane Act, §52.1 ................................................................ 18

    VIII.  NO ASSAULT, BATTERY OR NEGLIGENCE
            BY INDIVIDUAL DEFENDANTS ............................................. 19

          A.     Assault and Battery ......................................................... 19
          B.     Negligence .................................................................... 21
          C.     Negligent Hiring, Training and Retention ............................... 22

    IX.    INDIVIDUAL DEFENDANTS ARE ENTITLED
            TO QUALIFIED IMMUNITY ................................................... 23

County Defendants' Motion for Summary Judgment, etc.

X.  NO FACTUAL BASIS OR EVIDENCE FOR *MONELL* LIABILITY .............. 25

    A.  Plaintiffs Cannot Establish the Existence of an Officially Adopted Policy that is Unconstitutional .................................................. 26

    B.  Plaintiffs Cannot Establish an Unofficial Custom or Practice Relating to the Use of Excessive Force or Inadequate Training of County's Deputies ....................................... 27

    C.  Plaintiffs Cannot Establish Evidence of Ratification............................. 29

XI.  NO *MONELL* CLAIM AGAINST KCSO ......................................................... 29

XII.  CONCLUSION ................................................................................................ 30

---

County Defendants' Motion for Summary Judgment, etc.

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**CASES**</u>

3

*Abdul-Jabbar v. G.M. Corp.*

4
85 F.3d 407 (9th Cir. 1996) ........................................................................... 11

5

*Anderson v. Creighton*

6
483 U.S. 635, 107 S.Ct. 3034 (1987) ........................................................... 24

7

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ................................................................................10-12

8

9

*Bay Area Rapid Transit Dist.  v. Superior Court*
38 CalApp.4th 141 (1995) ............................................................................ 19

10

11

*Bryan County v. Brown*
520 U.S. 397, 117 S.Ct. 1382 (1997) ......................................................26-27

12

13

*California v. Campbell*
138 F.3d 772 (9th Cir. 1998) ........................................................................ 10

14

15

*Castaneda v. Department of Corrections and Rehabilitation*
212 Cal.App.4th 1051 (2013) ....................................................................... 17

16

17

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ................................................................................10-11

18

19

*Christie v. Lopa*
176 F.3d 1231 (9th Cir. 1999) ...................................................................... 28

20

*City of Canton  v. Harris*
489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)........................25-26, 28

21

22

*Cochran v. Herzog Engraving Company*
155 Cal.App.3d 405 (198) ............................................................................ 23

23

24

*Connick v. Thompson*
563 U.S. 51, 131 S.Ct. 1350 (2011)............................................................. 25

25

26

*County of Sacramento v. Lewis*
523 U.S. 833 (1998)...................................................................................... 16

27

*Devereaux  v. Abbey*
263 F.3d 1070 (9th Cir. 2001)  ................................................................10-11

28

_____

**CASES (continued)**

*Edson v. City of Anaheim*
63 Cal.App.4th 1269 (1998) ..................................................................................21

*Elder v. Holloway*
975 F.2d 1388 (9th Cir. 1991) ..............................................................................24

*Estate of Ford v. Ramirez*
301 F.3d 1043 (9th Cir. 2002) ..............................................................................25

*Forrester v. City of San Diego*
25 F.3d 804 (9th Cir. 1994) ..................................................................................15

*Gillette v. Delmore*
979 F.2d 1342 (9th Cir. 1992) ..............................................................................29

*Graham v. Connor*
490 U.S. 386 (1989)................................................................. 15-16, 20-21, 26

*Han v. City of Folsom*
2015 WL 1956521 (E.D. Cal., Apr. 29, 2015)..................................................21-22

*Hayes v. County of San Diego*
57 Cal.4th 622, 160 Cal.Rptr. 684 (2013)..........................................................21-22

*Hernandez v. City of Pomona*
46 Cal.4th 501 (2009) ..........................................................................................21

*Hilts v. County of Solano*
265 Cal.App.2d 161 (1968) ..................................................................................23

*Hunter v. Bryant*
502 U.S. 224, 112 S.Ct. 534 (1991)......................................................................24

*Jackson v. City of Bremerton*
268 F.3d 646 (9th Cir. 2001) ................................................................................24

*Johnson v. County of Los Angeles*
340 F.3d 787 (9th Cir. 2003) ................................................................................21

*Johnson v. Glick*
481 F.2d 1028 (2nd Cir. 1973)..............................................................................15

*Jones v. City of Oakland*
2015 WL 3896096 (9th Cir. June 25, 2015) ........................................................28

County Defendants' Motion for Summary Judgment, etc.

1

**CASES (continued)**

2

*KRL v. Moore*
384 F.3d 1105 (9th Cir. 2004) ...................................................................... 25

3

4

*Knox v. McGinnis*
998 F.2d 1405 (7th Cir. 1993) ...................................................................... 23

5

6

*Ladd v. County of San Mateo*
12 Cal.4th 913 (1996) ...................................................................... 21

7

8

*Lemire v. Cal. Dept. of Corrections and Rehabilitation*
726 F.3d 1062 (9th Cir. 2013) ...................................................................... 16

9

10

*Lytle v. Carl*
382 F.3d 978 (9th Cir. 2004) ...................................................................... 29

11

12

*Malley v. Briggs*
475 U.S. 335, 106 S.Ct. 1092 (1996) ...................................................................... 24

13

14

*Martinez v. County of Los Angeles*
47 Cal.App.4th 334 (1996) ...................................................................... 20

15

16

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*
475 U.S. 574 (1986) ...................................................................... 11

17

18

*Mendoza v. City of Los Angeles*
66 Cal.App.4th 1333 (1998) ...................................................................... 21

19

*Mistriel v. Kern County*
2011 WL 864495, 2011 WL 2192834 (E.D. Cal., June 6, 2011) ...................................................................... 29-30

20

21

*Monell v. Dep't of Soc. Services of City of New York*
436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ...................................................................... 25

22

23

*Moreland v. Las Vegas Metropolitan Police Department*
159 F.3d 365 (9th Cir. 1998) ...................................................................... 16

24

25

*Muhammad v. Garrett*
66 F.Supp.3d 1287 (E.D. Cal. 2014) ...................................................................... 19

26

27

*Munoz v. City of Union City*
120 Cal.App.4th 1077 (2004) ...................................................................... 23

28

*Munoz v. State of California*
33 Cal.App.4th 1767 (1995) ...................................................................... 18

v

**CASES (continued)**

*Neal v.Helbling*
726 S.W.2d 483 (1987)...........................................................................................21

*Nissan Fire & Marine Industries Co., Ltd. v. Fritz Companies, Inc.*
210 F.3d 1099 (9th Cir. 2000) ........................................................................10-11

*Oklahoma City v. Tuttle*
471 U.S. 808, 105 S.Ct. 2427 (1985)...................................................................27

*Porter v. Osborn*
546 F.3d 1131 (9th Cir. 2008) .............................................................................16

*Rodriguez v. City of Modesto*
2013 WL 6415620 (E.D. Cal., Dec. 9, 2013) ..................................................18-19

*Roy v. Inhabitants of City of Lewiston*
42 F.3d 691 (1st Cir. 1994)...................................................................................20

*Saucier v. Katz*
533 U.S. 194, 121 S.Ct. 2151 (2001)...................................................................24

*Schacht Wisconsin Dep't of Corrections*
175 F.3d 497 (7th Cir. 1999) ...............................................................................11

*Sornberger v. City of Knoxville, Ill.*
434 F.3d 1006 (7th Cir. 2006) .............................................................................28

*Sorrels v. McKee*
290 F.3d 965 (9th Cir. 2002) ...............................................................................24

*Tennessee v. Garner*
471 U.S. 1 (1985).................................................................................................15

*Thompson v. City of Los Angeles*
885 F.2d 31439 (9th Cir. 1989) ...........................................................................28

*Trevino v. Gates*
99 F.3d 911 (9th Cir. 1996) .............................................................................26-28

*Triton Energy Corp. v. Square D Co.*
68 F.3d 1216 (9th Cir. 1995) ...........................................................................11-12

*Wirsing v. Krzeminski*
61 Wisc.2d 513 (1973)..........................................................................................20

County Defendants' Motion for Summary Judgment, etc.

**Federal Rules of Civil Procedure**

Fed. R. Civ. Proc. 56 (c) .................................................................................. 10

**State Statutes**

Civil Code § 51 ................................................................................................ 18
Civil Code § 51.7 ............................................................................................. 18

Government Code § 815 ................................................................................... 23

Penal Code § 242 ............................................................................................. 19
Penal Code § 835a ................................................................................... 19, 26

County Defendants' Motion for Summary Judgment, etc.

# I.     INTRODUCTION

This case involves claims for damages arising out of an incident which occurred on the evening of August 19, 2013 during an interaction (hereinafter the "Incident") between Ronnie Ledesma Jr. (hereinafter "Ledesma" and/or "Plaintiff") and Deputies Warren Martin (hereinafter "Martin"), Karena DeLaGarza (hereinafter "DeLaGarza"), Dwayne Perkins (hereinafter "Perkins"), James Melton (hereinafter "Melton") and Christopher Wong (hereinafter "Wong") (hereinafter the "Individual Defendants") from the Kern County Sheriff's Office ("KCSO"), an integral agency of Kern County (hereinafter the "County") (hereinafter County, KCSO and Individual Defendants are collectively identified as "Defendants").

