# EXHIBIT H

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "H"**

ORIGINAL

## In the Matter Of:

## LEDESMA vs. KERN COUNTY

14-CV-01634-LJO-JLT

## DEPUTY DWAYNE PERKINS

*January 25, 2016*



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 3 of 73

DEPUTY DWAYNE PERKINS                                 January 25, 2016
LEDESMA vs. KERN COUNTY                                              1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ADRIANA LEDESMA, an                )
individual; JESSICA LEDESMA,       )
an individual; MARISSA             )
LEDESMA, an individual by          )
and through her Guardian Ad        ) No.   14-CV-01634-LJO-JLT
Litem Raquel Sierra; RONNIE        )
MATTHEW LEDESMA, and               )
individual by and through          )
his Guardian Ad Litem              )
Christina Garcia; CHIRSTINA        )
HERRERA;                           )
                                   )
             Plaintiffs,           )
                                   )
      vs.                          )
                                   )
KERN COUNTY, KERN COUNTY           )
SHERIFF'S DEPARTMENT; WARREN       )
MARTIN; KAREN DE LA GARZA;         )
DWAYNE PERKINS; JAMES              )
MELTON; CHRISTOPHER WONG;          )
AND DOES 1-200, INCLUSIVE;         )
                                   )
             Defendants.           )
                                   )
                                   )