# II.    SUMMARY OF ARGUMENT

Defendants move for Summary Judgment or, alternatively, Adjudication, as follows:

1.      During the Incident the actions of the Individual Defendants were objectively reasonable in light of the circumstances facing the Individual Defendants.

2.      Since the actions of the Individual Defendants were objectively reasonable, Individual Defendants have no liability for a violation of the 4th and/or 14th Amendment rights of Plaintiffs.

3.      There was no violation of any 5th and/or 8th Amendment.

4.      Since the actions of the Individual Defendants were objectively reasonable there is no pendent state liability for assault, battery or negligence.

5.      Since the actions of the Individual Defendants were objectively reasonable there is no pendent state liability for a violation of Civil Code §§ 51, 51.7, 52 and/or 52.11.

6.      Individual Defendants are entitled to qualified Immunity.

7.      There is no evidence of, or basis for, Monell liability since:

a) County had no unconstitutional policy which resulted in a constitutional violation;

b) County had no unofficial policy and/or practice related to excessive force or inadequate training which resulted in a constitutional violation;

c) There was no County ratification of a constitutional violation.

8. County has no pendent state liability for negligent hiring, training and retention since the Individual Defendants actions were objectively reasonable.

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

1    9. Kern County Sheriff's Office, as an integral agency of the County has no independent

2    liability, either Federal (Monell) or State (negligent hiring, training and retention).

3    **III.    FACTUAL BACKGROUND**

4    On August 19, 2013, at or around 8:34 p.m. Deputy Martin (hereinafter "Martin") was

5    dispatched to Walgreens (UMF 5.) for a call regarding two suspicious people at the Walgreens.

6    (UMF 6.) The dispatch could be heard by all the units in the Bakersfield Metro Patrol area.

7    (UMF 7.)

8    When Martin arrived, he recognized Ledesma from the description in the dispatch.

9    (UMF 9.) Martin asked Ledesma what Ledesma was doing and was met by a blank stare from

10   Ledesma. (UMF 10.)  Martin asked Ledesma a second time what Ledesma was doing and

11   Ledesma responded that he was at the store buying beer. (UMF 11.) Then Martin asked

12   Ledesma about how much had he had to drink, and Ledesma responded one beer. (UMF 12.)

13   Martin believed that Ledesma was drunk in public since Ledesma was buying beer, had

14   thick slurred speech, red watery eyes, had a smell of alcohol on his breath and was off balance

15   when walking and standing. (UMF 13.) As Martin spoke with Ledesma, Martin came to believe

16   that Ledesma was under the influence of a controlled substance. (UMF 14.)

17   Martin told Ledesma turn around and place his hands behind his back. (UMF 16.) In

18   response Ledesma turned away from Martin and walked 10 to 20 feet away from Martin. (UMF

19   16.)  Martin told Ledesma to stop and that he (Ledesma) was under arrest. (UMF 17.)  Martin

20   was arresting Ledesma for public intoxication. (UMF 15.)Ledesma turned toward Martin and

21   said "Fuck you." (UMF 18.) As Martin approached Ledesma and attempted to grab his arm,

22   Ledesma pulled away and raised his right hand in a clenched fist in a threatening manner, but

23   did not strike Martin. (UMFs 19 and 20.) Martin pushed Ledesma because Martin was afraid

24   that Ledesma was going to hit him (Martin) as a result of the manner that Ledesma was holding

25   his fist near his face like he was preparing to throw a punch. (UMF 21.)

26   After pushing Ledesma away, Martin pulled his baton and directed Ledesma to place his

27   hands on his head. (UMF 22.)  Ledesma responded "fuck you" and continue to keep his

28   clenched fist near his face. (UMF 23.)  Martin believes that Ledesma was close enough to have

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

connected a punch from his location. (UMF 24.) Martin told Ledesma to go to his knees, but Ledesma did not comply. (UMF 25.)  Martin struck Ledesma in the lower leg with his baton, but Ledesma did not respond. (UMF 26.)  Martin struck Ledesma a second time with the baton and Ledesma went to ground, rolling onto his back, bending his knees and protecting himself in a trained fighting position which allowed Ledesma to kick at Martin. (UMF 27.) Martin ordered Ledesma to stop resisting and Ledesma began kicking at Martin. (UMF 28.) Martin is not certain whether any of Ledesma's kicks struck him (Martin). (UMF 32.)

Martin put out a §148 call, for resisting, delaying, obstructing a peace officer, but is unsure when he made the §148 call. (UMF 29.) While Ledesma was on the ground kicking at Martin, Martin struck Ledesma on the arms and/or legs five (5) to seven (7) times with the baton. (UMF 33) Martin put out a §69 call which is for a subject who is violently resisting but is unsure when he made the §69 call. (UMF 34.)

While responding to the call, DeLaGarza heard Martin broadcast a §148 (UMF 30) which made her concerned for Martin's safety, especially since she was not aware of any other Deputies on scene at the time of the broadcast. (UMF 31.)  Perkins also heard the dispatch and heard Martin's §148 and §69 calls, and knowing that Martin usually had things under control quickly, realized that the situation was more than simply resisting arrest. (UMF 40.)

As DeLaGarza and Perkins arrived at about the same time (UMF 48), Ledesma stopped kicking and was sitting up, and Martin was attempting to put Ledesma's arm in a control hold (UMF 37) but Ledesma was tensing up his arms and thrashing his body side to side to prevent Martin from completing the control hold. (UMFs 38 and 39.)

Upon arrival DeLaGarza saw Martin standing behind Ledesma who was sitting on the floor. (UMF 35.)  As DeLaGarza approached, she realized that Ledesma had probably not been searched for weapons which caused her concern, and made her realize it necessary to quickly control and handcuff Ledesma. (UMF 36.)  DeLaGarza approached Ledesma and attempted to grab his right arm to place handcuffs on Ledesma, but was unable to do so since he tensed up his right arm, laid on his back with his arms underneath him began kicking and resisted attempts to control him, which prevented her from placing handcuffs on him. (UMF 49.)  As DeLaGarza

was attempting to grab Ledesma's arm, she gave him verbal commands to "give me your hands" and "stop resisting." (UMF 50.)

Perkins arrived, saw DeLaGarza running and put his canine on a leash and ran to the front of Walgreens. (UMF 51.) As Perkins approached Ledesma, Martin and DeLaGarza were struggling with Ledesma, with DeLaGarza trying to grab Ledesma's right arm and Martin trying to grab the left arm (UMF 52) to control Ledesma and place handcuffs on him, but Ledesma would tense up and break free of them with no effort at all. (UMF 53.) Perkins witnessed Ledesma actively resisting, realized that Ledesma was under the influence of PCP, was in an area with the public and continued to actively resist arrest, so Perkins determined that Ledesma posed an immediate threat to officers and the public. (UMF 54.) Perkins did not believe that there was any alternative means to arrest Ledesma other than to deploy the canine. (UMF 62.)

As DeLaGarza is grabbing Ledesma's right arm, Perkins was yelling "Sheriff's Office" and told Ledesma to stop fighting and stop resisting (UMF 56) while canine was barking. (UMF 57 and 58.) Meanwhile, Martin was trying to place Ledesma's left arm in a control hold, and DeLaGarza was on the other arm. (UMF 63.) Ledesma was fighting with the Deputies by continuing to physically struggle and resist being arrested and handcuffed. (UMF 61.)   Perkins directed Ledesma to "stop resisting at least three (3) times and informed Ledesma that if he did not stop resisting, Perkins would send the dog. (UMF 59.)  Perkins advised Ledesma that he was under arrest. (UMF 75.) Perkins moved the canine up to Ledesma and gave the canine the command "puchen" which is a canine direction to apprehend or capture (UMF 76) understanding that the direction to the canine would result in a bite to Ledesma. (UMF 77.) Perkins canine bit Ledesma in the lower leg, the safest place to bite. (UMF 78.) As Perkins deployed the canine, Ledesma began kicking the canine in the head numerous times (UMF 79) and punching the canine. (UMF 80.)

When DeLaGarza witnessed Ledesma grab the canine by his nose (UMF 64) DeLaGarza struck Ledesma three (3) times on his arm and leg with her collapsible baton so he would release the canine but the baton strikes had no effect on Ledesma.  (UMF 65.)  In an effort to
\ \ \

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

gain compliance and control of Ledesma, DeLaGarza struck Ledesma two more times with her collapsible baton on the leg and arm, but the baton strikes were still ineffective. (UMF 66.)

Wong and Melton were partners and riding in the same vehicle. (UMF No. 8.)  Melton heard Martin broadcast the 148, heard radio clips which occur when an officer's hand slips or is knocked off of the transmitter (UMF 41) and understood the radio traffic to mean that Martin was in a physical confrontation with a suspect. (UMF 42.) Melton then heard the §69 broadcast and, when considered with the clips and the §148, believe that there was an active fight occurring (UMF 46) which increased Melton's level of concern for Martin's safety. (UMF 47.) Wong heard the 148 and understood that a suspect was being resistive or assaultive. (UMF 43.) When Wong hears a §148 he is always worried about the involved officer. (UMF 44.)

When Melton arrived, he did not know if Ledesma had weapons since he was unsure if Ledesma had been searched (UMF 69) and he looked for other possible threats and suspects since the original broadcast identified two suspects. (UMF 68.)  Right after he arrived, Melton saw Ledesma sitting up, swinging/flailing his arms in a windmill like motion with his fists clinched/balled up and rotating to his left then right (UMF 70) with Martin on the ground with Ledesma, DeLaGarza on Ledesma's left side and Perkins' canine biting Ledesma's leg. (UMF No. 72.) Melton heard Ledesma yelling but could not make out what he was saying. (UMF 71.)