DEPOSITION OF DEPUTY DWAYNE PERKINS

Monday, January 25, 2016

Bakersfield, California

Reported by:· Vanessa Zaragoza, CSR No. 13924



```
 1                          APPEARANCES

 2

 3   For Plaintiffs:        Geragos & Geragos
                            BY MR. BENJAMIN J. MEISELAS
                            Attorney at Law
 4                          644 South Figueroa Street
                            Los Angeles, California 90017
 5                          (213)625-3900
                            Ben@geragos.com
 6

 7   For Defendants:        Kern County Office of County
                            Counsel
                            BY MR. ANDREW THOMSON
 8                          Deputy County Counsel
                            1115 Truxtun Avenue
 9                          4th Floor
                            Bakersfield, California 93301
10                          (661)868-3814
                            Athomson@co.kern.ca.us
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



DEPUTY DWAYNE PERKINS
LEDESMA vs. KERN COUNTY

January 25, 2016
3

1                    I  N  D  E  X

2

3   EXAMINATION BY                              PAGE

4   MR. MEISELAS                                  4

5   MR. THOMSON                                  78

6   MR. MEISELAS (Further)                       80

7

8

9

10

11                 EXHIBIT INDEX

12   Plaintiffs' Exhibits           Marked   Referenced

13   1 - Dispatch Log                  1

14   2 - Field Arrest Data             2

15   3 - Police Report                 3          20

16   4 - Final Report                  4

17   5 - Photocopies                   5          17

18   6 - Event Description             6

19   7 - Documents                     7

20   8 - Policies And Procedures       8

21   9 - Video (Retained by Counsel)   9

22   10 - K-9 Policy Manual            10         67

23

24

25



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 6 of 73

DEPUTY DWAYNE PERKINS                          January 25, 2016
LEDESMA vs. KERN COUNTY                                        4

1              Bakersfield, California

2          Monday, January 25, 2016; 1:17 p.m.

3          Kern County Administration Center

4

5              DEPUTY DWAYNE PERKINS,

6    called as a witness by counsel for Plaintiffs, being

7    first duly sworn, testified as follows:

8                              EXAMINATION

9    BY MR. MEISELAS:

10       Q.    Can you please state and spell your name for

11   the record, Deputy.

12       A.    Dwayne Perkins, D-w-a-y-n-e P-e-r-k-i-n-s.

13       Q.    And you're still a deputy, correct, with Kern

14   County?

15       A.    Yes, sir.

16       Q.    That's because when I just deposed Deputy

17   Martin, I learned he's now Officer Martin as of February

18   of 2015.

19       A.    Yes.

20       Q.    Have you held the same position since

21   August 19th, 2013, through the present?

22       A.    Yes, I have.

23       Q.    And have your roles and responsibilities

24   changed in any way?

25       A.    No.



1    Q.    And looking at your report, at some point in

2    time, you get a phone call or you get a dispatch that

3    there's an incident taking place at a Walgreens?

4    A.    Yes.

5    Q.    And were you with anybody in the car at the

6    time other than Volker?

7    A.    No.

8    Q.    And do you recall approximately how far away

9    you were from Walgreens at the time you received the

10   dispatch?

11   A.    I was near Cottonwood Road and Feliz.

12   Q.    And do you recall approximately the distance?

13   Was it over a mile?

14   A.    Over a mile.

15   Q.    What's your estimate of the distance from

16   Cottonwood and Feliz to Walgreens?

17   A.    I would say between four and six miles.

18   Q.    And what did you hear over the dispatch that

19   made you head over to the Walgreens?

20   A.    It was two suspicious subjects inside the

21   Walgreens.

22   Q.    And so at that time, were you responding to

23   that information on dispatch?  Was that what made you

24   head over there in the first instance?

25   A.    Yes.



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 8 of 73

DEPUTY DWAYNE PERKINS                          January 25, 2016
LEDESMA vs. KERN COUNTY                                      24

1        MR. THOMSON:  Vague and ambiguous.

2   BY MR. MEISELAS:

3        Q.   Okay.  What I mean by that is at some point in

4   time you are aware that Deputy Martin, deputy at the

5   time, put out over the radio a 148?

6        A.   Yes.

7        Q.   You were already headed to that location even

8   before the 148?

9        A.   Yes.

10       Q.   And do you recall approximately how close you

11  were to that location when the 148 was --

12       A.   I don't recall.

13       Q.   And in terms of the decision to head to that

14  Walgreens when you see that there's two suspicious men,

15  is that something that you understand to be at your

16  discretion or does a sergeant tell you, hey, head over

17  there?

18       A.   That's at my discretion, but that's one of the

19  calls as a K-9 handler you go to something like that in

20  progress.

21       Q.   And so when you say go to something like that

22  in progress, at that time when you hear two suspicious

23  men at the Walgreens, you had no understanding at that

24  time that a crime was committed, though; right?

25       A.   Not yet.



1   time you got to Walgreens?

2       A.   I don't recall that.

3       Q.   And when you got there, where did you park?

4       A.   In the -- just south of the store in the

5   parking lot.

6       Q.   And when you arrived, did you see Deputy

7   Martin?

8       A.   At first I did not see him.

9       Q.   And did you see any other deputies when you

10  arrived?

11      A.   Yes.

12      Q.   And who else did you see?

13      A.   Deputy De La Garza arrived in her vehicle in

14  front of mine and got out and started running out in

15  front of the store.

16      Q.   Did she tell you what she was doing when she

17  was running?

18      A.   No.

19      Q.   You just saw her running?

20      A.   I saw her running.

21      Q.   And so when you saw her run, what did you do

22  next?

23      ■.   I exited my patrol vehicle, and I put my K-9

24  partner, Volker, on his leash, and I began to run

25  towards the front of the store.



1    Q.    And approximately how far away were you parked

2  from the front of the store?  Can you estimate the

3  amount of feet?  Was it a football field?  How would you

4  describe it?

5    A.    Less than a football field, more than 30 feet.

6    Q.    And when you finally got to the front of the

7  store, what did you first observe?

8    A.    I saw Deputy Martin and Deputy La Garza with

9  Mr. Ledesma.

10    Q.    So at that point in time, La Garza had already

11  been -- had already reached Ledesma?

12    A.    Yes.

13    Q.    And what did you observe --

14          MR. THOMSON:  Just for the record, I think both

15  of you said La Garza, but you're talking about De La

16  Garza; correct?

17          MR. MEISELAS:  De La Garza.

18          THE WITNESS:  De La Garza.

19          MR. THOMSON:  Just so that we're clear we are

20  talking about the same person.

21          MR. MEISELAS:  Perfect.

22  BY MR. MEISELAS:

23    Q.    What were they -- what was their -- what did

24  you observe their interaction with Mr. Ledesma to be

25  like?



1       A.    It appeared they were trying to arrest him and

2    he was -- or they were struggling with him.

3       Q.    And did they each have physical contact with

4    Mr. Ledesma?

5       A.    Yes.

6       Q.    And do you recall where they were touching

7    Mr. Ledesma?

8       A.    Deputy Martin was on Mr. Ledesma's left side.

9    It appeared he was trying to grab him by the left arm

10   and shoulder.  And Deputy De La Garza was on his right

11   side near his arm and shoulder.

12      Q.    And did you observe Mr. Ledesma punching either

13   officer or Deputy De La Garza or Deputy Martin?

14      A.    I did not see him punch them.

15      Q.    What about kick?  Did you notice him kicking

16   them?  At that specific time when you arrived with the

17   dog, you see De La Garza on one side of Mr. Ledesma and

18   you see Deputy Martin on the other side, and you're

19   approaching them with the dog; correct?

20      A.    Correct.

21      Q.    And at that point in time, we'll expand the

22   narrative in a little bit.  At that point in time, do

23   you see Mr. Ledesma kicking either of them?

24      A.    I didn't see him kicking at that point, no.

25      Q.    And so all you observed at that time are the



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 12 of 73

DEPUTY DWAYNE PERKINS                          January 25, 2016
LEDESMA vs. KERN COUNTY                                      29

1    officers trying to grab his arms and what?  Place cuffs
2    on him?
3        A.    Yes.
4        Q.    And he was tensing up, or what would you
5    describe what he was doing?
6        A.    He was sitting up with his legs out in front of
7    him, but he had a blank stare on his face, and he was
8    sweating profusely, very wide-eyed.   It -- when Deputy
9    Martin and Deputy De La Garza were trying to grab his
10   shoulder and take control of him, it seemed like -- it
11   looked like he was tense, but it looked like he was able
12   to just break free of them with no effort at all.
13       Q.    When you describe him -- so he was sitting down
14   and his legs in front of him -- Mr. Ledesma's legs were
15   in front of him?
16       A.    Yes.
17       Q.    And he was sitting on his buttocks?
18       A.    Yes.
19       Q.    And each officer was on each side of him?
20       A.    Yes.
21       Q.    And were you standing directly in front of him
22   kind of where his legs were facing?
23       A.    I was coming in an angle.
24       Q.    And the angle closer to De La Garza or closer
25   to Martin?



1      A.    Closer to De La Garza.

2      Q.    So what's the next thing that you did when you

3  saw this?

4      A.    Well, when I was running up, I was yelling,

5  "Sheriff's Office," and I was telling people in the

6  parking lot to get back because the store was open, and

7  there was people out in the public.  And then when I

8  approached him, I yelled at him to put his hands behind

9  his back and quit resisting.

10     Q.    At that point in time, about how far away were