As Wong arrived he saw Deputies trying to get Ledesma into custody (UMF 73) with Martin and DeLaGarza were on the ground with Ledesma trying to get control of Ledesma and Perkins was present with his canine. (UMF 73.) Wong attempted to grab Ledesma's arm and place Ledesma in a control hold but was unsuccessful since Ledesma was sweating profusely and would throw and jerk his arms. (UMF 74.) As Ledesma was kicking the canine, Wong directed him to quit resisting, but Ledesma ignored the order (UMF 81) and continued to pull at the canine's mouth even though the canine was no longer engaged. (UMF 82.) Melton grabbed Ledesma's arm and tried to get a control hold (UMF 85) as DeLaGarza was on Ledesma's left side trying to get ahold of Ledesma. (UMF 86.) As Melton grabbed Ledesma's arm, Ledesma slipped his arm free from Melton's grasp and punched the canine on the canine's left side. (UMF 87.)

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

Ledesma continued to actively resisting by pulling away from Deputies, pulling his arms away and refusing to allow Deputies to arrest him or place him in handcuffs. (UMF 88.) Ledesma also flailed his arms while swinging his body side to side, possibly in an attempt to strike somebody. (UMF 90.) With his baton, Wong struck Ledesma in the right shoulder area three (3) times but Ledesma continued to resist and pull away. (UMF 89.)

Ledesma continued to frustrate the attempts to place handcuffs on him by turning on his stomach and pulling his arms in underneath his body so that the Deputies could not get ahold of his arms. (UMF 92.) Melton tried to grab Ledesma's arm but Ledesma, sweating profusely, simply slipped his arm away from Melton, and tried to tuck his arms underneath himself. (UMF 93.) Martin and DeLaGarza attempted to control Ledesma's arms but are unable to do so because of the way Ledesma was moving. (UMF 94.) Deputies were trying to hold Ledesma down but did not use a choke hold. (UMF 91.)

Ledesma then lay on the ground and began resisting deputies by kicking his feet and placing his arms underneath him. (UMF 60.)The Deputies continued to struggle to get control of Ledesma and tried to roll him over but Ledesma was able to get an arm down and pushed himself up from the ground. (UMF 95.) Ledesma started to stand and Wong instructed Ledesma to stop resisting (UMF 96) and, while in a kneeling position, jabbed Ledesma in the left shoulder area in an effort to gain compliance but Ledesma continued to stand up so Wong placed his foot in the middle of Ledesma's body to get Ledesma to become off balance, and Ledesma sat back down onto the ground. (UMF 96.) Ledesma refused to comply, and prevented the Deputies from handcuffing him by keeping his arms from the Deputies (UMF 98) by getting his hands underneath his body, and then balled up real tight. (UMF 99.) Melton, while kneeling down trying to get ahold of Ledesma's arm, directed Ledesma to "stop resisting" and "let me see your hands." (UMF 100 and 101.) With no response, Melton punched Ledesma in the left shoulder blade area so that Ledesma's would bring his arm out and Melton could grab it. (UMF 101.) Ledesma had no reaction to the punch, he continued to keep his arms under him and wiggle back and forth (UMF 102) but Melton continued to try to pull Ledesma's left hand out. (UMF 103.) Melton grabbed Ledesma's arm with both of his hands but Ledesma was still able

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

6

to pull the arm back under his body. (UMF 106.)   Using distraction blows, Melton kicked Ledesma two times with the top of Melton's foot to the left side "love handle" area, just above the belt line, so that Ledesma would move, and when Ledesma moved his elbow down, Melton was able to squeeze his hand in and grab Ledesma's arm. (UMF 104.)  When kicked, other than a slight movement of the elbow, Ledesma had no response and did not yell or otherwise react. (UMF 105.)

The Deputies the rolled Ledesma onto his stomach and were able to get control and handcuff Ledesma despite Ledesma making his muscles rigid in an effort to frustrate the handcuffing. (UMF 97.) As Melton maintained a grip on the arm and pulled, Martin grabbed the arm with Melton and the two of them were able to pull the arm out and behind Ledesma's back. (UMF 107.)  Meanwhile DeLaGarza and another Deputy pulled Ledesma's other arm out and back and the Deputies were able to handcuff Ledesma. (UMF 108.)

It took multiple Deputies to control Ledesma so that he could be handcuffed by Martin and Wong. (UMFs 109 and 111.) Martin, DeLaGarza, Melton and Wong were eventually able to control and handcuff Ledesma by using two deputies on each side, grabbing Ledesma's arms and pulling them out from underneath him and then placing handcuffs on him. (UMF 110.) Once Ledesma was handcuffed, Melton, other Deputies and a Police Officer went into Walgreens to attempt to locate the second suspect but were unsuccessful. (UMF 112.)

After the canine bit Ledesma, Martin concluded that Ledesma was immune to pain. (UMF 113.) Around the time of Ledesma's interaction with the canine, Martin concluded that Ledesma was under the influence of PCP since he was immune to pain, had a blank stare and he was sweating profusely. (UMF 114.) To Perkins it also appeared that Ledesma was impervious or immune to pain (UMF 83) and he did not recall Ledesma screaming or crying. (UMF No. 84.) During the incident, DeLaGarza realized that Ledesma was likely under the influence of PCP since he was sweating profusely, was often staring straight ahead, looked out of it and when force was used he did not react in a normal manner since he would simply shake it off, would not have any physical reaction, would not verbal recognize any pain and never verbalize anything in words. (UMF 115.)

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

Shortly after Ledesma's arrest, due to the canine bite, Ledesma was transported to the hospital in a Sheriff's vehicle since the hospital was less than one mile from the scene. (UMF 117.)   At the hospital Martin interviewed Ledesma (UMF 118) but did not make an audio recording. (UMF 119.) Ledesma repeatedly stated he was sorry (UMF 120), apologized for hitting and kicking the canine, and admitted hearing Perkin's announcements. (UMF 121.)

During the incident, Ledesma committed crimes of being under the influence of a controlled substance, resisting arrest and striking and kicking a police dog (UMF 55) and could have been charged with a violation of Penal Code §600. (UMF 122.)

During the incident, the Deputies did not use any choke holds (UMF 116) and no Deputy struck Ledesma in the head. (UMF 123.)

As a result of an autopsy, the Coroner's Forensic Pathologist determined to a reasonable degree of medical certainty that Ledesma's cause of death was "A) Massive right cerebral hemisphere infarction, interval between onset and death is days; B) Thrombosis of the proximal right middle cerebral artery, interval between onset and death is days." (UMFs 124 and 125.) The Forensic Pathologist also determined that to a reasonable degree of medical certainty, thrombi from the legs did not cause Ledesma's thrombosis of the proximal right middle cerebral artery. (UMFs 126 and 127.)  The Forensic Pathologist identified the death as an accident (UMF 128) and determined that Ledesma did not suffer any head injury. (UMF 129.)

## IV.   PLAINTIFFS' COMPLAINT

The Complaint, filed October 15, 2014, consists of four (4) causes of action, as follows:

### A.   Deprivation of Civil Rights under Color of Law

"Defendants, and each of them, violated decedent's civil rights under the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution prohibiting unlawful seizure, cruel and unusual punishment and violation of due process of law. The violation was under color of state law." (Complaint, ¶ 32.)

"The illegal seizure and use of excessive force on Ronnie Ledesma, Jr., was in violation of his civil rights to be free from the unreasonable search and seizure of his person, to be free from the loss of his physical liberty interest, and for him to be free from cruel and unusual punishment and denial of substantive due process under the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution." (Complaint, ¶ 34.)

"Defendants violated Mr. Ledesma's and Plaintiffs' Civil Rights by using a degree of physical coercion which was not objectively reasonable under the circumstances. Defendants' use of excessive force was unreasonable and in violation of Mr. Ledesma's and Plaintiffs' Civil

Rights under the Fourth and Fourteenth Amendments of the United States Constitution to be free from an unreasonable seizure of his person and to be free from a loss of physical liberty. The use of excessive force also violated the Eighth Amendment, as it was cruel and unusual punishment to be subjected to injury and death." (Complaint, ¶ 36.)

### B. Deprivation of Civil Rights under Color of Law (*Monell* Claim)

"Defendants Kern County and Kern County Sheriff's Department maintained a custom, policy and practice to allow the violation of Civil Rights. . . [and] had a custom and practice of denying Governmental claims, rejecting, failing to act on and denying Citizen Complaints, and engaging in excessive use of force and other actions." (Complaint, ¶ 46.)

Defendants "actions were done in violation of decedent and Plaintiffs' Civil Rights under Color of State Law and constituted a systematic custom, policy, practice and procedure instituted for denial of the Civil Rights of Plaintiff and others." (Complaint, ¶ 46.)

### C. Wrongful Death and for Personal Injury/Survival [C.C.P. §§ 377.601, 377.301] for a. Assault &Battery; b. Negligence; and c. Negligent Hiring, Training & Retention.

#### 1. Assault &Battery

"[E]mployees of defendant Kern County Sheriff's Department, while in the course of their employment, seized, assaulted and battered Ronnie Ledesma, Jr., inflicting serious injuries from which he never recovered and which factually and proximately caused his death . . . ." (Complaint, ¶ 51.)