11 you from Mr. Ledesma when you were yelling at him to

12 stop resisting?

13     A.    The first time was probably within 15

14 feet, 20 feet, somewhere in there.

15     Q.    And is Volker barking at that point?

16     A.    He started barking when I was -- after I gave

17 him a command.

18     Q.    And so when you say after you gave him the

19 command, did you give Volker the command to start

20 barking?

21     A.    No.  He just starts barking.

22     Q.    Is that something that's trained?  To bark when

23 he hears a certain command or --

24     A.    No.  It's -- sorry.

25         MR. THOMSON:  I was just going to say I think



1   it's cross purposes.  I think he meant when he gave the

2   direction to Mr. Ledesma.

3           MR. MEISELAS:   Yeah, no, I get that.

4           MR. THOMSON:  Okay.  Okay.

5   BY MR. MEISELAS:

6       Q.   I'm just saying did Volker understand the

7   direction that you were giving Mr. Ledesma then starts

8   barking, or did you have to give Volker a command to

9   start barking, or does Volker just start barking when he

10  sees --

11      A.   Usually if I'm yelling or talking aloud, I

12  think he picks up on the inflection in my voice, and

13  then he'll usually start barking.

14      Q.   Okay.  So what do you see next?  At this point

15  you're yelling, "Stop resisting.  Stop resisting."  What

16  do you observe happen next?

17      A.   I tell him one more time to stop resisting, or

18  I was going to send my dog.

19      Q.   And is that how you said it?  Did you say, you

20  know, if you stop resisting, I mean, or you better stop

21  resisting or I'm going to send my dog?  I mean how did

22  you say it to him?  You were yelling at him obviously.

23      A.   It was something to the effect, of, "Stop

24  resisting, or I'm going to send my dog."

25      Q.   Okay.  In terms of resisting, at that point in



Case 1:14-cv-01634-DAD-JLT    Document 59-6    Filed 08/05/16    Page 15 of 73

DEPUTY DWAYNE PERKINS                           January 25, 2016
LEDESMA vs. KERN COUNTY                                        32

1    time, you still did not see Mr. Ledesma punch or kick

2    either of the officers; correct?

3         A.    I don't remember him kicking at that point, no.

4         Q.    Okay.  Or punching?

5         A.    Or punching, no.

6         Q.    Okay.  And was it at that point in time that

7    you released the K-9?

8         A.    I walked him up to him, and then I gave him a

9    command.

10        Q.    Okay.  So at that point in time, you go from

11   being 15 feet away from Mr. Ledesma, then you walk up

12   close to Mr. Ledesma?

13        A.    Yes.

14        Q.    And when you walked up close to Mr. Ledesma,

15   are you still on the side closest to De La Garza?

16        A.    Yes.  But at an angle coming up.

17        Q.    Okay.  And is De La Garza and Martin still

18   trying to place cuffs on Mr. Ledesma?

19        A.    Yes.

20        Q.    And then when you say you gave him a command,

21   now you're talking about giving Volker a command?

22        A.    Yes.

23        Q.    And what command did you give Volker?

24        A.    Pucken (phonetic).

25        Q.    How do you spell that?



DEPUTY DWAYNE PERKINS
LEDESMA vs. KERN COUNTY

January 25, 2016
33

1    A.   I believe it's p-u-c-k-e-n. I'm not quite sure

2  on the German spelling.

3    Q.   Okay.  And what does pucken mean other than I

4  should never say it in front of a German Shepherd?

5    A.   To apprehend or capture.

6    Q.   And is there any distinction in apprehend or

7  capture and bite or is essentially giving pucken, means

8  that, you know, use all -- you know, the dog needs to

9  use all means necessary to apprehend or capture?

10    A.   I think to the dog, it's all just one thing

11  of -- to apprehend the person.

12    Q.   Your expectation when you scream pocker --

13    A.   Pucken.

14    Q.   Pucken.  So your expectation when you give the

15  command of pucken to Volker is that Volker is going to

16  use force against the individual who the command is

17  directed at?

18    A.   Yes.

19        MR. THOMSON:  Vague and ambiguous.

20  BY MR. MEISELAS:

21    Q.   Okay.  So your expectation was at that

22  situation specifically, when you said pucken, Volker was

23  going to bite Ledesma?

24    A.   Correct.

25    Q.   Is there a specific area where Volker is



1    trained to bite or not bite?

2              MR. THOMSON:  Vague and ambiguous and compound.

3              You can pick one or the other and answer.

4    BY MR. MEISELAS:

5        Q.    I mean, you know, is the reason -- is there any

6    specific reason you're aware of that Volker bit his leg

7    versus his arm?

8        A.    That was the safe -- I thought the safest place

9    and the furthest away from the deputies to make sure

10   they didn't get bit or cause other problems.  So I

11   thought that was the safest place to bite him.

12       Q.    Okay.  So if you brought Volker near one of the

13   other deputies, and you screamed, "Pucken," or gave that

14   command, it's possible that Volker -- or he would've --

15   he could've potentially bit either Deputy Martin or De

16   La Garza?

17             MR. THOMSON:  Vague and ambiguous.

18             Go ahead.

19             THE WITNESS:  It's possible with the chaotic

20   scene that's going on and everybody's fighting and

21   struggling, yes.

22   BY MR. MEISELAS:

23       Q.    When you say everybody's fighting and

24   struggling, it sounds like you mean more at that time

25   that there's struggling going on.  You didn't see any



1   specific fighting, did you?

2        A.   I would still consider that being fighting with

3   them even though I'm not seeing him punching or hitting.

4        Q.   Okay.

5        A.   He was fighting with the deputies.

6        Q.   Okay.   So just to be clear and it's not a trick

7   question for purposes of the report, you would consider

8   fighting being the struggle that was taking place of

9   them trying to apprehend him and put his hands behind

10  his back?

11       A.   Yes.

12       Q.   And so you bring Volker up to Mr. Ledesma's leg

13  and you scream, "Pucken."   You believe that's the safest

14  place to attack.   Was it the safest place to attack

15  Mr. Ledesma or the safest place to attack to avoid

16  collateral damage of other officers?

17       A.   Both.

18       Q.   And had you been trained on the potential

19  effects of a dog bite on someone's leg?

20       A.   Could you clarify?

21       Q.   Yeah.   As part of your training, did anybody

22  ever run down -- did Johannes or anybody ever run down

23  the types of injuries people can sustain when a dog

24  bites someone's leg?

25            MR. THOMSON:   Vague and ambiguous.



1          Go ahead.

2   BY MR. MEISELAS:

3       Q.   And when I mean Johannes, I'm talking about --

4       A.   We've discussed injuries, and we've seen lots

5   of injuries, but usually -- and normally the dogs are

6   trained on the bite sleeves or the bite suits.  So they

7   usually go for the arm or the leg because that's what

8   they've been trained to do.  And that's the safest thing

9   away from head and face.

10      Q.   Okay.  And so when Volker starts biting

11  Mr. Ledesma's leg, what's the next thing you recall

12  observing?

13      A.   He starts kicking and swinging his arms, and

14  then he's using his arms -- or his hands trying to pry

15  Volker off of him.  So he's got his hands up around his

16  head and mouth area.

17      Q.   It's your understanding that when Volker bites

18  after the pucken command, it does cause an individual

19  pain; correct?

20      A.   Yes.

21          MR. THOMSON:  Lacks foundation.  Calls for

22  speculation.

23  BY MR. MEISELAS:

24      Q.   Outside common sense on the foundation parts,

25  but you know that it causes pain?



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 20 of 73

DEPUTY DWAYNE PERKINS                    January 25, 2016
LEDESMA vs. KERN COUNTY                                 37

1   MR. THOMSON:  To the extent that --

2   MR. MEISELAS:  Yeah.

3   MR. THOMSON:  -- there's a number of people in

here that have indicated that Mr. Ledesma seemed to be

impervious to pain or as Officer Martin put it,

"immune."  I don't know that common sense would come

into play when you have somebody on PCP and alcohol.

But --

9   MR. MEISELAS:  That's okay.

10   MR. THOMSON:  That's something we'll discuss at

a later date.

12   MR. MEISELAS:  No.  I'm okay with the speaking

objection because he'll testify at trial.

14   MR. MEISELAS:

15   Q.  So do you agree with your counsel's testimony

there that it appeared to you that Mr. Ledesma was

impervious or immune to pain?

18   A.  Yes.

19   Q.  And so you didn't hear Mr. Ledesma scream or

cry for help?

21   A.  I don't recall him screaming or crying.

22   Q.  Do you recall Mr. Ledesma, you know, yelling,

"ow, ow, ow"?

24   A.  I don't recall what sounds he was making.

25   Q.  And your own personal perception, based on your



1 | but he had very little reaction as far as his demeanor

2 | and what he's saying or his actions, I should say.

3 | BY MR. MEISELAS:

4 |     Q.   Do you recall at some point, other officers

5 | arriving on scene as well?  So right now, as I

6 | understand it, when you give Volker the command, pucken,

7 | you have De La Garza and you have Martin; correct?

8 |     A.   Correct.

9 |     Q.   And then at some point in time, other officers

10 | arrive?

11 |     A.   There was one point where there was a

12 | Bakersfield police officer there.  I don't know when he

13 | left, though, if he was there when Volker bit him.  I

14 | remember he was there at the beginning, and he was gone,

15 | and I didn't even know who he was.

16 |     Q.   So my understanding from Deputy Martin's

17 | testimony is that Bakersfield officer was kind of just

18 | standing and watching what was taking place?

19 |     A.   I believe so.  I thought when I first got

20 | there, I thought he was trying to help them, but I don't

21 | remember seeing him actually physically going hands on

22 | or doing anything.  And then he was gone.  So I'm not

23 | sure when he actually left.

24 |     Q.   What about other deputies?  Do you recall at

25 | some point in time other deputies --



DEPUTY DWAYNE PERKINS                    January 25, 2016
LEDESMA vs. KERN COUNTY                              40