"Defendants intended to cause and did cause Plaintiffs to suffer serious physical harm as the result of the intentional and unnecessary application of force to decedent Ronnie Ledesma, Jr." (Complaint, ¶ 53.)

#### 2. Negligence

"[D]efendants negligently battered Ronnie Ledesma, Jr., such that he sustained multiple injuries from which he never recovered . . . ." (Complaint, ¶ 56.)

#### 3. Negligent Hiring, Training & Retention

"Defendants County of Kern and Kern County Sheriff's Department were aware of the unfitness of defendants Warren Martin; Karena DeLaGarza; Dwayne Perkins; James Melton [and] Christopher Wong . . . and that defendants County of Kern and Kern County Sheriff's Department nonetheless as a policy, custom and practice continued to employ and utilize defendants Martin, DeLaGarza, Perkins, Melton [and] Wong . . . , resulting in the violation of the Civil Rights of decedent Ronnie Ledesma, Jr." (Complaint, ¶ 62.)

"County of Kern and Kern County Sheriff's Department negligently hired, trained, supervised, employed and/or managed Defendants Martin; DeLaGarza; Perkins; Melton; [and] Wong . . . ,by failing and refusing to train Kern County Sheriff's Department deputies, or other employees, in proper arrest techniques and not using excessive force, so that they did not pose an unreasonable risk of serious bodily injury and death; such that the Defendants County of Kern and Kern County Sheriff's Department knew, or in the exercise of reasonable diligence, should have known, that Defendants Martin; DeLaGarza; Perkins; Melton [And] Wong . . . were dangerous and violent employees, prone to use of unnecessary force, and in a manner that demonstrated callous disregard for the rights and safety of civilian citizens, and assault and batter persons and/or use unnecessary, unreasonable and/or unlawful physical force without reasonable justification." (Complaint, ¶ 64.)

__DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES__

### D.  Violation of State Civil Rights [Civil Code §§ 51, 51.7, 52, & 52.11]

"Defendants, and each of them, owed a duty of ordinary care to avoid harm to Decedent Ronnie Ledesma, Jr.  The County of Kern and Kern County Sheriff's Department's duties included the duties to completely train, hire and supervise its law enforcement officers in the proper use of force and tactics of their service revolvers when responding to and dealing with unarmed individuals, combative or not." (Complaint, ¶ 69.)

". . . Defendants . . . breached these aforementioned duties, either negligently or intentionally in relation to all their interactions with decedent Ronnie Ledesma, Jr. . . . including, but not limited to, unnecessary, intentional and excessively forceful conduct towards Ronnie Ledesma, Jr." (Complaint, ¶ 70.)

"[T]he aforementioned negligent/intentional breach of their duties by Defendants constituted violations of the civil rights of Decedent Ronnie Ledesma, Jr., in contravention of civil rights afforded pursuant to California Civil Code §§ 51, 51.7,52 and 52.1 and the Constitution of the United States." (Complaint, ¶ 71.)

"Defendants negligent/intentional use of excessive force upon Decedent Ronnie Ledesma, Jr., was a substantial factor in his injuries . . . and a legal cause of his death . . . . " (Complaint, ¶ 72.)

"Defendants . . . violated decedent's civil rights guaranteed by the Constitution of the United States and afforded pursuant to California Civil Code §§ 51, 51.7, 52 and 52.1, prohibiting unlawful seizure, cruel and unusual punishment and violation of due process of law. The violation was under color of state law. Defendants . . . acted in violation of civil rights afforded by the Constitution of the United States and pursuant to California Civil Code §§ 51, 51.7, 52 and 52.1 when decedent was subjected to excessive force . . . ." (Complaint, ¶ 73.)

## V.  STANDARDS FOR SUMMARY JUDGMENT

The Court must grant a motion for summary judgment if the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).  Material facts are those that affect the outcome of the case.  *Anderson v. Liberty Lobby Inc*. 477 U.S. 242, 247-8 (1986).

The moving party bears the initial burden of informing the court of the basis for its motion and identifying parts of the file which it believes indicates an absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 417 U.S. 311, 323 (1986).  To meet its burden, the moving party must either negate an essential element of the non-moving party's claim or show the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Industries Co., Ltd. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1102 (9th Cir., 2000); see also *Devereaux v. Abbey*, 263 F.3d

1   1070, 1076 (9th Cir. 2001) (when the non-moving party has the burden of proof at trial, the

2   moving party need only point out "that there is an absence of evidence to support the

3   nonmoving party's case." [quoting *Celotex*, 417 U.S. at 325].

4       If the moving party meets its initial burden, the burden shifts to the non-moving party to

5   produce evidence supporting its claims. *Nissan Fire & Marine*, *supra*, at 1103.  The nonmoving

6   party cannot simply rest on its allegations without any significant probative evidence tending to

7   support the complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).   The

8   nonmoving party must produce evidence on which a reasonable trier of fact could find in its

9   favor, viewing the record as a whole, in light of the evidentiary burden the law places on that

10  party.  *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995).   The

11  nonmoving party "must do more than show there is some metaphysical doubt as to the material

12  facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  Evidence

13  that is merely colorable, is not significantly probative or would not support a favorable jury

14  verdict is insufficient. *Anderson v. Liberty Lobby Inc., supra,* 477 U.S. at 249-250.  Summary

15  judgment has been called "the 'put up or shut up' moment in a lawsuit, when a party must show

16  what evidence [he] has that would convince a trier of fact to accept [his] version of events."

17  *Schacht v. Wisconsin Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999).

18      To defeat a motion for summary judgment, the non-moving party must show (1) that a

19  genuine factual issue for trial exists, and (2) that this factual issue is material. *Celotex Corp. v.*

20  *Catrett*, *supra*, 417 U.S. at 325.  If the non-moving party does not produce evidence to show a

21  genuine issue of material fact, the moving party is entitled to summary judgment.  *Celotex*,

22  *supra*, at 323.  "One of the principle purposes of the summary judgment rule is to isolate and

23  dispose of factually unsupported claims and defenses, and we think it should be interpreted in

24  such a way that allows it to accomplish this purpose." *Celotex*, *supra*, at 324.

25      A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it

26  is to determine whether there is a genuine issue for trial. See *Abdul-Jabbar v. G.M. Corp.*, 85

27  F.3d 407, 410 (9th Cir. 1996)  A genuine issue of fact exists only when the non-moving party

28  produces evidence on which a reasonable trier of fact could find in its favor viewing the record

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

as a whole in light of the evidentiary burden the law places on that party.  See *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The "preliminary question for the judge [in evaluating a motion for summary judgment is], not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251.

## VI.    INDIVIDUAL DEFENDANTS ACTS WERE OBJECTIVELY REASONABLE

During the incident, the Deputies use of force was reasonable given their understanding and knowledge of the situation, and their belief that Ledesma was under the influence of alcohol and/or a controlled substance.  At no time was any lethal force used, and the non-lethal force was limited to baton strikes, distraction blows from hands and feet, and the canine application.

Martin used a total of five to seven baton strikes during the incident. During his initial contact with Ledesma, Martin attempted to get Ledesma to comply but was unsuccessful. When Ledesma took a fighting stance that left Martin thinking that Ledesma would strike him with a fist, Martin struck Ledesma once in the lower leg with a baton.  Ledesma had no reaction, so Martin again struck Ledesma in the leg with a baton and Ledesma went to the ground, assumed a fighting position and began kicking at Martin.  Martin is unsure if any Ledesma's kicks struck him.  In response to the kicking, Martin used three to five more baton blows.  After the arrival of DeLaGarza, the second Deputy on scene, Martin's contacts were limited to the use of hands-on techniques to try to control and handcuff Ledesma.

While responding to the call, DeLaGarza was concerned because she heard Martin's §148 broadcast and was aware that he was at the scene with no assisting law enforcement. When DeLaGarza arrived on scene, she realized that Ledesma had probably not been searched which made controlling and restraining him important. DeLaGarza witnessed Martin with Ledesma and ran to assist Martin.  DeLaGarza verbalized directions to Ledesma, grabbed one of his arms and Martin grabbed the other, but Ledesma continued to pull away from the attempted control holds.  After the canine arrived, DeLaGarza watched Ledesma repeatedly kick and

1   punch and grab the muzzle of the canine. When Ledesma grabbed the canine's muzzle, in an
2   effort to protect the canine and gain control of Ledesma, DeLaGarza struck Ledesma three times
3   in the arms or legs with her baton.  She then reassessed the unchanged situation, and again
4   struck Ledesma in the arms or legs two more times.  With the ineffectiveness of the baton
5   strikes, DeLaGarza reholstered her baton. The remainder of her physical contact with Ledesma
6   was hands-on efforts to gain control of Ledesma's arms.  The totality of DeLaGraza's non-
7   hands-on contact with Ledesma was five baton strikes while Ledesma was assaulting the canine.

8       Perkins was aware that Ledesma was resisting from hearing the §148 and §69
9   broadcasts, and with his knowledge of Martin, he knew that the situation was potentially
10  dangerous. When Perkins arrived he witnessed Ledesma resisting the hands-on attempts by
11  Martin and DeLaGarza to grab Ledesma's arms to control and arrest him. As Perkins
12  approached Ledesma, his canine was barking. Along with the barking, Perkins gave Ledesma
13  warnings, but Ledesma did not acknowledge the canine or Perkins and continued to resist.
14  Perkins assessed the situation and believed that the only way to take Ledesma into custody was
15  to deploy the canine.  Perkins moved the canine to the lower leg, the safest place for a canine
16  bite in order to avoid serious injury and directed the canine to "arrest" Ledesma. The canine
17  contact did not appear to cause Ledesma pain, but Ledesma repeatedly and continuously kicked,
18  punched and pulled and pushed at the muzzle of the canine which knocked the canine off of the
19  bite. The canine, when knocked off of the bite, reengaged Ledesma.  The canine was
20  subsequently knocked off the bite and was not directed to reengage since the canine contact was
21  not having the desired effect on Ledesma.  Perkins had no other physical contact with Ledesma.