```
 1        A.    Other deputies arrived.
 2        Q.    And what other deputies arrived?
 3        A.    Towards the end, I believe Deputy Wong and his
 4   trainee arrived.   I think that's Mr. Melton.
 5        Q.    Any other deputies?
 6        A.    I think at the very end Deputy Sweeney arrived.
 7   Another Bakersfield Police Department officer arrived at
 8   the very end because I think he went back into Walgreens
 9   to help them check for a second subject later.
10        Q.    When you arrived and saw De La Garza and Martin
11   each holding one of Mr. Ledesma's arms, from that point
12   forward, did you ever observe any other officers strike
13   Mr. Ledesma with a baton?
14        A.    I don't recall anybody else striking him with a
15   baton.
16        Q.    Do you recall any officers punching
17   Mr. Ledesma?
18        A.    Can I back up on the other one?
19        Q.    Yeah.
20        A.    I remember somebody swinging a baton at some
21   point, I think, once or twice.   I don't know if they
22   connected, and I don't remember which deputy it was.
23        Q.    Okay.   And so just to be clear, I'm just
24   talking about the first time you have a visual of
25   Mr. Ledesma, you see De La Garza and you see Martin who
```

Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 23 of 73

DEPUTY DWAYNE PERKINS                          January 25, 2016
LEDESMA vs. KERN COUNTY                                      41

1   are hands on trying to restrain Mr. Ledesma?

2       A.   Yes.

3       Q.   That's the first time you even make contact

4   with Mr. Ledesma; correct?

5       A.   Yes.

6       Q.   And so prior to that, you didn't see anyone

7   even hands on with Mr. Ledesma?

8       A.   No.

9       Q.   Okay.  But after that, you do recall at least

10  one deputy who was swinging a baton, but you can't

11  recall if it connected?

12      A.   Correct.

13      Q.   Do you recall any deputies from that point of

14  your first visual of Mr. Ledesma going forward ever

15  punching Mr. Ledesma?

16      A.   That, I don't recall.

17      Q.   Do you recall any deputy from that point

18  forward kicking Mr. Ledesma?

19      A.   No, I don't recall anybody kicking.

20      Q.   Do you recall from that point forward any

21  deputy trying to place Mr. Ledesma in any, you know,

22  choke hold?

23      A.   No.

24      Q.   What about any hold at all other than trying to

25  restrain his arms?



1    A.    I think at the very end, I saw them trying to

2    hold him -- hold him down -- physically hold him down,

3    but I don't -- no choke holds or anything like that, no.

4    Q.    Have you heard the term carotid hold before?

5    A.    Carotid.

6    Q.    Carotid?

7    A.    Yes.

8    Q.    Did you see that take place --

9    A.    No.

10   Q.    -- when you were around?

11          And at some point in time, Mr. Ledesma was

12   finally res trained?

13   A.    Yes.

14   Q.    And do you recall who restrained him?

15   A.    I think it took multiple officers.  I'm not

16   sure how many, though.

17   Q.    And do you have any understanding how long it

18   took from the time you arrived and you first observed

19   Mr. Ledesma from the time he was restrained, do you

20   recall how long that took?

21   A.    I -- I don't.

22   Q.    Do you recall ever seeing bruising on

23   Mr. Ledesma's face after he was restrained?

24   A.    I think he had like some kind of mark or

25   something under his eye.



1    Q.   Do you recall seeing blood on his head?

2    A.   I don't recall.

3    Q.   Do you recall seeing any other bruising on his

4  body?

5    A.   I think he had like minor abrasions on his --

6  like, I think on one of his knees he had -- I don't know

7  if it was -- looked like abrasion or scuff mark.  I

8  can't remember which knee, though.

9    Q.   Then you did observe the laceration on his leg

10  caused by Volker?

11    A.   Yes.

12    Q.   And at some point in time, did you see

13  Mr. Ledesma again at Kern County Medical Center?

14    A.   Yes.

15    Q.   And who are you -- what other deputies were you

16  with at that time?

17    A.   When I came in -- well, Deputy Martin had

18  already taken him in.  He already -- he was already in a

19  bed and in one of the trauma rooms when I entered.  And

20  Deputy Martin told me that he had already Mirandized

21  him, and he was already speaking to them when I walked

22  in.

23    Q.   Okay.  And what did you observe in the room?

24  What was Mr. Ledesma saying to Deputy Martin?

25    A.   He had really calmed down.  I remember that.



DEPUTY DWAYNE PERKINS
LEDESMA vs. KERN COUNTY

January 25, 2016
44

1    And he seemed very apologetic.

2        Q.    Did you hear him say, "I'm sorry"?

3        A.    Several times.

4        Q.    And what did he say specifically?

5        A.    To me or -- because when I spoke to him, he was

6    apologizing a lot.

7        Q.    Okay.  Specifically what was he saying to you?

8        A.    I asked him if heard me give the K-9

9    announcements.  He said he had heard them, and he said

10   he had heard several announcements.  I asked him if he

11   remembered hitting and kicking my dog during the

12   incident.  He apologized.  He didn't say he remembered

13   kicking him or hitting him, but he apologized for it.

14           One point he said was -- or he said, "It was my

15   fault," but he was very apologetic.  His demeanor seemed

16   completely different once he got in the hospital and

17   calmed down.

18       Q.    Was he talking to you or talking to Deputy

19   Martin or both?

20           MR. THOMSON:  Vague and ambiguous as to when.

21   BY MR. MEISELAS:

22       Q.    I'm talking in the -- you're actually in his

23   hospital room at that point; correct?

24       A.    Correct.

25       Q.    And was there any other patients in that



1   A.   Correct.

2   Q.   What do you understand those factors to be?

3   A.   We base it on Graham versus Connor on a

4  three-prong test.  Number one is the severity of the

5  crime.  Number two is if he posed an immediate threat to

6  citizens or officers, and then the third one is if he's

7  actively resisting or attempting to evade by flight.

8   Q.   And so I see in your report on Page 7, where it

9  begins and on Page 8 you go through a number of these

10 factors.  Is that just the common practice if there's

11 ever a use of force involving a K-9, your reports will

12 reflect the factors and you decided to use force?

13  A.   Yes.

14  Q.   Okay.  So going through these factors, it says

15 the subject posed an immediate threat to officers and

16 the public.  So that's number two in your -- let's call

17 it the Graham Test that you just discussed.  Okay?

18         So what factors led you to believe that the

19 subject posed an immediate threat to the officers and

20 the public?

21  A.   Well, based on his actions when I saw him, I

22 immediately thought he was under the influence of a

23 controlled substance and I believed it to be PCP.

24 Deputy Martin had already put out 148 over the radio and

25 then as I was arriving, he put out the PC 69.  So I



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 28 of 73

DEPUTY DWAYNE PERKINS                           January 25, 2016
LEDESMA vs. KERN COUNTY                                      50

1    thought he had assaulted Deputy Martin or another

2    officer at the scene.  And then he hadn't been searched,

3    to my knowledge.  He is in a public area.  So he posed a

4    threat to the citizens also.

5        Q.   And so essentially, I mean, here him being

6    under the influence and him resisting arrest and

7    assaulting deputies.  Now, when you're talking about

8    assaulting deputies, is your understanding of assaulting

9    deputies that he was resisting the arrest?

10       A.   Well, that can be assaultive; however, when he

11   put out the PC 69, I thought it was more than just

12   resisting.  So he had either swung at him, kicked him,

13   did something greater than pulling away.  And there was,

14   I think, around two minutes of silence while Deputy

15   Martin had put out the 148.  So I knew it was severe

16   because he doesn't -- dealing with him and normally when

17   I've gone to things with him, he usually has things

18   under control and under control pretty quickly.  So you

19   have to think of all those things when you're getting

20   there.

21       Q.   Okay.  So for this was it fair to say that for

22   this Graham factor that the subject posed an immediate

23   threat to officers and the public, that there you relied

24   specifically on the information you had received over

25   the dispatch from Deputy Martin to make that



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 29 of 73

DEPUTY DWAYNE PERKINS                        January 25, 2016
LEDESMA vs. KERN COUNTY                                      51

1    determination?

2        A.   No.  Because when I got there, I also saw him

3    still actively resisting.  I saw what I thought was him

4    being under the influence of PCP, and he's there in a

5    public area with all the public, and they have already

6    spent several minutes trying to get him into custody.

7        Q.   So let me ask you this:  If there was no

8    assaulting of the deputies, okay, and you just saw an

9    individual who was resisting in a crowded place, and you

10   believed that individual to be intoxicated, would that

11   factor, based on your understanding of the criteria, be

12   satisfied?

13       A.   Satisfied for a dog bite?

14       Q.   For a dog bite, yeah.  If I removed from this

15   line "and assaulted deputies" and I took that out --

16       A.   If he's actively resisting, and it's been a

17   long fight.  I could still deploy my K-9.  I have to

18   weigh that factor and decide that.

19       Q.   Okay.  So, again, and I'm not -- all I'm saying

20   here is we take away "assaulted deputies," if there's a

21   long-term resisting, and you're in a crowded group and

22   there's intoxication, that would satisfy the subject

23   posed an immediate threat to officers and public

24   permitting a bite to take place?

25       A.   Yes.



DEPUTY DWAYNE PERKINS
LEDESMA vs. KERN COUNTY

January 25, 2016
60

1   BY MR. MEISELAS:

2       Q.   Your own observation of Mr. Ledesma would be --

3   what crimes was Mr. Ledesma committing that you

4   observed?

5           MR. THOMSON:  Lacks foundation.  Calls for

6   speculation.  He's not an expert.  To the extent he has

7   a personal opinion, he can provide it.

8           THE WITNESS:  I believed he was under the

9   influence.  I believed he resisted arrest.  He was also

10  hitting and kicking at my dog during the incident.

11  During the incident, I didn't know whether or not my dog

12  had sustained any injuries.  So at that point, that was

13  what we had.

14  BY MR. MEISELAS:

15      Q.   So I guess prior to you walking up to

16  Mr. Ledesma with your dog when you were about 15 feet

17  away from him and you were observing Officer -- or

18  Deputy De La Garza and Deputy Martin hold each arm, at

19  that point in time --

20          MR. THOMSON:  Attempting to hold.

21  BY MR. MEISELAS:

22      Q.   Attempting to hold his arm.  At that point in

23  time, you heard over the radio PC 148.  Well, you're

24  hearing a 148 and 69; correct?

25      A.   Yes.



DEPUTY DWAYNE PERKINS                    January 25, 2016
LEDESMA vs. KERN COUNTY                                73

1   electronic device, we're fine.

2           THE WITNESS:   I did not carry a Taser on me,

3   no.

4   BY MR. MEISELAS:

5       Q.   And was that your --- just practice at that

6   time?

7       A.   Once I became a K-9 handler, because the

8   holster I had was a drop-down holster, a lot of times my

9   dog was hitting the side of the Taser.  It was

10  uncomfortable plus the leash would hang up on it, and I

11  was afraid it would accidental -- accidentally deploy or

12  it would hinder any of my K-9 practice.  So I quit

13  carrying it.

14      Q.   Did you have any understanding if Deputy Martin

15  or De La Garza had Tasers at that time?

16      A.   I'm not sure if they did or not.

17      Q.   At that time when you were about 15 feet away

18  from Ledesma when you arrived on scene, did you believe

19  that there was any alternative that you had other than

20  deploying the dog that would lead to apprehension of

21  Ledesma?

22      A.   No.

23      Q.   And so your view was, again, the only thing

24  that could've been done to end this standoff was

25  deploying the K-9, and that's why you decided to use the



1    K-9?

2         A.    Yes.

3         Q.    And I may have asked you this before, and if I

4    did, I apologize, which is at the time when you saw

5    Ledesma with each officer's arm or each officer on one

6    of Mr. Ledesma's arm, did you personally view

7    Mr. Ledesma as a flight risk at that time?

8              MR. THOMSON:  Vague and ambiguous.

9              MR. MEISELAS:  That he would flee the scene.

10             MR. THOMSON:  Misstates his testimony.

11             Go ahead.

12             THE WITNESS:  I thought it was possible he

13   could still get up and get away.

14   BY MR. MEISELAS:

15        Q.    How would you describe Mr. Ledesma's physical

16   appearance when he was sitting on the ground when you

17   were 15 feet away from him?

18             MR. THOMSON:  Vague and ambiguous.

19             Go ahead.

20   BY MR. MEISELAS:

21        Q.    Physically, was he --

22             MR. THOMSON:  Oh, I'm sorry.

23   BY MR. MEISELAS:

24        Q.    Was he in shape?  Was he overweight?

25        A.    He appears to be a large subject.  He's



1    feel a dog bite.

2        Q.   Does Volker participate in or does he -- is he

3    utilized for any other purpose other than apprehension?

4        A.   Yes.

5        Q.   And what are those other purposes?

6        A.   We've also done noncriminal searches for

7    persons, and he's also used for narcotic detection.

8        Q.   Are you aware if the K-9 policy has changed

9    since this 2013 revision?

10       A.   Not to my knowledge.

11       Q.   Are you aware if there is any policy in place

12   for requesting medical assistance after a dog bite, a

13   K-9 bite?

14       A.   If it's necessary and if it needs immediate

15   attention, we request medical aid.

16       Q.   And was that done in this case?

17       A.   I don't know if anybody requested medical aid,

18   but since we were within -- less than a mile, we decided

19   it would be quicker to take him to the hospital than

20   wait on an ambulance.

21       Q.   Were you in the vehicle when Mr. Ledesma was

22   driven to the hospital?  Were you with him?

23       A.   No.

24       Q.   Do you have any estimate of time from when

25   Mr. Ledesma was apprehended at Walgreens to when he



1      A.    Yes.

2      Q.    Or that your dog would be used?

3      A.    Yes.

4      Q.    Okay.  Also what exactly is PC 69?  We've

5  talked about PC 69.  What exactly is it?

6      A.    Well, it's when you have -- like we talked

7  about before, you have a resisting arrest on the 148.

8  PC 69 is going to fall under a more assaultive nature

9  where someone takes a swing at a deputy, kicks him, does

10  something more than just pull away.  It could be

11  something that causes sustainable injury or attempts to

12  cause great bodily injury to them.

13      Q.    Would that also apply to a K-9 deputy?

14      A.    Yes.

15      Q.    Not the handler.  The K-9 itself?

16      A.    Yes.  Well, that would fall under PC 600 if the

17  dog gets hurt.

18      Q.    Okay.  So if somebody kicks at the dog or

19  strikes the dog with a closed fist, that would be a

20  PC 69 or a PC 600?

21      A.    Usually, it's going to fall under a PC 600.

22  There's a misdemeanor section or a felony connection.

23          MR. THOMSON:  Okay.  I don't have anything

24  further?

25  ////



DEPUTY DWAYNE PERKINS
LEDESMA vs. KERN COUNTY

January 25, 2016
82