22      Even before arriving, Melton was concerned for Martins' safety after hearing the §148,
23  §69 and the intermittent radio clicks.  When Melton arrived, he became concerned that Ledesma
24  had not been search and realized that he needed to be controlled so that he could be searched.
25  Melton first saw Ledesma sitting and flailing his arms about in a windmill fashion in order to
26  avoid being handcuffed. As Ledesma was experiencing canine contact and assaulting the
27  canine, Melton tried to grab Ledesma's arm but Ledesma slipped his arm from Melton's control
28  and resumed punching the canine. After the canine was disengaged, Melton continued his effort

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

to grab an arm and control Ledesma but Ledesma flailed his arms while turning his body side to side to possibly strike a Deputy. Ledesma turned and rolled onto his stomach and pulled his arms underneath his body, and again began kicking out with his legs. Melton, kneeling beside Ledesma tried to pull his arm out but was unsuccessful. With his hand, Melton then struck Ledesma in the left shoulder blade area, with no effect on Ledesma. Melton returned to attempting to grab Ledesma's arms, again with no success. As distraction blows, Melton kicked Ledesma two times with the top of Melton's foot to Ledesma's left side "love handle" area, just above the belt line, so that Ledesma would move. Ledesma slightly moved his elbow down, Melton was able to squeeze his hand in and grab Ledesma's arm.  With Martin on the same arm, Melton was able to pull Ledesma's arm out, while the two Deputies on the other arm did the same and the Deputies placed handcuffs on Ledesma. Other than the hands-on attempts to grab Ledesma's arms, Melton's contact with Ledesma was limited to one hand strike to shoulder area and two subsequent distraction kicks which allowed the Deputies to handcuff Ledesma.

Wong, after hearing the §148 was concerned for Martin's safety.  When Wong arrived he saw two Deputies trying to grab and control Ledesma and while the canine was engaged with Ledesma.  Wong witnessed Ledesma's assault on the canine and witnessed the other Deputies unsuccessful attempt to control Ledesma.  After the canine disengaged, Ledesma resumed hitting the canine.  When Ledesma returned to flailing his arms about, Wong struck Ledesma three times in the right shoulder with his baton, but Ledesma continued to resist and pull away from the Deputies. Wong returned to hands-on to attempt to gain control of Ledesma's arm but was unsuccessful.  Ledesma, with his hands underneath his body, began to push up in an effort to stand. While in a kneeling position, Wong jabbed Ledesma in the left shoulder area, but with no effect since Ledesma continued to attempt to stand.  Wong then placed his foot in the middle of Ledesma's body which caused Ledesma to become off balance and return to the ground.  The totality of Wong's non-hands-on contact was limited to one baton strike to the shoulder area, one hand strike to shoulder area and one contact with foot pressure to keep Ledesma from standing. The remainder of Wong's contact with Ledesma was all hands-on attempts to grab an arm to control and handcuff Ledesma.

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

1       Given the situation, the knowledge of the Individual Defendants and Ledesma's degree

2 of active and passive resistance, combined with the knowledge that Ledesma was under the

3 influence of a controlled substance and the associated factors, the Individual Defendants had an

4 obligation to take Ledesma into custody.  The Individual Defendants' conduct was reasonable

5 and necessary given the situation. The use of force was "objectively reasonable in light of the

6 facts and circumstances confronting" the Individual Defendants.

7       In examining the wrongful death issue, there is no evidence to support an allegation that

8 the Individual Defendants caused Ledesma's death.  There were no blows or strikes to the head

9 and no carotid holds used during the incident.  The Coroner's Pathologist stated that Ledesma

10 did not suffer any head injury, and stated to a reasonable degree of medical certainty that

11 Ledesma died from a stroke (massive right cerebral hemisphere infarction) and that the stroke

12 was not caused by any pulmonary embolism (thrombi of the legs). There is no medical evidence

13 that anything occurred during, or resulted from, the incident that caused Ledesma's death.

14     A.    **4th Amendment**

15       The Fourth Amendment requires that police officers use only an amount of force that is

16 objectively reasonable in light of the circumstances facing them.  (*Tennessee v. Garner* (1985)

17 471 U.S. 1, 7–8, 105 S.Ct. 1694).

18       Neither tackling nor punching a suspect to make an arrest necessarily constitutes

19 excessive force. (*Graham v. Connor, supra*, 490 U.S. 386, 396, "'Not every push or shove, even

20 if it may seem unnecessary in the peace of the judge's chambers,' ... violates the Fourth

21 Amendment", quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).  Police officers

22 need not employ the "least intrusive" degree of force possible.  *Forrester v. City of San Diego*,

23 25 F.3d 804, 807–8 (9th Cir.1994)).  The key question in all cases is whether the use of force

24 was "objectively reasonable in light of the facts and circumstances confronting" the arresting

25 officers.  *Graham,* 490 U.S. at 397 (internal quotation marks omitted).

26       From the perspective of a reasonable officer, the Individual Defendants' use of force

27 was objectively reasonable under the circumstances.  There was no use of lethal force and no

28 choke holds were used.  There is no evidence that any of the Individual Defendants struck or

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

beat, or used a canine on, Ledesma with the intent to hurt or injure him.  In fact, on the occasions when non-lethal force was used and noticed to be ineffective, the Defendants ceased the use of the force.  At all times the Individual Defendants acted reasonably under the circumstances and acted in good faith.  The Individual Defendants acted in an objectively reasonable manner to gain control of, and handcuff, an extremely agitated subject who was forcefully resisting the Individual Defendants attempts to take him into custody.

**B.    14th Amendment**

Plaintiffs claim that defendants' use of force unconstitutionally violated their rights to familial relationships in violation of the Fourteenth Amendment.  Preliminarily, when the Court determines there was no violation of the Fourth Amendment; this claim must fail as well. *Morland v. Las Vegas Metropolitan Police Department* 159 F.3d 365, 371 n.4 (9th Cir., 1998) (where officers conduct was objectively reasonable, it does not offend due process.)

Parents and children may assert a Fourteenth Amendment substantive due process claim if they are deprived of the companionship of their child or parent through official conduct. *Lemire v. Cal. Dept. of Corrections and Rehabilitation,* 726 F.3d 1062,1075 (9th Cir., 2013). The Due Process Clause is violated only when the official conduct can be properly characterized as arbitrary, or conscious shocking.  *County of Sacramento v. Lewis*, 523 U.S. 833, 845-7 (1998); *Lemire*, 726 F.3d at 1075.  Liability turns on whether the force was applied maliciously or sadistically for the purpose of causing harm.  *County of Sacramento v. Lewis*, 523 U.S. at 852-3.  "Purpose to harm" in this context means acting with a purpose to harm the decedent for reasons unrelated to legitimate law enforcement objectives.  *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir., 2008).  Nothing the Individual Defendants did to Ledesma even remotely approaches conduct that shocks the conscience, or violated the civilized standards of decency, necessary to establish a Fourteenth Amendment claim. Conduct that is reasonable under *Graham v. Connor*, does not shock the conscience, or violated the civilized standards of decency.

**C.    5th and 8th Amendments**

In the alleged factual situation, the Fifth and Eighth Amendment issues are not

applicable since the Complaint alleges a search, personal seizure and arrest as a result of an incident in which there was cause to detain, Terry search and arrest Ledesma.

The Fifth Amendment imposes restrictions on the government's prosecution of persons accused of crimes.   It prohibits self-incrimination and double jeopardy and mandates due process of law during the criminal process.  The Eighth Amendment addresses issues related to prisoners, which includes bail, conditions of confinement and punishment for crimes of which one has been convicted.   The Fourteenth Amendment already requires due process for the deprivation of life, liberty or property and mandates the equal protection of the law.

## VII.    NO VIOLATION OF STATE CIVIL RIGHTS BY INDIVIDUAL DEFENDANTS

The Complaint alleges violations of Civil Code §§ 51, 51.7, 52 and 52.1, including the Unruh Act, Bane Act and the Ralph Act.

### A.    Only Unruh Act (Civil Code §51) is in Plaintiffs' Tort Claims

As to the pendent state civil rights allegations, the allegations in the Complaint exceed the allegation and information set forth in Plaintiffs' California Tort Claims Act Claims. Plaintiffs' Claims references only a violation of the Unruh Act, Civil Code § 51.7, however, the Complaint alleges violations of Civil Code §§ 51, 51.7, 52 and 52.1, including the Bane Act and the Ralph Act, which were never mentioned or referenced in the Claim.