```
1    STATE OF CALIFORNIA )
                         )  ss.
2    COUNTY OF KERN      )

3

4         I, OFFICER DWAYNE PERKINS, do hereby certify:

5         That I have read the foregoing

6    deposition;

7         That I have made such changes in form and/or

8    substance to the within deposition as might be necessary

9    to render the same true and correct;

10        That having made such changes thereon, I hereby

11   subscribe my name to the deposition.

12        I declare, under penalty of perjury, that the

13   foregoing is true and correct.

14        Executed this  22  day of  MARCH , 2016,

15   at  BAKERSFIELD , California.

16

17

18

19

20

21

22

23

24

25
```



DEPUTY DWAYNE PERKINS
LEDESMA vs. KERN COUNTY

January 25, 2016
83

```
1   STATE OF CALIFORNIA )
                        ) ss.
2   COUNTY OF KERN      )

3

4

5          I, Vanessa Zaragoza, a Certified Shorthand

6   Reporter in the State of California, holding Certificate

7   No. 13924, do hereby certify that OFFICER DWAYNE

8   PERKINS, the witness named in the foregoing deposition,

9   was by me duly sworn; that said deposition was taken

10  Monday, January 25, 2016 at the time and place set forth

11  on the first page hereof.

12          That upon the taking of the deposition, the

13  words of the witness were written down by me in

14  stenotypy and thereafter transcribed by computer under

15  my supervision; that the foregoing is a true and correct

16  transcript of the testimony given by the witness.

17          I further certify that I am neither counsel for

18  nor in any way related to any party to said action, nor

19  in any way interested in the result or outcome thereof.

20          Dated this 4th day of February, 2016, at

21  Bakersfield, California.

22

23          _____

24          Vanessa Zaragoza, CSR No. 13924

25
```



# EXHIBIT I

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "I"**

ORIGINAL

## In the Matter Of:

## LEDESMA vs. KERN COUNTY

14-cv-01634-LJO-JLT

## JAMES MELTON

*January 28, 2016*



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 39 of 73

JAMES MELTON                                           January 28, 2016
LEDESMA vs. KERN COUNTY                                              1

1                 UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF CALIFORNIA

3


4    ADRIANA LEDESMA, an individual;
     JESSICA LEDESMA, an individual;
5    MARISSA LEDESMA, an individual
     by and through his Guardian Ad
6    Litem Raquel Sierra; RONNIE
     MATHEW LEDESMA, an individual by
7    and through his Guardian Ad Litem
     Christina Garcia; CHRISTINA HERRERA;
8
                      Plaintiffs,
9
     vs.                                        Case No.
10                                      14-cv-01634-LJO-JLT
     KERN COUNTY; KERN COUNTY SHERIFF'S
11   DEPARTMENT; WARREN MARTIN; KARENA
     DE LA GARZA; DWAYNE PERKINS; JAMES
12   MELTON; CHRISTOPHER WONG; AND DOES
     1-200, INCLUSIVE,
13
                      Defendants.
14   _____

15

16                    DEPOSITION OF

17                    JAMES MELTON

18

19               January 28, 2016

20                  10:37 a.m.

21

22        1115 Truxtun Avenue, Fourth Floor

23            Bakersfield, California

24

25      Victoria L. Thomas, CSR No. 12927



JAMES MELTON
LEDESMA vs. KERN COUNTY

January 28, 2016
2

```
1                    APPEARANCES OF COUNSEL

2   For Plaintiffs:
    GERAGOS & GERAGOS
3   BENJAMIN MEISELAS, ESQ.
    DAVID GAMMILL, ESQ.
4   644 Historic South Figueroa Street
    Los Angeles, California 90017
5   (213) 625-3900

6   For Defendants:
    OFFICE OF COUNTY COUNSEL
7   ANDREW THOMSON, DEPUTY COUNTY COUNSEL
    1115 Truxtun Avenue, Fourth Floor
8   Bakersfield, California  93301
    (661) 868-4814
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                         I N D E X

 2   WITNESS:   James Melton

 3

 4   EXAMINATION                                        PAGE

 5   By Mr. Gammill                                        5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



JAMES MELTON
LEDESMA vs. KERN COUNTY

January 28, 2016
4

```
1    INDEX TO EXHIBITS

2

3

4      (None offered.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 43 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                        5

```
 1                    BAKERSFIELD; CALIFORNIA;

 2              THURSDAY; JANUARY 28, 2016; 10:37 A.M.

 3

 4                       JAMES MELTON,

 5      having been first duly sworn, testifies as follows:

 6

 7          MR. GAMMILL:  This is David Gammill on behalf of

 8   the plaintiff, Ledesma.

 9                Do you want to state your appearances as

10   well?

11          MR. MEISELAS:  There's no camera.  You don't have

12   to.

13          MR. THOMSON:  That's okay.  I'd be more than

14   happy -- Andrew Thomson, Kern County Counsel's Office on

15   behalf of the defendants.

16          MR. MEISELAS:  And Ben Meiselas, M-e-i-s-e-l-a-s,

17   Geragos & Geragos.

18                       EXAMINATION

19     BY MR. GAMMILL:

20          Q.   Would you please state your name and spell it

21   for the record.

22          A.    James Melton.  First name is J-a-m-e-s.  Last

23   name is M-e-l-t-o-n.