> "The intent of the Tort Claims Act is not to expand the rights of plaintiffs against governmental entities. Rather, the intent of the act is to confine potential governmental liability to rigidly delineated circumstances. [Citation.] [] The Tort Claims Act requires that any civil complaint for money or damages first be presented to and rejected by the pertinent public entity [Citations.]. The act creates a bond between the administrative claim and the judicial complaint. Each theory of recovery against the public entity must have been reflected in a timely claim. In addition, the factual circumstances set forth in the claim must correspond with the facts alleged in the complaint. [Citation.]" (Munoz v. State of California (1995) 33 Cal.App.4th 1767, 1776, 39 Cal.Rptr.2d 860.) The aim of the tort claim statutes is to provide sufficient information to enable the public entity to investigate claims and [1496] settle, if appropriate, without the expense of litigation, and to take the potential claim into account in fiscal planning. (Nelson v. County of Los Angeles (2003) 113 Cal.App.4th 783, 797, 6 Cal.Rptr.3d 650; Johnson v. San Diego Unified School Dist. (1990) 217 Cal.App.3d 692, p. 697, 266 Cal.Rptr. 187.) [Castaneda v. Department of Corrections and Rehabilitation, (2013) 212 Cal.App.4th 1051, 1061.]

"Compliance with the claims provisions is mandatory." [Johnson v. San Diego Unified School Dist., (1990) 217 Cal.App.3d 692, 697.] Fulfilling the requirements of the tort claims presentation procedure is a condition precedent to filing suit; it is not an affirmative defense. [Munoz v. State of California, (1995) 33 Cal.App.4th 1767, 1777.]

**B.    Unruh and Ralph Acts, §§ 51, 51.7**

The Claim contains only allegations related to the Unruh Act, Civil Code §51.7. However, Civil Code §51.7 is the Ralph Act, but it references the Unruh Act.  The Act provides, as follows:

> All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive. (Civil Code, § 51.7.) (Emphasis added.)

"'California Civil Code §51(b) applies the Unruh Act to violence committed on account of sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation ...' while §51(e) further defines these terms. [Rodriguez v. City of Modesto, (E.D. Cal., Dec. 9, 2013, No. 1:10-CV-01370-LJO) 2013 WL 6415620, at *10.]

The Unruh Act, Civil Code §51(b) and (e), which was not addressed in Plaintiffs' Claim, provides as follows:

> (b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

There is simply no evidence that the incident, or any portion thereof, was based upon any of the Civil Code §51 factors.

**C.    Bane Act, §52.1**

Plaintiffs lack standing to bring a claim under the Bane Act on behalf of themselves since the Bane Act allegation was not included in Plaintiffs' Tort Claims Act Claims and since the

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

Bane Act provides a <u>personal</u> cause of action for victims of a hate crime and does not provide derivative liability for the parents of a victim of a hate crime under *Bay Area Rapid Transit Dist. v. Superior Court*, 38 Cal.App.4th 141, 144, 44 Cal.Rptr.2d 887 (1995).  Here, with no cause of action for the estate or on behalf of Ledesma himself, the derivative action fails.

> In a pendent state action under the Bane Act, a "plaintiff must demonstrate that the constitutional violation 'occurred and that the violation was accompanied by threats, intimidation or coercion within the meaning of the statute.' <u>Barsamian v. City of Kingsburg</u>, 597 F.Supp.2d 1054, 1057 (E.D.Cal.2009).  'The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law.' Austin B. v. Escondido Union School Dist., 149 Cal.App.4th 860, 883, 57 Cal.Rptr.3d 454 (2007)." [<u>Rodriguez v. City of Modesto</u>, (E.D. Cal., Dec. 9, 2013, No. 1:10-CV-01370-LJO) 2013 WL 6415620, at *10.]

> "[W]here the arrest was lawful, there must be evidence of a separate act of violence, threats of violence or coercion along with the constitutional violation to constitute a Bane Act claim." [<u>Muhammad v. Garrett</u>, (E.D. Cal. 2014) 66 F.Supp.3d 1287, 1296.]

Here, with objectively reasonable acts, a lawful detention and/or arrest, and in the absence of a constitutional violation, there is no Bane Act violation.

As such, the California civil rights allegations fail.

## VIII.   <u>NO ASSAULT, BATTERY OR NEGLIGENCE BY INDIVIDUAL DEFENDANTS</u>

Plaintiffs allege a survival/wrongful death claim for assault, battery, negligence and negligent hiring, training and retention. There is insufficient evidence to sustain this allegation.

### A.   <u>Assault and Battery</u>

A battery is any willful and unlawful use of force or violence upon the person of another.  (California Penal Code, § 242.)

Plaintiffs do not have evidence sufficient to state claims for assault and battery.

"A police officer in California may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance. (Penal Code, § 835a.) The standard jury instruction in police battery actions recognizes this: "A peace officer who uses unreasonable or excessive force in making a lawful arrest or detention commits a

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

1    battery upon the person being arrested or detained as to such excessive force." (BAJI No. 7.54.)
2    By definition then, a prima facie battery is not established unless and until plaintiff proves
3    unreasonable force was used.

4           This rule takes into account the special situation of the police defendant. Unlike private
5    citizens, police officers act under color of law to protect the public interest. They are charged
6    with acting affirmatively and using force as part of their duties, because "the right to make an
7    arrest or investigatory stop necessarily carries with it the right to use some degree of physical
8    coercion or threat thereof to effect it." (*Graham v. Connor* (1989) 490 U.S. 386, 396, 109 S.Ct.
9    1865, 1872, 104 L.Ed.2d 443.) They are, in short, not similarly situated to the ordinary battery
10   defendant and need not be treated the same. In these cases, then, "the defendant police officer is
11   in the exercise of the privilege of protecting the public peace and order [and] he is entitled to the
12   even greater use of force than might be in the same circumstances required for self-defense. [¶]
13   ... [¶] ... [T]he burden of proof [is] upon the plaintiff to establish the use of excessive force...."
14   (*Wirsing v. Krzeminski, supra,* 61 Wis.2d 513, 522, 213 N.W.2d 37, 41.)

15          Equally important, a police officer must have control over the manner and means of
16   making an arrest or detention. The interests of the commonwealth happily coincide here with
17   sound logic. Both dictate that "[t]he calculus of reasonableness must embody allowance for the
18   fact that police officers are often forced to make split-second judgments—in circumstances that
19   are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a
20   particular situation." (*Graham v. Connor, supra,* 490 U.S. at pp. 396–397, 109 S.Ct. at p. 1872.)
21   Placing the burden of proof on the plaintiff gives the police appropriate maneuvering room in
22   which to make such judgments free from the need to justify every action in a court of law.

23          It makes sense to "surround the police who make these on-the-spot choices in dangerous
24   situations with a fairly wide zone of protection in close cases...." (*Martinez v. County of Los
25   Angeles* (1996) 47 Cal.App.4th 334, 344, 54 Cal.Rptr.2d 772, quoting from *Roy v. Inhabitants
26   of City of Lewiston* (1st Cir.1994) 42 F.3d 691, 695.) We share the view of the Missouri courts
27   that "[T]the officer in the first instance is the judge of the manner and means to be taken in
28   making an arrest. Unless a plaintiff can show that unnecessary force was used, courts will

1   protect the officer." (*Neal v. Helbling, supra,* 726 S.W.2d at p. 487.)" (*Edson v. City of Anaheim*
2   (1998) 63 Cal.App.4th 1269, 1272–74.)

3       "The 'reasonableness' of a particular use of force must be judged from the perspective of
4   a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Graham v.*
5   *Connor* (1989) 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443.)

6       Where the force used was not unreasonable under the fourth amendment, a state law
7   claim will also fail.  *Johnson v. County of Los Angeles,* 340 F.3d 787, 794 (9ᵗʰ Cir., 2003).  As
8   set forth above, the Individual Defendants' actions in this case were objectively reasonable, as
9   such, Plaintiffs cannot establish an actionable assault or battery.

10      **B.   Negligence**

11      In California, the elements of a negligence cause of action are the existence of a legal
12  duty of care, breach of that duty, and the breach as the proximate cause of the resulting injury.
13  (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917-18; *Mendoza v. City of Los Angeles*
14  (1998) 66 Cal.App.4th 1333, 1339.) With respect to the wrongful death negligence claim,
15  plaintiffs must show that defendants breach a duty of care that resulted in the death.  *Hayes v.*
16  *County of San Diego,* 57 Cal.4ᵗʰ 622, 629 (2013).   If the officer's actions are objectively
17  reasonable under Fourth Amendment law, there can be no liability for negligence.  Id. at 632.

18      The negligence issue in a §1983 wrongful death claim, that being whether the officers
19  acted with reasonable care in their conduct, is precisely the issue resolved in a determination
20  that, from the perspective of a reasonable officer on the scene taking into account the facts and
21  circumstances confronting them, the officer's conduct was objectively reasonable. (*Hernandez*
22  *v. City of Pomona* (2009) 46 Cal.4th 501, 513.)

23      In *Han v. City of Folsom* (E.D. Cal., Apr. 29, 2015, No. 2:10-CV-00633-MCE) 2015
24  WL 1956521, at *4, the Eastern District addressed negligence in wrongful death cases and
25  confirmed that the standard remains "reasonableness" and that the Deputies are afforded
26  discretion in performing their duties.

27      The California Supreme Court "has long recognized that peace officers have a duty to
28  act reasonably when using deadly force." *Hayes v. County of San Diego,* 57 Cal.4th 622, 629,

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

160 Cal.Rptr.3d 684, 305 P.3d 252 (2013). The cause of action is grounded in the tort of negligence and the corresponding duty of police officers to act reasonably when using deadly force. *Id.* As the Court explained, "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances," which includes preshooting circumstances. *Id.* at 629–30, 160 Cal.Rptr.3d 684, 305 P.3d 252. Those preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable, such as where officers negligently provoke a dangerous situation in which the subsequent use of deadly force was justified. *Id.* at 630, 160 Cal.Rptr.3d 684, 305 P.3d 252.