24          Q.   And what you do for a living?

25          A.   I work for Fresno Police Department as a
```



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 44 of 73

JAMES MELTON                                          January 28, 2016
LEDESMA vs. KERN COUNTY                                            12

1        Q.    Is there any particular detail that you left

2   out that you find absent or concerning that it's absent?

3        A.    One was that I remembered when I was arriving

4   and walking up to the scene that a suspect was pulling

5   at the dog's mouth.  I didn't put that.  Just the way

6   that he was sweating and -- profusely.  I believe I put

7   that.  But just things like that.

8        Q.    Okay.  So let's talk about that day a little

9   bit.

10            Were you -- you were working with a partner,

11  officer -- Deputy Wong; is that correct?

12       A.    Yes.

13       Q.    Were you driving or was Wong driving?

14       A.    I was driving.

15       Q.    Okay.  And you hear Martin over the radio

16  broadcasting 148; correct?

17       A.    Yes.

18       Q.    What did you that mean to you?

19       A.    That he was in a physical confrontation with

20  the assailant.

21       Q.    Do you remember how Wong responded?  Did he

22  say anything to you when he heard that broadcast?

23       A.    I don't recall.  I believe, He said let's go.

24       Q.    Okay.  So then you headed towards where the

25  call was coming from; correct?



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 45 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      13

1        A.   Yes.

2        Q.   Now, how much time passed between when you

3   hear the 148 and then you said you heard him broadcast

4   69?

5        A.   I'm not sure.  Um, I would say approximately

6   a minute, minute and a half.

7        Q.   Okay.  Now, is there anything about that gap

8   of time, that minute and a half, that concerns you?

9        A.   By him being quiet on the radio after

10  broadcasting the 148, I was concerned about his safety.

11  I didn't know what was going on because he was quiet.

12  And then I heard his radio clip.  So then I was under

13  the impression that he was physically fighting.

14       Q.   What do you mean by the radio clipped?

15       A.   When you key your radio, when you push the

16  button to communicate, if your hand's knocked off or

17  your hand just slips off, it will make a clipping sound,

18  like a staticky sound.  So when it did that two or three

19  times, that wasn't an accident.  I mean...

20       Q.   Okay.  So is it fair to say when you hear

21  there's a 148 and you start to respond, that -- does the

22  adrenaline start pumping at that point?

23       A.   I can't speak for nobody else, but --

24       Q.   For you?

25       A.   A little bit.



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 46 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      14

1      Q.   Starts --

2      A.   I get concerned and try to get there.

3      Q.   When you hear those clips, does that increase

4   your level of concern?

5      A.   Yes.

6      Q.   When you hear the 69, does that increase your

7   level of concern?

8      A.   Yes.

9      Q.   And what is the concern you're feeling?

10      A.   That the safety of the deputies or anyone

11   else is around.   There's a lot of variables.   I don't

12   know what's going on because I'm not there.   So I just

13   have an overall concern and try to get there and

14   evaluate the situation and deescalate it as quickly as

15   possible.

16      Q.   What are you worried you're going to find

17   there as you're on your way?

18      MR. THOMSON:   Vague and ambiguous.

19           Go ahead.

20      THE WITNESS:   Honestly, I don't know.   I can't

21   say.   I mean, I can't see the future.   Just -- I mean,

22   with 148 calls and 169 calls, is -- somebody is actively

23   fighting.   So that's just the base of it.   But other

24   than that, I don't know what to find.

25   ///



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 47 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                    15

1       BY MR. GAMMILL:

2           Q.   So when you're in your car and you hear 148,

3       you hear 69, you hear clips, you think actively

4       fighting; is that fair to say?

5           A.   Yes.

6           Q.   In your mind on that day, what's worst case

7       scenario you're going to show up to if there's an active

8       fight with a police officer?

9           A.   Worst case scenario is that the police

10      officer is being beat up, rendered unconscious or

11      seriously injured.

12          Q.   Dead?

13          A.   Yeah, possibly dead.

14          Q.   So you're on your way to help out your fellow

15      officer; is that a fair statement?

16          A.   Yes.

17          Q.   And you don't know what -- you don't know how

18      bad the situation you're going to come up on is, do you?

19          A.   No.

20          Q.   Okay.  And in that type of situation is it

21      fair to say that you -- by the time you arrive that

22      you're fully alert and that your adrenaline is pumping

23      and that you are ready to go and interact if you have

24      to?

25          A.   Depending on what you mean by "go."



1          Q.   Well, I mean, take, for example, as you sit

2    here today calmly talking to me; correct?

3          A.   Yes.

4          Q.   If someone were to barge through that door,

5    you would have had no time to get yourself mentally and

6    physically prepared for altercation; correct?

7          A.   Correct.

8          Q.   But if you had two or a number of minutes to

9    go to where you knew there was a physical altercation

10   taking place, unsure as to what degree, that by the time

11   you got there, physically, mentally, and emotionally,

12   you would be ready to go and do whatever had to be done;

13   is that fair to say?

14          MR. THOMSON:   Vague and ambiguous.   Incomplete

15   hypothetical.

16             Go ahead.

17          THE WITNESS:   Um, yes.

18     BY MR. GAMMILL:

19          Q.   Okay.   So let's go to that day.   You pull up,

20   and you're not the first officer there; correct?

21          A.   Right.

22          Q.   Okay.   So what do you -- you show up and you

23   see -- is -- Ledesma, is he on the ground or is he

24   standing?

25          A.   He was on the ground.



JAMES MELTON
LEDESMA vs. KERN COUNTY

January 28, 2016
17

1    Q.   Was he seated or laid out?

2    A.   Seated.

3    Q.   Okay.  And you've got -- how many officers

4  are there near Ledesma when you roll up?

5    A.   Three.

6    Q.   And who are they?

7    A.   I believe it's Deputy Martin, Deputy de la

8  Garza, and Deputy Perkins.  Is that the K-9 officer's

9  name?

10    Q.   And you said -- is that the -- Deputy Perkins

11  is holding an animal?

12    A.   Yeah.

13    Q.   He's got a dog by the collar?

14    A.   Yes.

15    Q.   And how are they positioned in regards

16  Ledesma?

17    A.   Honestly, the only one I remember is

18  Deputy de la Garza was on, I believe his -- Ledesma's

19  left side, which was closer to the store, um, and Deputy

20  Perkins was at Ledesma's feet, standing by his feet.

21    Q.   What about Martin?

22    A.   I don't remember.

23    Q.   Was he close to Ledesma?

24    A.   He was close, but I can't remember exactly if

25  he was on his side or closer to his head.  I don't



JAMES MELTON                              January 28, 2016
LEDESMA vs. KERN COUNTY                              18

1    remember exactly where he was at.

2         Q.   Was la Garza touching Ledesma in some way?

3         A.   That I don't remember.  I just know once I

4    got the car, I seen a lot of stuff going on, so I

5    focused on him.  So I can remember where they're

6    standing, but I can't remember exactly -- remember.  I

7    believe -- no.  I don't know.

8         Q.   What about Martin, was he touching Ledesma?

9         A.   I believe Martin was on the ground with him.

10        Q.   So they both laid down?

11        A.   Yes.

12        Q.   Is Martin next to him or on top of him, if

13   you remember?

14        A.   I don't.

15        Q.   And what about the dog?  What's the dog doing

16   when you arrive?

17        A.   When I arrived, the dog was applied to -- I

18   can't remember which leg, but to one of Ledesma's legs.

19        Q.   When you say "applied to," is that --

20        A.   He was -- I'm sorry.

21        Q.   What does that main?

22        A.   He was biting him.

23        Q.   Okay.  And when you say "biting him," was

24   it -- did it appear to you that the dog had clamped on

25   and was holding or repeatedly biting?



JAMES MELTON                                      January 28, 2016
LEDESMA vs. KERN COUNTY                                        20

1      Q.   No officers appear to be unconscious?

2      A.   Right.

3      Q.   No officers appear to be injured?

4      A.   No.

5      Q.   There seems to be only one suspect?

6      A.   Yes.

7      Q.   There's three officers already on scene?

8      A.   Yes.

9      Q.   There's one dog?

10     A.   Yes.

11     Q.   The suspect's on the ground?

12     A.   Yes.

13     Q.   There's three officers surrounding him?

14     A.   Yes.

15     Q.   And the dog is biting him?

16     A.   Yes.

17     Q.   So this is not -- this is not worst case

18  scenario; is that fair to say?

19     A.   It's fair to say.  But there is one point I

20  left out.

21     Q.   Please.

22     A.   Um, when we did get the call on the freeway,

23  the synopsis -- we have a computer.  Synopsis in the car

24  said that there was two suspects.  So by me just seeing

25  him, I'm still thinking of this second person.  I'm not



1    knowing if he's standing trying to ambush somebody or if

2    he ran or what.  So there's still that variable of a

3    second suspect.  So just because the one suspect was

4    down, it still wasn't the best case scenario because we

5    didn't know where the second suspect was.

6           Q.    Did you -- well, when you got out of the car,

7    did you move towards the three officers and Ledesma or

8    did you look for a second suspect?

9           MR. THOMSON:  Or something else?

10          THE WITNESS:  As I got out of the car, I seen

11   him.  I start running that way.  But I did look.  I

12   looked around as I was approaching him.

13      BY MR. GAMMILL:

14          Q.    Okay.  Did you see anybody?

15          A.    No.  You know what, I take that back.  There

16   was someone standing in front of the store.

17          Q.    Did you see anybody that you identified as a

18   threat?

19          MR. THOMSON:  Vague and ambiguous.

20             Go ahead.

21          THE WITNESS:  I couldn't determine then,

22   because -- just because somebody is standing there

23   doesn't make them not a threat.  It doesn't make them a

24   threat either.  But they weren't engaged, and they were

25   standing there watching.  So I didn't know if that was



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 53 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                       22

1    his associate or not.

2       BY MR. GAMMILL:

3          Q.   Sure.   Anything could happen?

4          A.   Right.

5          Q.   But as you advance towards the three officers

6    and Ledesma, you're looking for any other possible

7    threats; fair to say?

8          A.   Right.

9          Q.   And between the time you got out of your car

10   and the time you arrived to your fellow officers, you

11   didn't see anyone or anything that you took as a

12   possible threat that took priority over the present

13   situation; is that fair to say?

14         A.   Priority is fair to say, but not as a

15   possible threat.   I mean, it was a threat until I can

16   rule it out.   And I couldn't rule it out at that time.

17         Q.   So you get out of the car.   How -- when you

18   stop your car, how close is your car to the -- to

19   Ledesma?

20         A.   Um --

21      MR. THOMSON:   Vague and ambiguous as to which

22   portion of Ledesma.

23             But go ahead.   You can answer.

24      THE WITNESS:   Ledesma was in the driveway of the

25   pharmacy.   And I parked on the street, on the curb, so



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 54 of 73

JAMES MELTON                                          January 28, 2016
LEDESMA vs. KERN COUNTY                                            23

1    I'm not sure.  I can't give you, like, exact foot

2    measurement.

3      BY MR. GAMMILL:

4          Q.    Do you have a best guess, best estimate?

5          A.    Approximately 15 feet.

6          Q.    Okay.  I mean, are we talking it took you 10

7    steps to cover that area, 20 steps?

8          A.    That I don't remember.  I have was running

9    up.  So I mean, I didn't count my footsteps.

10         Q.    Were you in a spring or...

11         A.    About 80 percent.

12         Q.    Okay.  And as you're advancing, where's Wong,

13   if you saw him?

14         A.    I don't remember.  I just know he was in the

15   passenger seat, and he got out and -- got out.  So I

16   don't remember.

17         Q.    Okay.  So I want you to walk me through what

18   you see as you're making your way towards the group.

19   And by the group, I mean the officers and Ledesma and

20   the dog.

21                What's sort of the first thing that sticks

22   out in your mind what you saw?

23         A.    Um.  I seen Ledesma sitting on his backside

24   with his back up as he was sitting in the chair, and

25   him, like, turning, like, swinging in a kind of, like,



JAMES MELTON
LEDESMA vs. KERN COUNTY

January 28, 2016
24

1    windmill motion.  He was moving like this, swinging, and

2    yelling, but I couldn't make out what he was saying, but

3    he was yelling.

4            MR. THOMSON:  Okay.  For the record, you're

5    holding your hands with balled-up fists in front of you

6    and kind of rotating your upper torso portion to the --

7    headed to the left and then back towards the right;

8    correct?

9            THE WITNESS:  Yes.

10            MR. THOMSON:  Okay.

11       BY MR. GAMMILL:

12            Q.   And so he was in a seated position when you

13    first saw him?

14            A.   Yes.

15            Q.   Okay.  And when he is doing that sort of a

16    swinging motion back and forth, that pivoting motion

17    with his hands in front of him, are his hands -- are

18    they making fists, are they open, or you don't know?

19            A.   No.  They were clinched.

20            Q.   Okay.  And is he swinging his arms in a

21    striking motion or just -- is he just pivoting his

22    torso?

23            A.   Um.  His arms were -- actually call it

24    flailing around as his torso was moving left and right.

25            Q.   Okay.



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 56 of 73

JAMES MELTON                                      January 28, 2016
LEDESMA vs. KERN COUNTY                                         25