However, officers are afforded discretion in performing their duties. As explained by the California Supreme Court in *Hayes:*

> [A]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence. 57 Cal.4th at 632, 160 Cal.Rptr.3d 684, 305 P.3d 252 (quoting *Brown v. Ransweiler,* 171 Cal.App.4th 516, 537–38, 89 Cal.Rptr.3d 801 (2009)). Further, the California Supreme Court cautioned in *Hayes* that it was not suggesting that "a particular preshooting protocol (such as a background check or consultation with psychiatric experts) is always required." 57 Cal.4th at 632, 160 Cal.Rptr.3d 684, 305 P.3d 252. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." *Id.* (Han v. City of Folsom (E.D. Cal., Apr. 29, 2015, No. 2:10-CV-00633-MCE) 2015 WL 1956521, at *4.)

Since the conduct of the Deputies was reasonable, there can be no negligence or breach of a duty. Moreover, there is no evidence of negligence or negligent wrongful death.

## C.     Negligent Hiring, Training and Retention

Plaintiffs have alleged a cause of action for negligent hiring, training and retention against the County and KCSO. Since the conduct of the Individual Defendants was reasonable, there is no negligence for Defendants, including the public entity parties.  It is important to note \\\

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

1   that none of the Individual Defendants was in a position to hire, train or retain the others, and

2   there is no evidence of such a relationship.

3   Additionally, a pendent state cause of action for common law negligence against a

4   public entity does not exist (Government Code § 815, et seq.), and Plaintiffs have failed to

5   allege any statutory basis for the negligence which would allow the negligence cause of action

6   to stand based upon a statute.

7   The California Tort Claims Act has abolished all common law or judicially declared

8   forms of liability for public entities, except for state and federal constitutional liability.   As

9   such, in California, all governmental tort liability must be based upon statute.   (*Cochran v.*

10   *Herzog Engraving Company* (1984) 155 Cal.App.3d 405, 409.)   Government Code § 815

11   provides that a public entity cannot be held liable on a theory of common law negligence.   In

12   *Hilts v. County of Solano* (1968) 265 Cal.App.2d 161, 171, the Court specifically stated that "a

13   verdict against the county must be overturned if it is erroneously based on a negligence theory."

14   Public entities cannot be held liable in tort for negligence except where there is a

15   specific statute declaring them to be liable or creating a specific duty of care. (*Munoz v. City of*

16   *Union City* (2004) 120 Cal.App.4th 1077, 1112, disapproved on other grounds.) The court in

17   found no basis for a public entity's duty in circumstances similar to those here. Plaintiffs have

18   not identified any such statute allowing suit for negligent hiring, training and retention.

19   Moreover, there is no County liability since there is no underlying negligence since the conduct

20   was reasonable.

21   The law is clear and unambiguous. Plaintiffs cannot maintain a cause of action against

22   County, a public entity, for common law negligence.

23   **IX.   INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

24   The defense of qualified immunity shields an officer from trial when the officer

25   reasonably misapprehends the law governing the circumstances confronting him or her, even if

26   the officer's conduct is constitutionally deficient.   The question is not whether the conduct is

27   clearly constitutional, but whether it is clearly unconstitutional.   (*Knox v. McGinnis,* 998 F.2d

28   1405, 1409-1410 (7th Cir. 1993).)   Qualified immunity may be overcome only by a showing that

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

a constitutional right was in fact violated and based on fact-specific, analogous precedents which no reasonable officer could believe defendant's actions were lawful.  (*Saucier v. Katz,* 533 U.S. 194, 200-202, 121 S.Ct. 2151 (2001) [an officer must be "on notice" by pre-existing law that the alleged conduct is unlawful]; *Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir. 2001); *Sorrels v. McKee,* 290 F.3d 965, 969 (9th Cir. 2002).)  Unless the plaintiffs prove that "pre-existing" law *clearly prohibits* the use of force, the officer is "*presumed* to be immune from damages..."  (*Elder v. Holloway,* 975 F.2d 1388, 1392 (9th Cir. 1991), reversed on other grounds, 114 S.Ct. 1019 (1994).)

"The burden to overcome qualified immunity is heavy indeed.  The Supreme Court has repeatedly stressed that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Saucier, supra*, 533 U.S. at 202 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).  It must have been "obvious" to a reasonably competent officer that the conduct was unlawful.  *Id.* This deferential standard is necessary to fulfill the purpose of the qualified immunity to prevent officers from erring on the side of caution because they fear being sued."  (*Hunter v. Bryant,* 502 U.S. 224, 228-229, 112 S.Ct. 534 (1991); *Anderson v. Creighton,* 483 U.S. 635, 638-639, 107 S.Ct. 3034 (1987).)

Qualified immunity may not be overcome by reference to generalized Fourth Amendment principles that have doubtful or unclear application to the facts of the case. (*Saucier* at 202-203.)  The inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" (*Saucier*, *supra*, 533 U.S. at 202 (emphasis added); *Anderson v. Creighton,* 483 U.S. 635, 639 (1987).)  *Saucier* makes clear that the goals of qualified immunity cannot be served if courts "deny summary judgment any time a material issue of fact remains."  *(Saucier*, *supra*, 533 U.S. at 202.)

The relevant dispositive inquiry is whether it would have been clear to the Individual Defendants that their conduct, while trying to restrain and handcuff Ledesma in the face of forceful resistance by Ledesma, was unlawful.  There is simply no way that a reasonable officer could have believed that the Individual Defendants' conduct, as outlined above, was unlawful. Even if Plaintiffs were to contend that the non-lethal force used on Ledesma was not effective in

1   controlling and/or handcuffing Ledesma, the immunity would still apply since it accounts for

2   the fact that officers may make reasonable mistakes, and be uncertain as to how the relevant

3   legal doctrine will apply to the case.  (*Estate of Ford v. Ramirez*, 301 F.3d 1043, 1049 (9th Cir.,

4   2002).)

5       As noted above, the immunity is designed to protect all but plainly incompetent.  (*KRL

6   v. Moore*, 384 F.3d 1105, 1116 (9th Cir., 2004).)

7   **X.      NO FACTUAL BASIS OR EVIDENCE FOR *MONELL* LIABILITY**

8       The basis for municipal liability under 42 U.S.C. § 1983 for civil rights violations is

9   distinct from the individual officer's actions.  There is no §1983 *respondeat superior* liability

10  for the unconstitutional actions of a municipal employee. (*Monell v. Dep't of Soc. Services of

11  City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Connick v.

12  Thompson* (2011) 563 U.S.51, 131 S. Ct. 1350, 1359).)   Liability against the County for a

13  violation of civil rights under Section 1983 requires plaintiffs to show that the constitutional

14  violation was the result of a municipal policy or custom, or where it fails to train its officers.

15  (*Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. at 694; *City of Canton v. Harris*,

16  489 U.S. 378, 388.)

17      "Plaintiff may prove a municipal policy by presenting evidence of: (1) express adoption

18  of a policy by the municipality [See, *Monell*, 436 U.S. at 690]; (2) a "longstanding practice or

19  custom which constitutes the 'standard operating procedure' of the local government entity,"

20  [*Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989);

21  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485–87, 106 S.Ct. 1292, 89 L.Ed.2d 452) (1986);

22  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996)]; (3) a constitutional violation was caused by

23  a municipal employee with final policy-making authority, see *Pembaur*, 475 U.S. at 480–81; see

24  also *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1998)];

25  or (4) a municipal employee with final policy-making authority ratified a subordinate's

26  unconstitutional action and the basis for it [See *Praprotnik*, 485 U.S. at 127 (1998); *Gillette v.

27  Delmore*, 979 F.2d 1342, 1348 (9th Cir.1992)]; (5) a policy of inaction demonstrating a

28  deliberate indifference to a plaintiff's constitutional rights, such as a need to train or correct

---

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

subordinates of which the municipality is or should be aware.  See *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Plaintiffs must also identify evidence of direct and proximate causation. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996).  The United States Supreme Court has repeatedly cautioned that 42 U.S.C. §1983 culpability and causation requirements must be applied rigorously, so as to avoid "serious federalism concerns" and a collapse into *respondeat superior* liability.  *Bryan County v. Brown*, *supra*, 520 U.S. 397 at 405-406, 415.  The Court has also emphasized that Congress did not intend that liability could be established under §1983 based on a mere failure to act or to control others.  Rather, there must be a "direct causal link" between the injury and the defendant's deliberate conduct.  *Id*. at 404.

## A. <u>Plaintiffs Cannot Establish the Existence of an Officially Adopted Policy That is Unconstitutional</u>

In this case, it is undisputed that the County, through its integral agency KCSO, had adopted written policies on the use of force, the use of batons, and restraints.  None of these policies are unconstitutional on their face.  Policy No. F-100 (use of force) requires that deputies use no more force than necessary under the circumstances confronting a deputy, and specifically cites to both *Graham v. Connor*, 490 U.S. 386 (1989) and California Penal Code, section 835a, as the measure of force that a deputy may use.

Policy No. F-600 (batons) also comports with constitutional law.  This policy limits the circumstances under which a baton may be used to situations where the officer is acting within the guidelines of PC 835a and F-600.  Under this policy, use of batons is appropriate where lower levels of force have proven ineffective, or where the subject is assaultive or combative.