```
 1        A.   And then right before I reached him that's
 2  when he had grabbed the K-9, the dog.
 3        Q.   And that's what you're referring to pulling
 4  at the dog's mouth?
 5        A.   Yes.
 6        Q.   And as he's pulling at the dog's mouth, is
 7  that dog biting into him?
 8        A.   The dog was on his leg, was clamped on his
 9  leg.
10        Q.   Okay.  So the dog is biting onto his leg?
11        A.   Yes.
12        Q.   And he's pulling at the dog's mouth?
13        A.   Yes.
14        Q.   What did it look to you as though he's trying
15  to do?
16        A.   Um --
17  MR. THOMSON:  Vague and ambiguous.
18        Go ahead.
19  THE WITNESS:  He was trying to get the dog off of
20  him.  What did I say?  I believe the dog disengaged.  He
21  stopped biting him.  And Ledesma kept pulling at his
22  mouth.
23        The best way I can describe it, it reminded
24  me of that -- it sounds -- the King Kong movie, when
25  King Kong was pulling at the dinosaur's mouth trying to
```



JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      26

1   open up the jaw.  Once the dog let go, I seen him; he

2   kept pulling at the dog, the dog's mouth.  And then -- I

3   can't remember -- somehow -- I don't know if the dog

4   backed up or somehow, but he lost grip of the dog's

5   mouth.

6        BY MR. GAMMILL:

7            Q.    Okay.  What's the next thing you remember

8   seeing?

9            A.    Then I grabbed his arm trying to get a

10  control hold in.  By that time I was up close, in close

11  proximity.  I grabbed his arm trying to get a control

12  hold.

13           Q.    Are the other deputies holding onto him when

14  you go for that arm?

15           A.    Um --

16       MR. THOMSON:  Vague and ambiguous.  Lacks

17  foundation.  Calls for speculation.

18               Go ahead.

19       THE WITNESS:  I don't remember.  I believe de la

20  Garza was on his left side, and she was also trying to

21  get a control hold, but I'm not sure.

22       BY MR. GAMMILL:

23           Q.    Are all of the officers, to your

24  recollection, engaging Ledesma at that moment when you

25  arrive and you put your hands on him?



1   did you ever see him hit the dog up until that point of

2   you putting your hands on him?

3       A.   So all the way up to the point where I

4   grabbed him?

5       Q.   Yes.

6       A.   Hum.  No, I don't believe so.  I believe he

7   struck the dog after I grabbed him, because he slipped

8   out of my grasp at one time.  And like I said, I can't

9   remember when the dog engaged, but at some point it did,

10  and I do remember him punching the dog.

11      Q.   Where did he punch the dog?  On the dog --

12  where on the dog was the dog struck, if you remember?

13      A.   I don't.  I just believe he was on the dog's

14  left side somewhere.  I can't remember exactly where,

15  though.

16      Q.   So you grab onto his arm.  He slips free?

17      A.   Yes.

18      Q.   Then what happens?

19      A.   I try to regain a grip in the control hold as

20  he's moving his arm around.  He ends up laying down on

21  his back.  I grab his arm again.  And it was sweating,

22  like I said, profusely.  He was just wet, and slipped

23  again.  Um, then he turned over, I believe, on his belly

24  and tried to tuck his arms under.

25      Q.   What did you make of him trying to tuck his



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 59 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                        30

1   arms under?

2        A.   He didn't want to comply.  He didn't want to

3   allow us to place him in handcuffs.

4        Q.   Did you believe that he was trying to keep

5   his arms from you?

6        A.   Yes.

7        Q.   Did you have any other concerns?

8        A.   Um.  At that time, yes.  I was able to

9   communicate with the first responding deputies, so I

10  didn't know if he had any weapons on him.  I didn't know

11  if he was searched or not.  So with me not being able to

12  see his hands, I didn't know if he had any weapons.

13       Q.   Did you verbalize that concern?

14       A.   Um, as in did I say anything about weapons

15  or --

16       Q.   Yeah.  Did you say -- is he -- is he going

17  for a gun, he might be gunning -- did you say anything

18  to alert the other officers of your concern?

19       A.   No.  I was giving him commands, like, Let me

20  see your hands.  Stop resisting.  Things like that.

21       Q.   Did any other officer, to your recollection,

22  make any comment regarding the concern that he was going

23  for a weapon?

24       A.   I don't recall.

25       Q.   Nothing like, Watch him, he might have a



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 60 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                    31

```
1    weapon; he may be going for a weapon; careful, I can't
2    see his hand; anything like that?
3         A.   No, I don't remember anything like that.
4         Q.   And once -- is he successful in getting those
5    hands underneath his own body?
6         A.   Oh, yes.
7         Q.   And when he does that, are they up high like
8    under his chest area or are they down low like under his
9    belly, if you remember?
10        MR. THOMSON:  Or something else?
11    BY MR. GAMMILL:
12        Q.   Or something else?
13        A.   I don't.  I just know his elbows were by his
14   abdomen.  So I mean, I really couldn't see where his
15   hands, if they were here or here (indicating).  But I
16   mean, you know, you move your hands.
17        Q.   Were his elbows tucked in by his side or out?
18        A.   Initially, no, but --
19        MR. THOMSON:  Or something else?
20        THE WITNESS:  Yeah.  Initially, no, but
21   eventually they claim in, and he was trying to, like,
22   ball up in a sense, like, real tight.
23    BY MR. GAMMILL:
24        Q.   And when he's balled up like that, what are
25   you doing?
```



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 61 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      32

1      A.   Trying to pull his hand from under.

2      Q.   Do you remember which hand?

3      A.   His left hand.

4      Q.   And where as -- can you see Deputy Martin at

5  that point?

6      A.   No.  I don't remember where he was at at that

7  time.

8      Q.   De la Garza?

9      A.   No.  I believe she was still in the same spot

10 that I first seen her, but I don't remember.  I just

11 know I was focusing on him at that time.

12     Q.   Perkins?

13     A.   Don't remember.

14     Q.   The dog?

15     A.   Don't remember.

16     Q.   Are they close by?

17     A.   I'm assuming so.  Like I said, I'm completely

18 focused on him.

19     MR. THOMSON:  Don't assume.  If you can provide

20 an estimate, you can do that.  But don't assume.  Don't

21 guess.

22     THE WITNESS:  I don't know.

23     MR. THOMSON:  Okay.

24   BY MR. GAMMILL:

25     Q.   Did you feel as though you were alone



1   interacting with Ledesma or did you feel you were still

2   operating as part of a four-man team?

3        MR. THOMSON:  Or something else?

4        THE WITNESS:  I felt that they were still there.

5   I mean, they didn't run off.

6   BY MR. GAMMILL:

7        Q.   At that point when he's on his stomach and

8   you're reaching for his hand, did you see him get struck

9   with a baton?

10        A.   No.

11        Q.   Up until this point in the narrative, have

12   you seen him get struck with a baton, to your

13   recollection?

14        MR. THOMSON:  During the point in time that --

15   from the point in time that he first arrived?

16   BY MR. GAMMILL:

17        Q.   From the time you arrived to the time we are

18   in the story where he's on his belly, arms underneath

19   him and you're reaching for an arm, during that time did

20   you see him struck with a baton that you can recall?

21        A.   I don't remember.

22        Q.   Are you able to pull his arm out from under

23   him?

24        A.   Eventually, yes.

25        Q.   How did you get it out?



JAMES MELTON                                      January 28, 2016
LEDESMA vs. KERN COUNTY                                        34

1        A.   Um, I gave him a kick to his left side of his

2   ribs.  And I believe it was two.  I believe I kicked him

3   twice.  And his elbow came down as he was trying to

4   protect his ribs, and his arm came from under him.  So I

5   was able to grab it.  Initially, it was tucked in so

6   tight where I couldn't even squeeze my hand in there.

7   So when his elbow came down, his arm came up some, and I

8   was able to grab his arm.

9        Q.   So you kicked him twice in the left rib.  Is

10  that ribs -- left side of his ribcage?

11       A.   Ribcage, yes.

12       Q.   And that -- he moved his left arm to protect

13  those ribs?

14       A.   Yes.

15       Q.   And that's when you were able to grab him?

16       A.   Well, I don't know if he was protecting -- he

17  moved his left arm out some.

18       Q.   Did he move his left arm consistent in a

19  fashion with someone trying to protect the area you had

20  just struck?

21       A.   He moved his left elbow down, down to where

22  his elbow came out.

23       Q.   Did you strike him in the same place when you

24  struck him twice with your foot?

25       MR. THOMSON:  Vague and ambiguous.  Assumes facts



JAMES MELTON
LEDESMA vs. KERN COUNTY

January 28, 2016
35

```
1    not in evidence.
2        BY MR. GAMMILL:
3            Q.   Let me back it up.
4                 You kicked him twice, you said; right?
5            A.   Yes.
6            Q.   Kicked him with your foot; correct?
7            A.   Yes.
8            Q.   Are you hitting him with, like, your heel?
9    Are we talking about the top of your foot, your toe,
10   something else?
11           A.   The top of my foot.
12           Q.   Okay.  Kicked him twice with the top of your
13   foot?
14           A.   Yes.
15           Q.   Did you kick him in the same place?
16           A.   I can't say.  It was in the same general
17   area.
18           Q.   Okay.  Can you point on your own body where
19   that general area is?
20           A.   Around here (indicating).
21           Q.   So for the record, with your left hand you're
22   referencing sort of right above the left hip?
23           A.   Yes.
24           MR. THOMSON:  Right above the belt line.
25           MR. GAMMILL:  Right above the belt line.
```



JAMES MELTON                                           January 28, 2016
LEDESMA vs. KERN COUNTY                                            36

1          MR. THOMSON:  And that's pretty much mid-center

2    on the side.  Is that --

3          MR. GAMMILL:  Yeah.  I think --

4          MR. THOMSON:  As opposed to further forward or

5    further back.

6       BY MR. GAMMILL:

7          Q.   Kind of the area of the, sort of the love

8    handle?  Would you agree with that characterization?

9          A.   Yes.

10         Q.   So same general area.  I mean, you can't tell

11   me whether you precisely hit the exact spot, but fair to

12   say that you hit him -- you kicked him twice in the left

13   love handle area?

14         A.   Yes.

15         Q.   Okay.  When he moved his arm, did his arm

16   move to a place where he was then shielding that left

17   love handle area?

18         A.   His arm moved down.  It didn't actually get

19   all the way there, but it moved down towards that area.

20         Q.   Okay.

21      (Ben Meiselas exits and enters the proceedings.)

22      BY MR. GAMMILL:

23         Q.   You said you wrote a report that -- well, do

24   you remember that you wrote in your report that he was

25   not affected by your kicks?  Do you remember writing



JAMES MELTON                                   January 28, 2016
LEDESMA vs. KERN COUNTY                                      37

1   that?

2        A.   Yes.

3        Q.   And do you still agree with that?

4        A.   Yes.

5        Q.   What did you mean by that?

6        A.   Um, he didn't make that noise.  He didn't

7   seem to move.  I mean, he moved his elbow down, but he

8   didn't show any real concern about that area.  He just

9   sort of moved his elbow down as if he felt it, like

10  it -- his brain recognized it and he felt it, but it

11  didn't hurt.  It didn't affect him to the point where he

12  was, like, I was kicked.  I mean...

13       Q.   So he didn't react to the level of which you

14  would have expected?

15       A.   Right.

16       Q.   But fair to say he reacted?

17       A.   Yes.

18       Q.   Before -- in your report you indicated that

19  you had punched him as well.  Do you remember that?

20       A.   Yes.

21       Q.   Is that before or after you kicked him?

22       A.   Before.

23       Q.   Okay.  And at that -- is it the same point he

24  has got his hands tucked under his body?

25       A.   Yes.



JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                       38

1      Q.   So first you tried punching, and then you

2  went to kick him; is that --

3      A.   Yes.

4      Q.   Where did you punch him?

5      A.   In his left shoulder.

6      Q.   And is that when you are referring -- well,

7  you tell me.  Point to what you mean by shoulder.

8      A.   Back of the shoulder, like, left shoulder

9  blade area.

10     Q.   So not the, sort of the deltoid where one

11 would maybe put -- I'm pointing -- well, you point on

12 your body.  Where are you referring to?

13     A.   More of this area (indicating).

14     Q.   Okay.  So would you agree that that's sort of

15 the upper back, shoulder blade area?

16     A.   Yes.

17     Q.   Okay.  And why the shoulder blade area?

18     A.   Just the angle that I was in.  I was kneeling

19 down trying to grab his arm, like I said.  And it was

20 just the angle that I was in.  It was an exposed spot.

21 I wasn't trying to hit him in his head.  So I figured if

22 I hit him in shoulder blade area, he would move his

23 shoulder some to where his arm could pop out, and I

24 could possibly get a grip on him.

25     Q.   And what was his reaction to the shoulder --



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 68 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                       39

1   blows to the shoulder?
2        MR. THOMSON:  Vague and ambiguous as to "blows."
3        Go ahead.
4        THE WITNESS:  Nothing.  Nothing.  He just kept
5   moving around.
6      BY MR. GAMMILL:
7        Q.   How was he moving around?
8        A.   Tucking his hands in and just sort of
9   wiggling back and forth.
10        Q.   Did he make any noise when you punched him in
11   the shoulder blade?
12        A.   I don't remember.
13        Q.   But you're certain he didn't make any noise
14   when you kicked him in the ribs?
15        A.   Yes.
16        Q.   Throughout this -- from the moment you got
17   out of the car to the moment you've kicked him in the
18   ribs, have you seen him struck with a baton?
19        A.   I don't remember.
20        Q.   Have you heard him yelling?
21        A.   Um, yes.
22        Q.   And what kind of things was he yelling?
23        A.   That I don't recall.  It was just yelling.  I
24   can't remember exactly what he was saying.
25        Q.   Was he attempting to -- were these yells, was



Case 1:14-cv-01634-DAD-JLT   Document 59-6   Filed 08/05/16   Page 69 of 73

JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                       42

 1          A.    The only thing I remember stuck out to me,

 2    because it was probably within six inches away from us,

 3    more like 12 inches, I believe.

 4          Q.    When you say "us," you mean Ledesma?

 5          A.    Yes.

 6          Q.    And where was it when you say 12 inches away

 7    from Ledesma?  Is it 12 inches away from his foot, from

 8    his head, from his hand?

 9          A.    Um.  From his upper body area.  It was within

10    arm's reach of him.

11          Q.    Okay.  Did you ever see Ledesma go for that

12    baton?

13          A.    No.

14          Q.    Did you ever see Ledesma reach for any of

15    your weapons that were on your person?

16          A.    No.

17          Q.    Did you ever see Ledesma reach for any of the

18    weapons that were on any of the other officers?

19          A.    No.

20          Q.    So when you pull that -- you kick him twice

21    and move that arm down, what do you do?

22          A.    Then I grab his arm with both hands, his

23    wrist area, the forearm area, then I'm trying to pull

24    his arm to place it behind his back.  And with me

25    grabbing him with two arms, he was still pulling his arm



JAMES MELTON                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      43

1   under his body again.   So I just held on and continued
2   trying to put it behind his back.
3          Q.   And then what happened?
4          A.   Um, he continued to pull his arm under his
5   body, which shows his strength; because like I said, I
6   had two arms placed on his wrist, and I was sort of
7   pulling my body weight, and he was still pulling it
8   under his body.   Then Deputy Martin grabbed the arm with
9   me and was able to place it behind his back.
10         Q.   Where was the other arm as you and Martin are
11  putting the left arm behind his back?   Where's the right
12  arm?
13         A.   That I don't recall.   Just at some point in
14  time, I yelled, I have his arm behind his back.   Then
15  Deputy de la Garza, and I believe -- I'm not sure who,
16  but Deputy de la Garza and another deputy had placed his
17  other arm behind his back and placed him in handcuffs.
18         Q.   Okay.   From the time you walked up and you
19  first tried grabbing that arm and it slipped free to
20  placing the hand -- until the handcuffs get put on
21  Ledesma, how much time passes?
22         A.   I have no idea.   It all happened so fast.   I
23  really can't say.
24         Q.   Can you narrow it down at all?
25         A.   I really don't remember.   I mean, a couple



1      A.   No.  He was laying on his stomach.

2      Q.   Then what happens?

3      A.   Once the handcuffs was placed on him, um,

4  then myself and two other deputies and a Bakersfield

5  police officer walk inside the Walgreen's to see if --

6  well, first we scanned the area seeing if the second

7  suspect was around, and then somebody said he possibly

8  was still inside.  So we walked into Walgreen's to see

9  if he was in there.  We didn't find anyone, and then

10  came out.

11      Q.   So when you go to walk into the Walgreen's is

12  the last time you see Ledesma; he's laying on the ground

13  still?

14      A.   Yes.

15      Q.   When you get out of the Walgreen's, is he

16  still laying on the ground?

17      A.   No.

18      Q.   Where is he -- if you see him, where is he

19  when you walk out of the Walgreen's?

20      A.   He was placed in a patrol vehicle, and he was

21  being transported.

22      Q.   So at any point did you see Ledesma get

23  struck with a baton?

24      A.   No.  I don't remember.

25      Q.   Do you not remember specifically -- well, do



```
 1    Assignment No. J0286129

 2    Adriana Ledesma, et al.,
      vs.
 3    Kern County, et al.

 4

 5                DECLARATION UNDER PENALTY OF PERJURY

 6              I declare under penalty of perjury

 7      that I have read the entire transcript of my

 8      deposition taken in the captioned matter

 9      or the same has been read to me, and the same is

10      true and accurate, save and except for changes and/or

11      corrections, if any, as indicated by me on the

12      DEPOSITION ERRATA SHEET hereof, with the

13      understanding that I offer these changes as if

14      still under oath.

15

16              Signed on the _____ day of

17      _____, 20_____.

18

19      _____

20              JAMES MELTON

21

22

23

24

25
```



1

2

3          I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5          That the foregoing proceedings were taken

6   before me at the time and place herein set forth; that

7   any witnesses in the foregoing proceedings, prior to

8   testifying, were placed under oath; that a verbatim

9   record of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; further, that the foregoing is an accurate

12   transcription thereof.

13          I further certify that I am neither

14   financially interested in the action nor a relative or

15   employee of any attorney of any of the parties.

16          IN WITNESS WHEREOF, I have subscribed my

17   name this 1st day of February, 2016.

18

19                      _Victoria L. Thomas_

20                      _____

21                      Victoria L. Thomas
                        CSR No. 12927

22

23

24

25