Finally, Policy No. K9-500 (canine deployment), governs the deployment of a canine, and is permitted in the following instances:

> 1. There is a reasonable belief that the suspect(s) poses an immediate threat of violence or serious harm to the public, any officer, or him/herself: 2. The suspect(s) is/are physically resisting arrest and the use of the police service dog appears necessary to overcome such resistance; .... 5. It is recognized that situation [sic] may arise which do not fall within the provisions set forth in this

<u>**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**</u>

policy.  In any such case, a standard of reasonableness shall be used to review the decision to use a police service dog in view of the totality of the circumstances.

Each of these policies, on their face, is constitutionally valid. (True and correct copies of Policies F-100, F-600 and K9-500 which were in effect during August 2013 are attached to the Evidence Volume as Exhibits M, N and O respectively.)

Plaintiffs' have not and cannot produce evidence that these policies were/are unconstitutional. Plaintiffs' police practices expert, Scott DeFoe, in his Rule 26 report and deposition, voiced no criticism with the actual policies.  Instead, DeFoe was only critical of the Individual Defendants' actions during the incident.

**B. Plaintiffs Cannot Establish an Unofficial Custom or Practice Relating to the Use of Excessive Force or Inadequate Training of County's Deputies**

The KCSO official policies prohibit the use of unreasonable force.  In the absence of a policy that is facially unconstitutional, plaintiffs must show a practice or custom was adopted in deliberate indifference to the rights asserted herein and directly caused the violation of those rights.  *Bryan County v. Brown*, 520 U.S. 397, 403-404, 407, 117 S.Ct. 1382 (1997).  The deliberate indifference standard by its very nature involves evidence of the choices or options that were available to the policymaker as well as proof of other instances in which the policymakers choice resulted in a constitutional violation and proof that the customs or polices caused the violations.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427 (1985) (A policy is a course of action consciously chosen among various alternatives).  A custom is a practice or usage, so frequent and widespread as to have the force of law.  *Bryan County*, *supra*, 520 U.S. at 404.  If this case is the only instance in which a facially valid custom or policy resulted in a violation, then deliberate indifference cannot be shown unless plaintiffs present proof of widespread violations.  *Trevino v. Gates*, 99 F.3d 911, 918, (9th Cir. 1996) (setting forth the elements of *Monell* liability and observing that evidence of "sporadic incidents" is insufficient to establish liability).

Establishing liability based on a custom and practice "may not be predicated on isolated or sporadic incidents [but instead] must be founded upon practices of sufficient duration,

frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir.1996).  "Only if a plaintiff shows that his injury resulted from a permanent and well-settled practice may liability attach for injury resulting from a local government custom." *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1444 (9th Cir.1989).  A single constitutional violation is ordinarily insufficient to establish a long standing practice or custom. *Christie v. Lopa,* 176 F.3d 1231, 1235 (9th Cir., 1999).

In the instant case, the Plaintiffs have no evidence of a long standing pattern or practice to support a *Monell* claim on this basis.

Establishing municipal liability based upon a custom of inadequate training or supervision requires proof of "deliberate indifference" by the municipality in the face of either: (1) an obvious need for training to avoid violation of constitutional rights; or (2) a pattern of conduct so pervasive as to demonstrate actual or constructive notice to the municipality of the need for training. *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029–30 (7th Cir.2006) citing *City of Canton,* 489 U.S. at 390 and n. 10. ((*Jones v. City of Oakland,* No. 11-CV-4725 YGR, 2013 WL 1333933, at *4-5 (N.D. Cal. Mar. 29, 2013) aff'd, No. 13-15673, 2015 WL 3896096 (9th Cir. June 25, 2015)).

In the present case, it is undisputed that each of the involved KCSO deputies were well trained.  All KCSO peace officers are trained on Policies F-100 (use of force) and F-600 (batons), and canine Deputies are trained on Policy K9-500 (Police Service Dog Deployment). Deputies are trained against striking a person in the head or above the shoulders with a baton. They are also trained on proper restraint and takedown techniques.  Canine Deputies are trained to assess a situation and deploy the canine if the situation warrants.  Plaintiffs' police practices expert, Scott DeFoe, had no criticism of inadequate training on the policy, but asserted that for each of the Individual Defendants' actions "there was a deliberate departure from training."

The training on use of force and restraint techniques is received through the Academy that each officer must attend in order to become POST certified.  Additional policy review and training occurs during the new hire orientation at the KCSO, and periodically thereafter, including advanced officer training.  This training includes "hands on" classes taught by the

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**

KCSO defensive tactics team.  All of the KCSO personnel involved in this case had undergone such training.

Canine training is conducted when a Deputy has been selected for the canine unit.  All canine handlers must take and pass classroom testing, filed testing and POST certification before assignment as a canine handler.

In the instant case, Plaintiffs have no evidence of an unofficial custom or practice relating to the use of excessive force or inadequate training of County's deputies, and cannot establish a custom of inadequate training or supervision.

**C.  <u>Plaintiffs Cannot Establish Evidence of Ratification</u>**

Plaintiffs cannot establish a *Monell* claim based upon ratification.  To prove *Monell* liability based on ratification, the plaintiff must show that the final policymaker in question had "knowledge of the constitutional violation and actually approve[d] of it.  A mere failure to overrule a subordinate's actions, without more, is insufficient to support a section 1983 claim." *Lytle v. Carl,* 382 F.3d 978, 987 (9th Cir.2004).  The final policymaker's response to the subordinate's unconstitutional conduct must amount to more than acquiescence; he or she must have affirmatively approved both the subordinate's decision and the basis for it.  *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir.1992).

While it is the custom and practice of the County, through its integral agency KCSO, to investigate, review and determine whether conduct during an in custody death comports with policy, the County made no such determination in the instant case.  Instead, the matter was reviewed by the KCSO and County Counsel, after investigation, on an informal basis, in anticipation of litigation, and no official determination has been made with respect to the conduct of the KSCO personnel involved in this matter.

**XI.  <u>NO *MONELL* CLAIM AGAINST KCSO</u>**

In *Mistrel v. Kern County*, the USDC Eastern District stated that public entity departments are not "persons" for the purpose of §1983 litigation, as follows:

> While Section 1983 is not itself a source of substantive rights, it provides a cause of action against any person who, under color of law, deprives an individual of federal constitutional rights or limited federal statutory rights. 42 U.S.C. §

1983; Grahm v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The term "persons" encompasses state and local officials sued in their individual capacities, private individuals, and entities which act under the color of state law and local governmental entities. Vance v. Cnty. of Santa Clara, 928 F.Supp. 993, 995-96 (N.D.Cal.1996). However, the entities named above are all municipal departments and sub-units of local governments and are not generally considered "persons" within the meaning of Section 1983. See United States v. Kama, 394 F.3d 1236, 1239 (9th Cir.2005) (Ferguson, J., concurring) (noting that municipal police departments and bureaus are generally not considered "persons" within the meaning of Section 1983); Vance, 928 F.Supp. at 995-96 (dismissing sua sponte Santa Clara Department of Corrections as improper defendant); Jewett v. City of Sacramento Fire Dep't, No. CIV. 2:10-556 WBS KJN, 2010 WL 3212774, at (E.D. Aug. 12, 2010) (finding fire department not a "person" under Section 1983 and dismissing suit against it); Wade v. Fresno Police Dep't, No. Civ. 09-0588 AWI DLB, 2010 WL 2353525, at (E.D.Cal. June 9, 2010) (finding police department is not a "person" under Section 1983); Morris v. State Bar of Cal., No. Civ. 09-0026 LJO GSA, 2010 WL 966423, at (E.D. Cal. Mar.11, 2010) (finding that a fire department is a municipal department and therefore not a "person" under Section 1983); Sanders v. Aranas, No. 1:06-CV-1574 AWI SMS, 2008 WL 268972, (E.D. Cal. Jan 29, 2008) (finding Fresno Police Department improper defendant because it is a subdivision of the City of Fresno); Brockmeier v. Solano Cnty. Sheriff's Dep't, No. Civ-S-05-2090 MCE EFB PS, 2006 WL 3760276, (E.D.Cal. Dec. 18, 2006) (dismissing Sheriff's Department as an improperly named defendant for purposes of Section 1983). Therefore, these departments and sub-units should be dismissed as improper defendants under Section 1983.  Moreover, Plaintiff has also named the County of Kern and the City of Bakersfield as defendants; naming sub-units of these municipalities as defendants is redundant. See Abeytia v. Fresno Police Dep't, No. 1:08-cv-01528 OWW GSA, 2009 WL 1674568, at (E.D.Cal. June 12, 2009) ("Naming the [Fresno Police Department], which is a department of the City, as a defendant is redundant to naming the City of Fresno as a defendant."). Therefore, the sub-unit defendants should be dismissed." (Mistriel v. Kern County, (E.D. Cal., Mar. 10, 2011, No. 1:03-CV-06922-AWI) 2011 WL 864495, report and recommendation adopted (E.D. Cal., June 6, 2011, No. 1:03-CV-06922-AWI) 2011 WL 2192834.)

Defendant KCSO should be dismissed since it is an integral agency of the County.

## XII.   CONCLUSION

Defendants respectfully request that summary judgment be granted.

Dated: August 5, 2016                    **THERESA A. GOLDNER, COUNTY COUNSEL**


By  /s/ Andrew C. Thomson_____
      Andrew C. Thomson, Deputy
      Attorneys for Defendants

#22R8228

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES**