# EXHIBIT J

---

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "J"**

ORIGINAL

# In the Matter Of:

## LEDESMA vs. KERN COUNTY

14-cv-01634-LJO-JLT

---

## CHRISTOPHER WONG

*January 28, 2016*

---



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 3 of 86

CHRISTOPHER WONG                                     January 28, 2016
LEDESMA vs. KERN COUNTY                                            1

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3

4    ADRIANA LEDESMA, an individual;
     JESSICA LEDESMA, an individual;
5    MARISSA LEDESMA, an individual
     by and through his Guardian Ad
6    Litem Raquel Sierra; RONNIE
     MATHEW LEDESMA, an individual by
7    and through his Guardian Ad Litem
     Christina Garcia; CHRISTINA HERRERA;

8
                    Plaintiffs,
9
     vs.                                    Case No.
10                                  14-cv-01634-LJO-JLT
     KERN COUNTY; KERN COUNTY SHERIFF'S
11   DEPARTMENT; WARREN MARTIN; KARENA
     DE LA GARZA; DWAYNE PERKINS; JAMES
12   MELTON; CHRISTOPHER WONG; AND DOES
     1-200, INCLUSIVE,
13
                    Defendants.
14   _____

15

16                DEPOSITION OF

17               CHRISTOPHER WONG

18

19              January 28, 2016

20                 2:38 p.m.

21

22       1115 Truxtun Avenue, Fourth Floor

23            Bakersfield, California

24

25       Victoria L. Thomas, CSR No. 12927



Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 4 of 86

CHRISTOPHER WONG                                          January 28, 2016
LEDESMA vs. KERN COUNTY                                                  2

1                          APPEARANCES OF COUNSEL

2       For Plaintiffs:
        GERAGOS & GERAGOS
3       DAVID GAMMILL, ESQ.
        644 Historic South Figueroa Street
4       Los Angeles, California 90017
        (213) 625-3900
5
        For Defendants:
6       OFFICE OF COUNTY COUNSEL
        ANDREW THOMSON, DEPUTY COUNTY COUNSEL
7       1115 Truxtun Avenue, Fourth Floor
        Bakersfield, California  93301
8       (661) 868-4814

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 5 of 86

CHRISTOPHER WONG                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                            3

1                       I N D E X

2    WITNESS:   Christopher Wong

3

4    EXAMINATION                                    PAGE

5    By Mr. Gammill                                    5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    INDEX TO EXHIBITS

2

3

4      (None offered.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 7 of 86

CHRISTOPHER WONG                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                            5

```
 1                  BAKERSFIELD; CALIFORNIA;

 2            THURSDAY; JANUARY 28, 2016; 2:38 P.M.

 3

 4                   CHRISTOPHER WONG,

 5      having been first duly sworn, testifies as follows:

 6

 7                       EXAMINATION

 8      BY MR. GAMMILL:

 9          Q.   Would you please state and spell your name

10      for the record.

11          A.   My name is Christopher Wong.  Last W-o-n-g.

12      First, C-h-r-i-s-t-o-p-h-e-r.

13          Q.   Have you ever been deposed before?

14          A.   Hum, no.

15          Q.   Have you ever testified in court at a

16      preliminary hearing or a trial?

17          A.   Yes.

18          MR. THOMSON:  This week?

19          THE WITNESS:  Yes.

20          MR. THOMSON:  I'm joking, because he said he's

21      been there all week.  So...

22          THE WITNESS:  Yes, I have.

23       BY MR. GAMMILL:

24          Q.   And you understand the oath you just took and

25      swore to tell the truth, that's the same oath that you
```



1    Q.    Okay.  So let's go to August 19th, 2013.  You

2    are working with Deputy Melton; correct?

3    A.    That's correct.

4    Q.    And you guys are in the car together?

5    A.    Yes.

6    Q.    Is he driving or are you?

7    A.    He's driving.

8    Q.    Okay.  And what do you hear over the

9    broadcast?

10   A.    We initially heard Deputy Martin coded off on

11   the subject at the Walgreen's.  And then we later heard

12   Deputy Melton -- or, I'm sorry, Deputy Martin say 148

13   over the radio.  That's when we responded to the

14   Walgreen's with lights and sirens on in Code 3

15   authorization.

16   Q.    And how fast are you traveling at Code 3?

17   A.    Oh, I'd say at that point -- I don't know.  I

18   mean, we were driving, I'd say, probably fast enough to

19   the point where -- a little bit faster than normal

20   traffic.  I don't know.  You would have to ask Deputy

21   Melton, who was driving it.  So...

22   Q.    Generally speaking, what's -- explain Code 3.

23   A.    Well, Code 3 is when we activate our lights

24   and sirens on our patrol vehicle.  That consists of a

25   strobing light and a solid red light signifying for

```
 1   depending on the circumstances, I normally will slow

 2   down to the point where I can see that it is safe for us

 3   to go.  But if there's no need for us to make a complete

 4   stop, then we will go through.

 5       BY MR. GAMMILL:

 6          Q.   Is there any quicker way to get -- or is

 7   there any quicker designation to get from Point A to

 8   Point B?  Meaning, is there a Code 4 where you're going

 9   to travel even faster or more urgently, or is Code 3 as

10   urgent as it gets to get from A to B?

11          A.   Um, Code 3 is pretty much the -- what I --

12   from what we do, that's what we use to get from A to B

13   to get there within a faster travel time.

14          Q.   If you hear, Shots fired, officer down, and

15   you want to get there, are you going there Code 3?

16          A.   That's correct.

17          Q.   Okay.  So when you hear the 148, what are you

18   thinking of when you hear that over the radio?

19          A.   When I hear 148 over the radio, I'm thinking

20   that an officer is dealing with somebody that is being

21   either resistive or assaultive, depending on the

22   circumstances.

23          Q.   What's the difference to you?

24          A.   As far as?

25          Q.   Resistive versus assaultive.
```



1      Q.   Okay.

2      A.   I would say if somebody turns around and hits

3   me or pushes me or shoves me, that would be assault.

4      Q.   Okay.  So when you hear 148, someone's being

5   resistive?

6      A.   That's correct.

7      Q.   Okay.  And in that moment, do you remember if

8   you said anything to Melton:  Hurry, let's go, or, We

9   got to get there?  Did you say anything to Melton as far

10  as directing him?

11     MR. THOMSON:  Vague and ambiguous.  Compound.

12        Go ahead.

13     THE WITNESS:  I don't exactly recall whether I

14  said anything to him of whether we should get there

15  quicker or -- I mean, he's third phase so he should --

16  you know, third phase, as far as being third phase in

17  his training, he should pretty much know as soon as he

18  hears that.

19     BY MR. GAMMILL:

20     Q.   Were you worried when you heard another

21  officer put out 148?

22     A.   Was I worried?

23     Q.   Were you worried?

24     A.   I'm always worried when I hear an officer put

25  out 148.



1        Q.    Did he put out any other calls?

2        A.    I believe at some point he said PC 69, but I

3  can't exactly recall.

4        Q.    Are you -- do you remember that or are you

5  just remembering -- refresh --

6        A.    I'm trying to recall exactly from what I

7  recollect.  Yeah.  Trying to remember exactly he put

8  that out over the radio or not.  I can't honestly

9  remember.  I mean, it was a while ago.  It was, like,

10  almost three years ago, so...

11             Um, got off the top of my head, I think he

12  may have said words like that over the radio, because I

13  was trying to monitor both radios back and forth.  So we

14  switch over normally to go to a different channel, but

15  we're still having the main channel on our regular HT or

16  hand -- lack of a better term, your hand walkie-talkie

17  that you have, the one that goes personally on you, and

18  then also one in the car.

19             So in general, we switch over -- our policy

20  is to switch over to tell Dispatch that we're going en

21  route Code 3 to a call, because we don't want to put it

22  over the main channel because he may need that, or that

23  deputy or that officer may need that while they're being

24  engaged, or I should say in the active 148.

25        Q.    What did you see when you first arrived?



1   What's the first thing you remember seeing?

2         A.   Um, I saw that deputies were attempting to

3   get Mr. Ledesma into custody.

4         Q.   How many deputies?

5         A.   I'm going to say Deputy Martin was there,

6   Deputy de la Garza was there.  And I want to say --

7   roughly around that time, I want to say Deputy Perkins

8   was about -- right there at that time as well.

9         Q.   Did Perkins have a K-9 unit?

10        A.   Yes, he did.

11        Q.   When you say attempted to take Mr. Ledesma

12   into custody, what do you mean by that?

13        A.   They were struggling with him on the ground.

14   They actually had him on the ground.  They were trying

15   to place him into handcuffs, or at least get control

16   holds on him to place him in handcuffs.

17        Q.   To your recollection, did all three officers

18   have their hands on Ledesma?

19        A.   I want to say two did, and Deputy Perkins had

20   his K-9 out at that time.

21        Q.   Was the K-9 biting Ledesma?

22        A.   I don't recall the K-9 biting Ledesma at that

23   point.  I don't remember.

24        Q.   When your patrol vehicle comes to a stop and

25   you exit, do you make your way towards the group?



```
 1        BY MR. GAMMILL:
 2           Q.   As you sit here today, do you remember
 3     identifying any other safety concerns?
 4           A.   Not that I can remember, no.
 5           Q.   So you arrive, you see the three officers; to
 6     your recollection, you think Martin and de la Garza had
 7     hands on Ledesma.  Perkins has the dog.  And so what do
 8     you see happening next as you make your approach?
 9           A.   I went in there to assist them.  I grabbed
10     onto Ledesma.
11           Q.   Where?
12           A.   I want to say one of his arms initially, and
13     tried to place him into a control hold.
14           Q.   And what do you mean by control hold?
15           A.   Well, generally, we're trying to grab onto
16     his arms to place them behind his back to get a positive
17     control hold, consisting of like, either a rear-wrist
18     lock or something of that nature to place the hand --
19     place -- attempt to place him in the restraints.
20           Q.   When you were trying to grab onto the arm,
21     could you see what any other officers were doing?
22           A.   Hum, just briefly, kind of around as I'm
23     trying to do stuff, but I don't -- as far as like
24     intently viewing on what other officers are doing, I
25     can't really say I was able to -- I mean, I was
```

Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 14 of 86

CHRISTOPHER WONG                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                          23

1  concentrating more on what I was trying to do, so...

2      Q.   What's your recollection as to what was going

3  on around you as you grabbed for that arm?

4      A.   He was pulling his arm away from me.  It was

5  very difficult to grab ahold of his arm because he was

6  sweating profusely.  He was just throwing his arm -- I

7  should say jerking his arm away from me.

8      Q.   Was he being struck?

9      A.   Was he being struck?

10     MR. THOMSON:  Vague and ambiguous.

11         Go ahead.

12  BY MR. GAMMILL:

13     Q.   Was he being struck?

14     A.   By?

15     Q.   In that moment.  By anyone?

16     A.   I don't think so, no.  I don't remember.  I

17  don't believe so.

18     Q.   So then what happens when you try to grab the

19  arm?

20     A.   Um, Deputy -- or Deputy Perkins told Ledesma,

21  If you did not -- he advised him that he would deploy

22  his K-9 if he did not quit resisting, and he stated that

23  he was under arrest.  At that point Ledesma continued to

24  resist; Deputy Perkins deployed his K-9 on Ledesma.

25     Q.   So you believe that you heard Perkins warn



Case 1:14-cv-01634-DAD-JLT    Document 59-7    Filed 08/05/16    Page 15 of 86

CHRISTOPHER WONG                                January 28, 2016
LEDESMA vs. KERN COUNTY                                       24

1    Ledesma that he would deploy the dog?

2         A.    That's correct.

3         Q.    Fair to say, then, you don't think that, to

4    your recollection, the dog had been deployed from the

5    time you arrived to the time you hear that warning; you

6    never saw the dog deployed?

7         MR. THOMSON:    Incomplete hypothetical.  Assumes

8    facts not in evidence.

9         THE WITNESS:    I'm sorry, can you restate -- can

10   you reask that a different way?

11   BY MR. GAMMILL:

12        Q.    Yeah.  So you arrive on scene?

13        A.    Uh-huh.

14        Q.    And now we're talking about when you hear

15   Perkins give a warning that he's going to deploy the

16   dog.  At any point had you seen the dog bite Ledesma?

17        MR. THOMSON:    Prior to the warning.

18   BY MR. GAMMILL:

19        Q.    Prior to the warning?

20        A.    No.

21        Q.    Okay.  Are you sure that you heard Perkins

22   warn him?

23        A.    Yes.

24        Q.    Are you sure that the dog was not already

25   engaged biting Ledesma when you arrived?



1    A.   I don't recall the dog was biting -- engaging

2    Ledesma.  I know Perkins would generally give a warning

3    and have his dog out.  But like I said, I don't know

4    what the other officers did.  I mean, I was more

5    intently trying to get Ledesma into handcuffs.

6    Q.   Is it possible that dog bit Ledesma while you

7    were present and you did not notice?

8    A.   I don't believe so.

9    Q.   Is it possible the dog was biting Ledesma

10   when you arrived and you didn't take note of it?

11   A.   Like I said, I didn't see it, but I don't

12   know.  I couldn't tell you that from what I recall.

13   Q.   After he gives the warnings -- he being

14   Perkins, warns Ledesma that he's going to deploy the

15   dog, what happens?

16   A.   He deployed his K-9 on Ledesma's, I believe

17   his foot or his leg.

18   Q.   Can you describe what you mean by deploy on

19   his foot or leg?

20   A.   He would place the dog or he will give the

21   order to the dog to bite, and he will -- the dog must

22   have bit Ledesma's leg or foot.  I don't remember.  I

23   know it was the lower half of his body.  I mean, it

24   wasn't where we were, so...

25   Q.   Was this the first time you had been involved



Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 17 of 86

CHRISTOPHER WONG                          January 28, 2016
LEDESMA vs. KERN COUNTY                                    26

1  with a situation that involved a K-9?

2      A.   I've been in incidents where we've had to use

3  a K-9 before.

4      Q.   Did it surprise you that Perkins had the dog

5  bite him in that situation?

6      A.   No.

7      Q.   And when the dog bit on his lower portion,

8  we'll call it lower portion of his body, is that a fair

9  description?

10     A.   Sure.

11     Q.   What happened next?

12     A.   Um.  I started to see Ledesma attempt to kick

13 the dog with his foot.

14     Q.   What did it appear to you that he was doing?

15     A.   Kicking the dog with his foot.

16     Q.   Was he -- was the dog biting him at that

17 point?

18     A.   I believe it was biting and in the process

19 and trying to re-engage back on the foot.

20     Q.   Was he kicking with the foot that was being

21 bit or was he kicking with the off foot, if you

22 remember?

23         MR. THOMSON:  Vague and ambiguous.

24            Go ahead.

25         THE WITNESS:  I don't exactly remember exactly



1   which foot he was using to kick.  I just remember he was

2   kicking the dog's head with his foot.

3           Q.   Did he actually strike the dog's head?

4           A.   Yes, he did.

5           Q.   Okay.  Is that the only time you saw Ledesma

6   hit the dog?

7           A.   From what I recall.  I mean, he may have done

8   it more, but it was like a continuous.  He was just

9   kicking the dog in the head.  As far as how many times

10  he did it, I couldn't tell you.  I was kind of busy.

11          Q.   Well, can you describe it with a word?  And I

12  know if -- you can't count, but a few times, many times,

13  a lot of times, a bunch of times?  Is there a word?

14          A.   I would say many.

15          MR. THOMSON:  Vague and ambiguous.  Compound.

16               Give me a breath after.

17          THE WITNESS:  Sure.

18          MR. THOMSON:  Okay.

19      BY MR. GAMMILL:

20          Q.   Ledesma wasn't arrested for assault on the

21  dog, though, was he?

22          MR. THOMSON:  Lacks foundation.  Calls for

23  speculation.

24               Go ahead.

25  ///



Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 19 of 86

CHRISTOPHER WONG                              January 28, 2016
LEDESMA vs. KERN COUNTY                                      28

1      BY MR. GAMMILL:

2          Q.   To your knowledge?

3          A.   To my knowledge, I don't think so.  I don't

4      remember -- exactly remember the exact charges that he

5      was -- that were placed on him as far as anything

6      regarding the K-9.

7          Q.   So he's kicking at the dog.  What happens

8      next?

9          A.   After he kicked -- or after the dog engaged

10     on him and he kicked the dog, I stood up and deployed my

11     wooden police baton.  I gave Ledesma an order to quit

12     resisting.  He ignored my order, and I had to strike him

13     with my baton.

14         Q.   You said you gave an order to quit resisting.

15     Were those the words you used?

16         A.   Yeah.  I said, Quit resisting, or, Stop

17     resisting, or else you are going to get struck with the

18     baton.

19         Q.   At that point is he still being bit by the

20     dog?

21         A.   He's still being -- I don't remember if he

22     was still being bit by the dog at that point or not.  I

23     remember he was still actively pulling away from

24     deputies, pulling his arms away from deputies and trying

25     to -- not being compliant with deputies as far as when



Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 20 of 86

CHRISTOPHER WONG                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                          29

1    they were trying to put him into handcuffs or place him

2    under arrest.

3         MR. THOMSON:  For the record, during the answer

4    you had your hands balled up in fists in front of you,

5    not touching, but about two to three inches from your

6    body, and twisting your torso to the right, to the left;

7    correct?

8         THE WITNESS:  Yeah.

9    BY MR. GAMMILL:

10        Q.   And did you strike him with the baton?

11        A.   Yes, I did.

12        Q.   And how many times?

13        A.   If I remember correctly, it was possibly

14   three times.

15        Q.   And to what area of the body?

16        A.   It was the right shoulder area.

17        Q.   And was that all three blows to the right

18   shoulder area?

19        A.   Yes.

20        Q.   And is that consistent with your training as

21   far as using the baton?

22        A.   Yes.

23        Q.   Is the shoulder an area that you're taught to

24   strike -- to target in a strike?

25        A.   Yes.  It's like a -- more the shoulder and



CHRISTOPHER WONG                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                          30

1     biceps area, I guess.

2          Q.   Are there areas you're taught not to strike?

3          A.   Yes.  The head, the groin, and -- those are

4     the ones I can think of off the top of my head right

5     now.

6          Q.   After you hit him with the baton three times

7     in the right shoulder area, what was the response from

8     Ledesma?

9          A.   He still continued to resist and pull away

10    from us.

11         Q.   When you say "resist and pull away," is that

12    still that sort of pivoting behavior you demonstrated a

13    few moments ago?

14         A.   Right.  And as deputies were grabbing ahold

15    of his arms, he's pulling his arms away from deputies.

16         MR. THOMSON:  Just for the record, when you said

17    that, you had your left arm and you raised it in kind of

18    in a circular motion above shoulder level coming maybe

19    as high as your eye level and then back down; correct?

20         THE WITNESS:  Correct.

21    BY MR. GAMMILL:

22         Q.   At any point -- at any point that day, did

23    Ledesma strike you?

24         MR. THOMSON:  Vague and ambiguous.

25              Go ahead.



ESQUIRE

Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 22 of 86

CHRISTOPHER WONG                                      January 28, 2016
LEDESMA vs. KERN COUNTY                                             32

1   point ever take -- did he ever attempt to punch you?

2           MR. THOMSON:   Vague and ambiguous.   Lacks

3   foundation.   Calls for speculation as to the thought

4   processes of another.

5                To the extent that you recall seeing that,

6   you can relate that to him.

7           THE WITNESS:   I don't remember seeing him trying

8   to punch me or hit me.

9       BY MR. GAMMILL:

10          Q.   Okay.   Same question as to the other human

11  deputies.   Did you ever see him take what seemed to be

12  in -- sort of a swing?

13          A.   I mean, he's, like, moving -- he's swinging

14  his arms around.   He could have been.   I don't know.

15          Q.   Okay.   How would you describe him swinging

16  his arms around?

17          A.   Like I said, he's pulling his arms away, and

18  he's swinging his body around with his arms flailing

19  around from side to side.   The proximity that we were

20  next to him, or I should say around him, he could have

21  possibly attempted to swing at somebody.   I don't know.

22          Q.   Fair to say that when you start struggling

23  with a person and they're flailing their arms about --

24  and I'm not asking you to get in anybody's head, but

25  generally speaking -- not even about this incident --



1      A.    That's what I'm trying to tell you as far as

2   my memory on it.   I mean, I don't know how to, like,

3   answer that with -- I mean, if I thought from what I saw

4   from him flailing around or swinging his arms around if

5   it was intentional or not, whether he was intentionally

6   trying to strike another officer or anything like that,

7   I don't know how to answer that without getting into

8   somebody else's head.   And I get that.   But I mean,

9   yeah, generally, I can tell when somebody's trying to

10  intentionally strike at somebody or not intentionally

11  strike at somebody.   And I mean, I suppose that's a

12  possibility that that's what he was trying to do by

13  squirming, it was inadvertent from him swinging around.

14      Q.    Okay.   So just it was unclear to you?

15      A.    It was unclear.

16      Q.    Okay.   And after you used the baton the three

17  times, did you put it away or did you keep it out?

18      A.    I put it away.

19      Q.    And after you used the baton three times, you

20  put it away, what happens next?

21      A.    We continued to struggle with him.   I'm

22  grabbing onto his arms in an attempt to place him in a

23  control hold again.   At some point we tried to roll him

24  over onto his stomach, so that way we could get his arms

25  behind his back, and it was difficult for us to grab him



1   and latch onto his -- or hold onto his arms because of

2   the sweat, and he's pulling away, trying to pull --

3   actually, the arm is trying to -- back behind him

4   underneath his body to keep them away -- or keep his

5   arms away from us.

6            At some point he was able to actually free

7   one of his arms or free his arms and push his body up

8   from the ground as -- in an attempt to, I guess, get up

9   off the ground.

10       Q.   And what happened at that point?

11       A.   He after that he rolled back over onto his

12   back.  We were still trying to get him back -- to roll

13   back over on his stomach so we could attempt to place

14   him into custody.  He then started to stand, or attempt

15   to stand.

16            Once I saw he was attempting to stand, I

17   stood -- I stood up and gave him a few more orders to

18   quit resisting, and then took out my baton again.  And I

19   think I was, like, actually not standing.  It was more

20   along the line of, I was kind of kneeling -- well, in a

21   kneeling position over him.  So it was fairly close to

22   him or still in close proximity to him.

23            I deployed my baton, gave him orders to quit

24   resisting, and to roll back on his stomach.  I then

25   started to jab him with my baton, I want to say it was



1    in the left shoulder area, to gain compliance.   Once I

2    found that that was not working, I holstered -- or

3    placed my baton back in the holster.

4              He continued to start to stand.   And then the

5    only thing I was able to really do was -- I was still

6    off balance.   I placed my right foot onto his middle

7    body portion area to get him to lose his balance to get

8    back onto the ground backwards, to keep him on the

9    ground.

10         Q.    He goes down backwards onto the ground?

11         A.    That's -- well, he sat back down on the

12   ground.   He's not -- I wouldn't say -- I don't know how

13   you would put it.   He just kind of, yeah, put his --

14   placed his body back down backwards onto the ground.

15         Q.    And then what happened?

16         A.    After that, we rolled him back over on his

17   stomach, and we were able to get good enough control

18   holds to place him into two sets of handcuffs, because

19   he was still pulling his hands away.   And the rigidity

20   of his muscles, it was very difficult to actually get

21   his wrists close enough to place him into cuffs.

22              So after that was done, we were able to place

23   him in custody.

24         Q.    Did you ever see anybody else strike him with

25   a baton?



Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 26 of 86

CHRISTOPHER WONG                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                          50

1    Assignment No. J0286129

2    Adriana Ledesma, et al.,
     vs.
3    Kern County, et al.

4

5              DECLARATION UNDER PENALTY OF PERJURY

6              I declare under penalty of perjury

7    that I have read the entire transcript of my

8    deposition taken in the captioned matter

9    or the same has been read to me, and the same is

10   true and accurate, save and except for changes and/or

11   corrections, if any, as indicated by me on the

12   DEPOSITION ERRATA SHEET hereof, with the

13   understanding that I offer these changes as if

14   still under oath.

15

16             Signed on the ___14___ day of

17   __MARCH_____, 20_16_.

18

19   
     _____
20             CHRISTOPHER WONG

21

22

23

24

25

Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 27 of 86

CHRISTOPHER WONG                                    January 28, 2016
LEDESMA vs. KERN COUNTY                                          51

1

2

3           I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby certify:

5           That the foregoing proceedings were taken

6    before me at the time and place herein set forth; that

7    any witnesses in the foregoing proceedings, prior to

8    testifying, were placed under oath; that a verbatim

9    record of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; further, that the foregoing is an accurate

12   transcription thereof.

13          I further certify that I am neither

14   financially interested in the action nor a relative or

15   employee of any attorney of any of the parties.

16          IN WITNESS WHEREOF, I have subscribed my

17   name this 1st day of February, 2016.

18

19                    

20   _____

21          Victoria L. Thomas
            CSR No. 12927

22

23

24

25

# EXHIBIT K

---

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "K"**

ORIGINAL

# In the Matter Of:

## LEDESMA vs. KERN COUNTY

14-cv-01634-LJO-JLT

## EUGENE CARPENTER, JR.,M.D.

*January 28, 2016*



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 30 of 86

EUGENE CARPENTER, JR.,M.D.                    January 28, 2016
LEDESMA vs. KERN COUNTY                                     1

1                UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF CALIFORNIA

3

4   ADRIANA LEDESMA, an individual;
    JESSICA LEDESMA, an individual;
5   MARISSA LEDESMA, an individual
    by and through his Guardian Ad
6   Litem Raquel Sierra; RONNIE
    MATHEW LEDESMA, an individual by
7   and through his Guardian Ad Litem
    Christina Garcia; CHRISTINA HERRERA;
8
                   Plaintiffs,
9
    vs.                                      Case No.
10                                    14-cv-01634-LJO-JLT
    KERN COUNTY; KERN COUNTY SHERIFF'S
11  DEPARTMENT; WARREN MARTIN; KARENA
    DE LA GARZA; DWAYNE PERKINS; JAMES
12  MELTON; CHRISTOPHER WONG; AND DOES
    1-200, INCLUSIVE,
13
                   Defendants.
14  _____

15

16                  DEPOSITION OF

17          EUGENE CARPENTER, JR., M.D.

18

19               January 28, 2016

20                 11:45 a.m.

21

22        1115 Truxtun Avenue, Fourth Floor

23            Bakersfield, California

24

25        Victoria L. Thomas, CSR No. 12927



800.211.DEPO (3376)
EsquireSolutions.com

EUGENE CARPENTER, JR.,M.D.                          January 28, 2016
LEDESMA vs. KERN COUNTY                                            2

```
 1                      APPEARANCES OF COUNSEL

 2    For Plaintiffs:
      GERAGOS & GERAGOS
 3    BENJAMIN MEISELAS, ESQ.
      DAVID GAMMILL, ESQ.
 4    644 Historic South Figueroa Street
      Los Angeles, California 90017
 5    (213) 625-3900

 6    For Defendants:
      OFFICE OF COUNTY COUNSEL
 7    ANDREW THOMSON, DEPUTY COUNTY COUNSEL
      1115 Truxtun Avenue, Fourth Floor
 8    Bakersfield, California  93301
      (661) 868-4814
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                         I N D E X

 2    WITNESS:   Eugene Carpenter, JR., M.D.

 3

 4    EXAMINATION                              PAGE

 5    By Mr. Meiselas                          5, 100

 6    By Mr. Thomson                           77

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



EUGENE CARPENTER, JR.,M.D.                    January 28, 2016
LEDESMA vs. KERN COUNTY                                       4

1    INDEX TO EXHIBITS

2

3

4    (None offered.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:14-cv-01634-DAD-JLT   Document 59-7   Filed 08/05/16   Page 34 of 86

EUGENE CARPENTER, JR.,M.D.                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      5

1                    BAKERSFIELD; CALIFORNIA;

2            THURSDAY; JANUARY 28, 2016; 11:45 A.M.

3

4                    EUGENE CARPENTER, JR., M.D.,

5          having been first duly sworn, testifies as follows:

6

7                         EXAMINATION

8     BY MR. MEISELAS:

9          Q.    Good morning, Doctor.  How are you?

10         A.    I'm fine.  Thank you.  Good morning.

11         Q.    I understand today that you are not

12    represented by Counsel; is that correct?

13         A.    Correct.

14         Q.    So the gentleman sitting on your right,

15    Mr. Andrew Thomson, who has represented other County

16    officials in this proceeding, he is not your attorney;

17    correct?

18         A.    Correct.

19         Q.    He has never been your attorney in this case;

20    correct?

21         A.    Correct.

22         Q.    You have never been represented by any

23    attorney from the County in this case; correct?

24         A.    Correct.

25         Q.    Have you ever had your deposition taken



1   technically it has to be called a natural death.  It is

2   not an accidental death.  It is not due to trauma.  And

3   so I lay that all out for the benefit of both sides.

4          Q.   Okay.  So talking about that case, that

5   example that you gave, that there was the resisting,

6   there may have been excited delirium, in that case you

7   referred to the death as natural and then gave an

8   explanation; correct?

9          A.   Yes.

10         Q.   Here you refer to the death as accident;

11  correct?

12         A.   Yes.

13         Q.   And you also reference trauma; correct?

14         A.   Yes.

15         Q.   Okay.  And we'll get into your thought

16  process in a little bit of how you made that

17  distinction.  But the example that you just gave me is

18  you reached a different conclusion in the Ledesma case;

19  correct?

20         A.   A different --

21         Q.   You reached a different finding.  In the

22  other case it was natural; in the Ledesma case it was

23  accident?

24         A.   Yes.  In the other case it was natural, and I

25  explained my reasoning processes and how others might



EUGENE CARPENTER, JR., M.D.                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      32

1    disagree and why, because doctors are all over the place

2    as to their opinion as to the manner or mode or death.

3           Q.   At the time you were preparing the Ledesma

4    report, it was your understanding that there would be

5    civil litigation surrounding the case?

6           A.   No.  I anticipated there would not be.

7           Q.   And nonetheless, you still discussed in the

8    event of civil litigation, and you gave a number of

9    recommendations?

10          A.   Yes, because other doctors would call this

11   natural.  Um, I couldn't call it natural because I could

12   not say that the baton strikes to the back of the legs

13   or the dog bites to the back of the legs, I could not

14   say they do not play a role in some way, may be small,

15   but I couldn't say they did not play a role in this

16   death.  Therefore, technically, it was accident, and I

17   explained why.

18           It could -- other doctors may look at this,

19   and they say, No, this is a natural death due to

20   pulmonary embolism from an underlying natural tendency

21   to form blood clots.  And they will have a very good

22   argument for that.  But I was unwilling to leave that

23   material off the death certificate, which changed the

24   manner from natural.  It changed it to an accident,

25   technically.



EUGENE CARPENTER, JR.,M.D.                        January 28, 2016
LEDESMA vs. KERN COUNTY                                        68

1    correct?

2         A.   No.

3         Q.   And when you write on your police reports

4    that the police conformed to the community standard of

5    care, you don't rely on witness reports like this;

6    correct?

7         A.   No.  When I wrote on my autopsy report.

8         Q.   And you never had this information at the

9    time you wrote your autopsy report; correct?

10        A.   No.  I had information I had, which was part

11   of my reason to ask for more information or not ask for

12   more information because I had no injuries of any

13   consequence of the decedent.  There were no head

14   injuries other than a few small little cuts, no swelling

15   at the skin underneath his right eye, and no head

16   injuries, no throat injuries, no baton bruises, deep --

17   I cut open the legs and looked all the way down to the

18   bone and saw no baton strikes.

19             There's one photograph of what's probably a

20   baton strike.  It's not on the diagrams, but it's in the

21   photographs, but that's all we found.

22        Q.   And where was that baton strike?  Where does

23   that photograph?

24        A.   That I can't say.  I can say that there's

25   a -- that in my review this morning, I picked up that



1        Q.   And in looking at the report, is it your

2    understanding that the primary and secondary causes of

3    death are listed on your report on the second page under

4    A and B?

5        MR. MEISELAS:   Which page?

6      BY MR. THOMSON:

7        Q.   Second page at the very top, Section 2, Cause

8    of Death, A and B.   Those are your primary

9    determinations as to cause of death; correct?

10       A.   Yes.

11       Q.   And those are determined as to a reasonable

12    degree of medical certainty; correct?

13       A.   Yes.

14       Q.   Now, I believe that we have covered this, but

15    I just want to be absolutely sure.

16            You have not interviewed any Kern County

17    Sheriff's Office personnel relative to this matter;

18    correct?

19       A.   Correct.

20       Q.   And when I say that, I'm not talking about

21    anybody who works at the coroner's office.   I'm talking

22    about people from the Sheriff's Office; correct?

23       A.   Correct.

24       Q.   Okay.   Now, we have kind of danced around

25    this, and I just want to be sure that we have it clear

1    BY MR. THOMSON:

2         Q.   Okay.  Now, I just want to clear something

3    up.  You and Counsel had discussed leg thrombi,

4    essentially blood clots, if I can use that term.  And

5    you had indicated that it was your opinion that some of

6    those had traveled; correct --

7         A.   Yes.

8         Q.   -- in Mr. Ledesma?

9              Do you know if during your autopsy you were

10   able to determine that any of those thrombi had reached

11   the heart?

12        A.   Um, yes.  They have to go through the heart

13   to get to the lungs.

14        Q.   All right.

15        A.   The right side of the heart, not the left.

16        Q.   All right.  Let me ask, um, is it possible

17   for a thrombi to go through the heart?  Is that a common

18   situation?

19        A.   Yes.

20        Q.   Is it possible for the thrombi to go through

21   the lungs?  Is that a common situation?

22        A.   No.  It's impossible for it to go through the

23   lungs.

24        Q.   Now, blood traveling from the leg would go --

25   be pumped up through the heart, through the lungs, back



EUGENE CARPENTER, JR.,M.D.                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      84

1    through the heart, and then out again; correct?

2         A.    Yes.

3         Q.    So if there was thrombi from the leg, it

4    could have gone through the heart the first time, but

5    not the lungs?

6         A.    Correct.

7         Q.    Now, have you ever done an autopsy on someone

8    that has been diagnosed with Valley Fever?

9         A.    Yes.

10        Q.    In people diagnosed with Valley Fever, have

11   you found it common that these people would have

12   thrombi?

13        MR. MEISELAS:   Objection.   Foundation hasn't been

14   established.

15        THE WITNESS:   I don't have that much experience

16   with it.   I can't answer that.   I've seen people for the

17   first time here in the Bakersfield area who have had

18   Valley Fever in the past.   I have not had a case where

19   Valley Fever was a cause of death or a contributor to

20   death.

21     BY MR. THOMSON:

22        Q.    Now, a couple of things we talked about, dog

23   bites.   To a reasonable degree of medical certainty, can

24   you say that the dog bites caused the thrombi?

25        MR. MEISELAS:   Objection.   No foundation, based

EUGENE CARPENTER, JR.,M.D.                    January 28, 2016
LEDESMA vs. KERN COUNTY                                      85

1   on my questioning, but he can answer.

2        THE WITNESS:  No.

3   BY MR. THOMSON:

4        Q.   To a reasonable degree of medical certainty,

5   can you say that any baton blow caused the thrombi?

6        MR. MEISELAS:  Same objection.

7        THE WITNESS:  No.

8   BY MR. MEISELAS:

9        Q.   In your medical opinion, or to a reasonable

10  degree of medical certainty, did thrombi from the legs

11  cause the massive right cerebral hemisphere infarction?

12       MR. MEISELAS:  Same objection.

13       THE WITNESS:  No.

14  BY MR. THOMSON:

15       Q.   To a reasonable degree of medical certainty,

16  in your opinion, did the thrombi from the legs cause the

17  thrombosis of the proximal right middle cerebral artery?

18       MR. MEISELAS:  Same objection.

19       THE WITNESS:  No.

20  BY MR. THOMSON:

21       Q.   Doctor, I just want to ask you a few more

22  questions about your report.

23            You have indicated earlier that you had

24  reviewed KMC records; correct?

25       A.   Yes.



# EXHIBIT L

---

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "L"**

THERESA A. GOLDNER, COUNTY COUNSEL
By: ANDREW C. THOMSON, DEPUTY (SBN 149057)
Kern County Administrative Center
1115 Truxtun Avenue, Fourth Floor
Bakersfield, CA 93301
Telephone 661-868-3800
Fax 661-868-3805

Attorneys for Defendants Kern County,
Kern County Sheriff's Office, Warren Martin,
Karena De La Garza, Dwayne Perkins,
James Melton and Christopher Wong

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIANA LEDESMA, an individual; JESSICA LEDESMA, an individual; MARISSA LEDESMA,  an individual by and through her Guardian Ad Litem Raquel Sierra; RONNIE MATHEW LEDESMA,  an individual by and through his Guardian Ad Litem Christina Garcia; CHRISTINA HERRERA<br><br>                        Plaintiffs,<br><br>        vs.<br><br>KERN COUNTY, KERN COUNTY SHERIFF'S DEPARTMENT; WARREN MARTIN; KARENA DE LA GARZA; DWAYNE PERKINS; JAMES MELTON; CHRISTOPHER WONG; AND DOES 1-200, inclusive,<br>                        Defendants. | CASE NO. 1:14-CV-01634-DAD-JLT<br><br>DECLARATION OF DEPUTY KARENA AQUINO [FORMERLY DELAGARZA] IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY SUMMARY ADJUDICATION<br><br>[F.R.C.P. Rule 56] |

## DECLARATION OF DEPUTY KARENA (DELAGARZA) AQUINO

I, Karena (DeLaGarza) Aquino, declare:

1.    I am employed as a Sheriff's Deputy with the Kern County Sheriff's Office (hereinafter "KCSO") where I have been employed since December 2010.

---

Declaration of Deputy Karena (DeLaGarza) Aquino

1

1  THERESA A. GOLDNER, COUNTY COUNSEL
   By: ANDREW C. THOMSON, DEPUTY (SBN 149057)
2  Kern County Administrative Center
3  1115 Truxtun Avenue, Fourth Floor
   Bakersfield, CA 93301
4  Telephone 661-868-3800
   Fax 661-868-3805
5

6  Attorneys for Defendants Kern County,
   Kern County Sheriff's Office, Warren Martin,
7  Karena De La Garza, Dwayne Perkins,
   James Melton and Christopher Wong
8

*Return To ACT*

9          UNITED STATES DISTRICT COURT

10         EASTERN DISTRICT OF CALIFORNIA

11  ADRIANA LEDESMA, an individual;    )  CASE NO. 1:14-CV-01634-LJO-JLT
    JESSICA LEDESMA, an individual;    )
12                                     )
    MARISSA LEDESMA,  an individual by )  DECLARATION OF DEPUTY KARENA
13  and through her Guardian Ad Litem  )  AQUINO [FORMERLY DELAGARZA] IN
    Raquel Sierra; RONNIE MATHEW       )  SUPPORT OF DEFENDANTS' MOTION
14  LEDESMA,  an individual by and     )  FOR SUMMARY JUDGMENT OR
    through his Guardian Ad Litem      )  ALTERNATIVELY SUMMARY
15  Christina Garcia; CHRISTINA        )  ADJUDICATION
16  HERRERA                            )
                    Plaintiffs,        )
17      vs.                            )  [F.R.C.P. Rule 56]
18                                     )
    KERN COUNTY, KERN COUNTY           )
19  SHERIFF'S DEPARTMENT;              )
    WARREN MARTIN; KARENA DE LA        )
20  GARZA; DWAYNE PERKINS; JAMES       )
    MELTON; CHRISTOPHER WONG;          )
21  AND DOES 1-200, inclusive,         )
22                    Defendants.      )
                                       )
23

24      __DECLARATION OF DEPUTY KARENA (DELAGARZA) AQUINO__

25      I, Karena (DeLaGarza) Aquino, declare:

26      1.      I am employed as a Sheriff's Deputy with the Kern County Sheriff's Office

27  (hereinafter "KCSO") where I have been employed since December 2010.

28

_____
Declaration of Deputy Karena (DeLaGarza) Aquino
                    1

1      2.      I am a defendant in the above-referenced civil matter. I am thoroughly

2 familiar with the facts and issues set forth in this Declaration, and if called upon as a witness,

3 I could and would competently testify to each of the matters set forth herein.

4      3.      In 2012, I was placed in Metro Patrol as a patrol Deputy, and have been so

5 employed since that time.

6      4.      I recall being dispatched to the call which is the subject of this litigation. I

7 recall that I responded to the call regarding a deputy involved in a physical altercation on

8 August 19, 2013.

9      5.      While responding to the call, I heard Martin broadcast a §148 which means

10 that a suspect is resisting or obstructing an officer in his duties.

11      6.      Hearing Martin broadcast a §148 made me concerned for Martin's safety,

12 especially since I was not aware of any other Deputies on scene at the time of the broadcast.

13      7.      Upon arrival I saw Deputy Martin (hereinafter "Martin") standing behind

14 Ronnie Ledesma (hereinafter "Ledesma"), who was sitting on the floor.

15      8.      As I approached, I realized that Ledesma had probably not been searched for

16 weapons which caused me concern, and made it necessary to quickly control and handcuff

17 Ledesma.

18      9.      During the incident, I realized that Ledesma was likely under the influence of

19 PCP since Ledesma was sweating profusely, was often staring straight ahead, looked out of it

20 and when force was used he did not react in a normal manner. When force was used,

21 Ledesma would simply shake it off, would not have any physical reaction, would not verbal

22 recognize any pain and never verbalize anything in words.

23      10.      I approached Ledesma and attempted to grab his right arm to place handcuffs

24 on Ledesma, but was unable to do so since he tensed up his right arm, lay on his back with

25 his arms underneath him began kicking and resisted attempts to control him, which prevented

26 me from placing handcuffs on him.

27      11.      As I was attempting to grab Ledesma's arm I was giving him verbal

28 commands to "give me your hands" and "stop resisting."

---

**Declaration of Deputy Karena (DeLaGarza) Aquino**

1      12.     Ledesma then lay on the ground and began resisting deputies by kicking his

2  feet and placing his arms underneath him.

3      13.     I then witnessed Ledesma grab Deputy Perkins (hereinafter "Perkins") canine

4  by his nose as the canine was biting him

5      14.     When Ledesma grabbed the canine, I then struck Ledesma three (3) times on

6  his arm and leg with my collapsible baton so he would release the KCSO canine but the

7  baton strikes had no effect on Ledesma.

8      15.     In an effort to gain compliance and to get control of Ledesma, I struck

9  Ledesma approximately two more times with my collapsible baton on the leg and arm, but

10  the baton strikes were still ineffective.

11      16.     During the time that I was attempting to handcuff Ledesma, I attempted to

12  apply control holds but was unsuccessful since Ledesma continued to tense his arms and pull

13  away.  After Ledesma pulled away he went to ground on his back and was kicking at the

14  Deputies.

15      17.     Ledesma was also able to frustrate the attempts to place handcuffs on him by

16  turning on his stomach and pulling his arms in underneath his body so that the Deputies

17  could not get ahold of his arms.

18      18.     All four Deputies were eventually able to control and handcuff Ledesma by

19  two deputies on each side grabbing Ledesma's arms and pulling them out from underneath

20  him and then placing handcuffs on him.

21      The matters stated herein are true of my own knowledge, except as to those matters

22  which are stated upon information and belief and, as to those matters, I believe them to be true.

23  \ \ \

24  \ \ \

25  \ \ \

26  \ \ \

27  \ \ \

28  \ \ \

1    I declare under penalty of perjury under the laws of the state of California that the

2  matters stated in this declaration are true and correct, and if called upon, I could and would

3  truthfully and competently testify thereto.

4    Executed on this 7th day of July, 2016, in Bakersfield, California.

5

6    _____

7    Defendant, Deputy Karena (DeLaGarza) Aquino,
     Declarant

8  #22Q7994.DOC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**Declaration of Deputy Karena (DeLaGarza) Aquino**

4

**EXHIBIT M**

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "M"**



### Kern County Sheriff's Office
## Policies And Procedures

| TITLE:   USE OF FORCE - GENERAL | | NO: F-100 | |
|---|---|---|---|
| APPROVED:   Donny Youngblood, Sheriff-Coroner | | | |
| **EFFECTIVE:** **August 1, 1990** | **REVIEWED:** 6/1/2007 | **REVISED:** 03/01/2005 | **UPDATED:** 11/12/2007 |

## DEFINITIONS

When used in this policy, "law enforcement personnel", "law enforcement officers", or "officer" shall include sheriff's deputies, detentions deputies, and detention officers.

"Force" means physical contact with a person by hand or instrumentality to gain control of that person when verbal command is unavailing, inappropriate, or futile in the circumstances. Force shall not mean or include such routine or incidental physical contact with a person as is necessary to take the person into actual, physical custody or the application of a wrist lock or control hold to handcuff an inmate, prior to movement for security reasons, when there is no physical resistance by the inmate.

The term "deadly force" shall mean force likely to cause death or serious bodily injury.

## RELATIONSHIP WITH LAW

This policy does not have the effect of law and is not intended to have the effect of law. The law is contained in the federal and state constitutions, statutes, and court decisions. Ultimate liability of law enforcement personnel under law can only be determined by the courts. Violation of this policy does not, is not intended to, and cannot mean that the involved law enforcement personnel are liable under the law.

## SHERIFF'S OFFICE PHILOSOPHY

The use of any force, including deadly force, by law enforcement personnel is a matter of critical concern both to the public and the law enforcement community. Officers are involved on a daily basis in numerous and varied human encounters and, when warranted, may use reasonable force in carrying out their duties.

Law enforcement personnel must have an understanding of the extent of their authority; particularly with respect to overcoming resistance from and gaining and maintaining control over those with whom they come in official contact.

The Kern County Sheriff's Office recognizes and respects the value of human life and dignity without prejudice to anyone. It is also understood that deputies have the authority to use reasonable force, including deadly force, to protect the public and carry out their duties.

## POLICY

The use of force by law enforcement officers requires constant evaluation.  The use of force is a serious responsibility.  The purpose of this policy is to provide officers of the Sheriff's Office with guidelines on the reasonable use of force.

Deputy Sheriffs of the Sheriff's Office, in the performance of their lawful duties, are permitted to use force which reasonably appears necessary to prevent escape, overcome resistance, and effect arrests.  The use of such force by deputies shall conform to Penal Code Section 835a and the policies and procedures set forth in this manual.  Nothing in this policy is intended to hinder or prevent a deputy sheriff from using deadly force immediately to protect or defend himself or herself, another deputy or any other person from a significant threat of death or serious bodily injury.

Detentions Deputies, while in the performance of their lawful duties related to their custodial assignments, are permitted to use force that reasonably appears necessary to prevent escape, overcome resistance, and effect arrests.  The use of such force by Detentions Deputies shall conform to Penal Code Section 835a and the policies and procedures set forth in this manual and any applicable sections in the Detentions Bureau manual.

Detention officers may use such force as reasonably appears necessary in establishing and maintaining custody of prisoners.  The use of such force by detention officers shall conform to Penal Code Section 831.5(f) and the policies and procedures set forth in this manual and any applicable sections in the Detentions Bureau manual.

It is the policy of the Sheriff's Office that law enforcement personnel, in the performance of their duties, shall use only that amount of force which reasonably appears necessary, given the facts and circumstances known or reasonably believed by the officer at the time of the event, to effectively prevent escape, overcome resistance, or effect arrest.  "Reasonableness" of the force used must be judged from the perspective of a reasonable officer on the scene at the time of the incident.  (Graham v. Connor (1989) 490 U.S. 386).

California Penal Code Section 835a provides that:

> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance.

> A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.

F-100-2

| EFFECTIVE:<br>**August 1, 1990** | **REVIEWED:**<br>6/1/2007 | **REVISED:**<br>03/01/2005 | **UPDATED:**<br>11/12/2007 |
|---|---|---|---|

No policy can realistically predict or cover every possible situation an officer might encounter. Each officer, therefore, must be entrusted with discretion in determining the force necessary in each incident. While it is the ultimate objective of every law enforcement encounter to minimize injury to everyone involved, nothing in this policy requires an officer to actually sustain physical injury or allow physical injury to any other person before using reasonable force.

Any use of force, including deadly force, by a member of the Kern County Sheriff's Office, must be judged by the standard of "reasonableness." When determining whether to use force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration. Those factors include, but are not limited to:

- The conduct of the individual being confronted (as reasonably perceived by the officer at the time).

- Officer/subject factors (age, size, relative strength, skill level, injury/exhaustion, number and location of officers vs. subjects).

- Influence of drugs/alcohol (mental capacity).

- Proximity of weapons of any kind.

- Whether the subject poses an immediate threat to the safety of officers or others and the seriousness of the threat.

- Seriousness of the suspected offense or reason for contact with the individual.

- Whether the subject is resisting arrest by force.

- Whether the subject is evading arrest by flight.

- Training and experience of the officer.

- Potential for injury to citizens, officers, and suspects.

- Other circumstances.

At times, officers are called upon to make split-second decisions. In such cases, the amount of time available to evaluate and respond to changing circumstances may impact an officer's decision. When judging an officer's decision, this fact shall be given due consideration and weight.

Each officer is expected to use such force as reasonably appears necessary under the circumstances at the time to prevent escape, overcome resistance, and effect arrest.

The decision to use force rests with each officer. While there is no way to specify what force is reasonable in advance, each officer is expected to use these guidelines to make this decision in a professional, impartial, and safe manner.

F-100-3

| EFFECTIVE: | REVIEWED: | REVISED: | UPDATED: |
|---|---|---|---|
| August 1, 1990 | 6/1/2007 | 03/01/2005 | 11/12/2007 |

**DIRECTIVE**

Use of force by a member of the Sheriff's Office shall be reported to their immediate supervisor and documented on a crime and incident report in accordance with the procedures set forth in F-200.

F-100-4

| EFFECTIVE: | | REVIEWED: | REVISED: | UPDATED: |
|---|---|---|---|---|
| August 1, 1990 | | 6/1/2007 | 03/01/2005 | 11/12/2007 |

**EXHIBIT N**

---

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "N"**



**Kern County Sheriff's Office**

# Policies And Procedures

| TITLE:    **USE OF FORCE-BATON** | | | NO: F-600 |
|---|---|---|---|
| APPROVED:   **Donny Youngblood, Sheriff-Coroner** | | | |
| **EFFECTIVE:**<br>**August 1, 1990** | **REVIEWED:**<br>6/1/2007 | **REVISED:**<br>03/01/2007 | **UPDATED:**<br>11/12/2007 |

## APPLICABLITY

When used in this policy the terms, " officer", "peace officer", or "deputies" shall include both sheriff's deputies and detentions deputies.

## POLICY

Peace officer members of the Sheriff's Office are permitted to use a baton to subdue a person when the officer is acting within the guidelines of P.C. 835a and DPPM F-100; and the use of the baton reasonably appears necessary to effect an arrest, prevent escape, or overcome resistance.

Detention officers are permitted to use a baton under limited circumstances, as directed and authorized by their facility manager or shift supervisor, to prevent injury to any person by a prisoner, prevent prisoner escape or to quell a riot in or about any jail facility.

In all cases, the use of a baton shall only be used by trained and authorized members of the Sheriff's Office and shall conform to the policies and procedures set forth in this manual.

Members of the Sheriff's Office, authorized to carry or use a baton, shall only carry or use Sheriff's Office-issued or Sheriff's Office-approved batons. **The use of "saps", "sap gloves", "billy clubs", or similar unauthorized devices by employees of the Kern County Sheriff's Office is prohibited.**

Approved Batons - The Sheriff's Office will issue straight, wooden batons, Batons must be black in color, made of hard wood, 1 ¼ inches in diameter (round) and 29 inches in length with rounded ends, have a smooth surface without holes or grooves, and not have any intentional marks aside from inconspicuous markings containing the deputy's name, initials, or identification number.  Deputies will ensure that excessively worn or damaged batons are turned in and replaced.

Members of the Sheriff's Office, authorized to carry or use a baton, may use a baton longer than the standard 29 inches baton, when specifically authorized by the highest ranking officer at the scene or in charge of the event.

Deputies may carry their own batons, providing they conform to the above specifications and they are purchased and maintained at the deputy's expense.

Any exception to this specification must be approved by the Sheriff-Coroner.

Deputies who have been trained and certified by the Sheriff's Office's Defensive Tactics Team in the use of a collapsible baton may carry a collapsible baton in accordance with this policy. The collapsible baton shall be carried in lengths of 25" to 31", when fully extended.   The collapsible baton must be black with no chrome parts, and have a textured matte or machine foam grip.

Any exception to this specification must be approved by the Sheriff-Coroner.

The following uniformed tactical units are authorized to carry the collapsible baton when deployed in the course of their assignment:

- SWAT
- SERT
- K-9
- Bike Patrol

Uniformed deputies assigned to the Field Operations Bureau will have their straight baton available when on duty.   The wooden baton is the primary baton; however, a collapsible baton may be used in lieu of the wooden baton when the situation dictates.

Transportation or Court Services may carry the collapsible baton in place of the wooden baton in that work environment.

Deputies assigned to non-uniformed duties may carry the collapsible baton in place of the wooden baton in that work environment.

Uniformed Detentions Deputies will have their straight baton available while on duty.   Neither Detentions Deputies nor Detentions Officers will carry a Sheriff's Office issued baton on their person while off duty.

A baton will be used in accordance with the methods taught and approved by the Sheriff's Defensive Tactics Team.


**PROCEDURE**

The officer who has used a baton to arrest a suspect will:

- Follow the reporting procedure in F-200;

- Transport the suspect to a medical facility if necessary;

- Advise any transporting officer that a baton was used.

F-600-2

| EFFECTIVE: | REVIEWED: | REVISED: | UPDATED: |
|---|---|---|---|
| **August 1, 1990** | **6/1/2007** | **03/01/2007** | **11/12/2007** |

Any officer transporting an arrested person on which a baton has been used will:

- Advise detention facility personnel of the fact;

- Advise any medical or first aid treatment given;

- Comply with any requests by detention facility personnel for further medical treatment prior to booking.

F-600-3

| EFFECTIVE: | REVIEWED: | REVISED: | UPDATED: |
|---|---|---|---|
| **August 1, 1990** | **6/1/2007** | **03/01/2007** | **11/12/2007** |

# EXHIBIT O

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "O"**

# KERN COUNTY SHERIFF'S OFFICE

# METROPOLITAN PATROL DIVISION

# OPERATIONAL MANUAL

---

TITLE:      POLICE SERVICE DOG DEPLOYMENT                    NO. K9-500

---

**EFFECTIVE DATE:**    **April 14, 2002**           **REVISED:**    **April 18, 2013**

APPROVED BY:      Commander Steve Hansen

REFERENCE:

---

POLICY

The Police Service Dog Program mission is to provide a reliable patrol dog capability through the employment of trained officer-dog teams to aid in law enforcement. The primary task of the canine team is search and apprehension of criminal suspect(s). A police service dog may be used to apprehend an individual if the canine handler reasonably believes that the individual has either committed or is about to commit any offense and if any of the following conditions exist:

- There is a reasonable belief that the suspect(s) poses an immediate threat of violence or serious harm to the public, any officer, or him/herself;
- The suspect(s) is/are physically resisting arrest and the use of the police service dog appears necessary to overcome such resistance;
- The suspect(s) is/are escaping/fleeing on foot and the suspect(s) escape reasonably appears to pose a threat to the community at large;
- The suspect(s) is/are believed to be concealed in an area where entry by other than the canine would pose a threat to the safety of officers or the public;
- It is recognized that situation may arise which do not fall within the provisions set forth in this policy. In any such case, a standard of reasonableness shall be used to review the decision to use a police service dog in view of the totality of the circumstances;
- **Absent the presence of one or more of the above conditions, mere flight from pursuing officer(s) shall not serve as good cause for a canine apprehension.**

**DIRECTIVE A.   DEPLOYMENT FACTORS**

Prior to the use of a police service dog to search for or apprehend any individual, the canine handler shall carefully consider all pertinent information reasonably available at the time. This information shall include, but is not limited to:

- The seriousness of the crime;
- The suspect(s) age or estimate thereof;
- Any potential danger to any other officer(s) who may attempt to intervene or assist with the apprehension;
- Any potential danger to the public, which may result from the deployment of the police service dog.

# KERN COUNTY SHERIFF'S OFFICE

# METROPOLITAN PATROL DIVISION

# OPERATIONAL MANUAL

| TITLE: | POLICE SERVICE DOG DEPLOYMENT | NO. K9-500 |
|---|---|---|

**DIRECTIVE B.  CANINE DEPLOYMENT ANNOUNCEMENTS**

Canine deployments for searches and apprehensions of fleeing/escaping and resisting suspects should only be conducted after a canine deployment announcement is made. There is an exception. The announcement may be dispensed with **only** if such announcement would unnecessarily endanger any officer(s) or innocent person(s) and only with approval of a Command/Ranking Officer, unless waiting for said supervisor to arrive would escalate the danger. The announcement may consist of the following, depending on the type of deployment:

- Area/Building searches:

  - The initial announcement shall at a minimum include;

    1. Identification:  "Kern County Sheriff's Department";
    2. Canine:  "I have a police dog";
    3. Instruction: "Identify yourself now";
    4. Direction:  "Walk to the (front, side, rear, etc) of the (building, vehicle, park, etc.) now!"
    5. Warning:  "If my dog finds you, he will bite you!";

  - After giving a reasonable amount of time the initial announcement may be repeated. At a minimum the second announcement should include;

    1. Identification:  "Kern County Sheriff's Department";
    2. Warning:  "If you do not identify yourself, I will send in my police dog";

  - Again give a reasonable amount of time for person(s) to comply with the warning. If still no response, the canine may then be deployed by the handler;

- Fleeing/escaping or resisting suspect(s):

  - The initial announcement shall at a minimum include:

    1. Identification:  "Kern County Sheriff's Department";
    2. Canine:  "I have a police dog";
    3. Instruction:  "Stop (running, fighting, resisting, etc…)";
    4. Warning:  "My dog will bite you";

  - After giving a reasonable amount of time for the suspect(s) to comply, the initial announcement may be repeated, if it does not increase the risk to officer(s) or allow the suspect(s) time to escape.  The canine handler may deploy after the initial warning in this case.  If after the second announcement is given (if given) and the suspect(s) does not comply, the handler may then deploy the canine.

**DIRECTIVE C.  NOTIFICATION**

After any police service dog apprehension the Canine Handler will notify the Canine Section Coordinator, the on-duty command/ranking officer, as soon as practicable.

KERN COUNTY SHERIFF'S OFFICE

METROPOLITAN PATROL DIVISION

OPERATIONAL MANUAL

---

TITLE:     POLICE SERVICE DOG DEPLOYMENT                NO. K9-500

---

**DIRECTIVE D.   REPORTING**

Prior to going off duty the canine handler shall complete all necessary reports associated with the use of a police service dog in an apprehension, unless authorized by a command/ranking officer.

# EXHIBIT P

---

*Adriana Ledesma, et al. v County of Kern, et al.*
United States District Court Case No. 1:14-CV-01634 DAD JLT

**EXHIBIT "P"**



# Kern County Sheriff/Coroner

## Coroners Section

1832 Flower Street
Bakersfield, CA 93305

# FINAL REPORT

| CALL INFORMATION | | |
|---|---|---|
| **REPORT NUMBER : C01600-13** | CASE TYPE : Investigation | DATE/TIME : 8/27/2013  13:28 |
| NOTIFIED BY : Kern Medical Center | | TELEPHONE : (661)326-2000 |

| DECEDENT INFORMATION | | |
|---|---|---|
| NAME : Ronnie  LEDESMA | AKA : | |
| AGE : 39 Years | SEX : Male | RACE : Caucasian |
| DATE OF BIRTH : 10/23/1973 | SSN : 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 | MARITAL STATUS : Divorced |
| RESIDENCE : 410 Jefferson St., Bakersfield, CA 93305 | | |

| NEXT OF KIN INFORMATION | |
|---|---|
| NAME : Adrianna Ledesma | RELATIONSHIP: Daughter |
| ADDRESS : 924 Mammoth Ave., Bakersfield, CA 93308 | |
| NOTIFIED BY: Dr. Margarita Bass | NOTIFIED DATE: 8/27/2013 13:05 |

| DEATH INFORMATION | |
|---|---|
| DEATH PLACE : Kern Medical Center | ADDRESS : 1700 Mt. Vernon Ave., Bakersfield, CA 93305 |
| DATE : 8/27/2013          TIME : 13:05 | PRONOUNCED/AFFIRMED BY : Dr. Margarita Bass |
| **\*\* NOTE :**          Blank field indicates procedures or service not applicable or deferred by Coroner's Office. | |

| ADMINISTRATIVE | |
|---|---|
| TRANSPORTED BY : Heritage Mortuary Service | AUTOPSY PATHOLOGIST : Dr. Eugene Carpenter |
| TOXICOLOGY LAB : | TYPE OF EXAMINATION : Autopsy |
| DEATH CERTIFICATE SIGNED BY : Rebecca Fisher, Deputy Coroner | |
| FUNERAL HOME : Basham Funeral Care | PHONE : (661)873-8200 |
| INVESTIGATING AGENCY :  Kern County Sheriffs Office | INVESTIGATOR : Detective Henry Bravo | REFERENCE NO. : SR13-23185 |
| ADDRESS : 1350 Norris Road,Bakersfield, CA 93308 | |

| INJURY INFORMATION | |
|---|---|
| DATE OF INJURY :  8/19/2013 | TIME OF INJURY :  20:34 |
| PLACE OF INJURY : Private Property | |
| LOCATION OF INJURY : 2628 Mt. Vernon Ave., Bakersfield, CA 93306 | |
| HOW INJURY OCCURED : Drug Intake; Baton Strikes and Dog Bites to Lower Extremities | |

| IMPOUNDED PROPERTY | | | | |
|---|---|---|---|---|
| Description | Released By | Date Released | Released To | Relation-ship |

| Total Collected | | Total Cash | | Total Coins |
|---|---|---|---|---|
| $0.00 | = | 0.00 | + | 0.00 |

| CAUSE OF DEATH |
|---|
| CAUSE A : Massive Right Cerebral Hemisphere Infarction |
| CAUSE B : Thrombosis of the Proximal Right Middle Cerebral Artery |
| CAUSE C : |
| CAUSE D : |
| OTHER SIGNIFICANT CONDITIONS : Acute Pulmonary Thrombosis from Deep Vein Thrombosis of the Legs; Leg Injuries; Acute Drug Intoxication; Obesity; Hypertensive Heart Disease |

On August 25, 2013 at 2320 hours, Deputy Coroner Pat Tello received a call from Lieutenant Todd Bishop with the Kern County Sheriff's Office to advise of an expected death of, Ronnie Ledesma, a 39 year old Hispanic male, who was arrested but not yet booked or medically cleared, and was currently at Kern Medical Center on life support in grave condition. He was not expected to survive.

Lieutenant Bishop reported that on August 19, 2013, Ronnie Ledesma was involved in an altercation with Kern County Sheriff's Deputies and was arrested. Ronnie Ledesma was charged with assault on a peace officer, resisting arrest and under the influence of a controlled substance. Lieutenant Bishop said Ronnie Ledesma was bit by a Kern County Sheriff's Office canine. Ronnie Ledesma was transported to Kern Medical Center arriving on August 19. 2013 where his condition continued to decline. He was placed on life support and transferred in the intensive care unit.

On August 27, 2013 at 1320 hours, Dawn Ratliff Coroner Manager received a call from R.N. Megan Oblonsky at Kern Medical Center Intensive Care Unit reporting the in-custody death of Ronnie Ledesma. R.N. Oblonsky reported the decedent had his first brain death pronouncement on August 27, 2013 at 1015 hours by Dr. William Meyer and the second pronouncement occurred at 1305 hours by Dr. Margarita Bass.

I responded to the hospital and met Deputy Anhtu Phan who was outside of the hospital room. He told me family members were at the decedent's bedside. I spoke to R.N. Megan Oblonsky. She told me Dr. Bass told the family that the hospital would allow the decedent to remain on life support for an additional forty eight hours to grieve. She told me she would contact the Coroner's Office when they removed the decedent from life support on Thursday, August 29, 2013.

I reviewed the decedent's emergency room medical records that were in his chart and I obtained the following information. The decedent arrived at the hospital on August 19, 2013 at 2120 hours. He walked into the emergency room escorted by Kern County Sheriff's Deputies and he was handcuffed behind his back. He was wearing a spit mask and he was covered with blood. The decedent was cooperative and admitted to smoking PCP on that evening. On August 20, 2013 at 0355 hours, the decedent went into respiratory arrest, he was intubated, placed on ventilation therapy and transported to the intensive care unit.

I observed the decedent lying supine in a hospital bed. I observed multiple medical devices on his body, he was intubated and on a mechanical ventilation machine. He was clothed in a hospital gown. I observed two lacerations on his face just underneath his right eye. His left arm was bandaged and in a splint. On his left arm just above the splint was a large contusion. R.N. Flor Serrano told me the decedent had a fractured left ulna. I saw a small abrasion just below his left knee. There were multiple small lacerations on his left shin just above his ankle. I observed multiple lacerations circling his right ankle. R.N. Serrano assisted me in turning the decedent to his side and I observed a large contusion on his right posterior side. There was a brown patch placed over his coccyx area to prevent bedsores. I removed the patch and there were no injuries underneath.

I spoke to Cindy Valverde of One Legacy who was at the hospital. She told me the decedent was a registered donor which was a legal binding document and they wanted to perform organ procurement on the decedent. I advised Cindy that the Coroner's Office needed to obtain the decedent's medical records and additional information regarding the circumstances before a decision was made by the Coroner's Office. Cindy told me she would standby at the hospital until a decision was made.

At the hospital, I met with Christina Herrera, the decedent's mother, Adrianna Ledesma and Jessica Gomez, the decedent's daughters. Christina Herrera told me the decedent resided at her residence. She last saw the decedent on August 19, 2013 at about 1200 hours, when he left the residence to run errands. She told me she called all of the local hospitals and the Kern County Sheriff's Office Central Receiving Facility looking for the decedent. She said she was informed that the decedent was hospitalized on Monday, August 26, 2013. The decedent had a medical history of hypertension; however, he was not under the care of a physician. She said occasionally the decedent took some of her blood pressure prescription medication. Metoprolol, because he did not have medical insurance. She said the decedent was healthy and donated plasma regularly. She said the decedent smoked methamphetamine off and on. He occasionally drank alcohol and he did not smoke cigarettes. Adrianna Ledesma told me she was against taking the decedent off life support.

On August 28, 2013 at 1600 hours, I met with Detective Michael Dorkin and Detective Henry Bravo of the Kern County Sheriff's Office and Dr. Eugene Carpenter Forensic Pathologist.

Detective Bravo told me on August 19, 2013 at 2034 hours, Deputy Warren Martin was the first deputy to arrive at the Walgreens Drug Store, located at 2628 Mt. Vernon Avenue, for two Hispanic males that were acting suspicious going in and out of the store. Deputy Martin saw Ronnie Ledesma walking unsteadily and stumbling in the parking lot of the Walgreens Drug Store. Deputy Martin made contact with Ronnie Ledesma believed he was under the influence of a controlled substance and attempted to place him in custody. At 2045 hours, Ronnie Ledesma was uncooperative and began resisting arrest while Deputy Martin attempted to take him into custody. Deputy Martin used his department approved collapsible baton and struck Ronnie Ledesma multiple times. At about 2048 hours, Deputies Karena De La Garza and Dwayne Perkins, who was a canine handler, arrived with his canine partner Volker and assisted Deputy Martin in attempt to take Ronnie Ledesma into custody.

Deputy Martin attempted to take him into custody. Deputy Martin used his department approved collapsible baton and struck Ronnie Ledesma multiple times. At about 2048 hours, Deputies Karena De La Garza and Dwayne Perkins, who was a canine handler, arrived with his canine partner Volker and assisted Deputy Martin in attempt to take Ronnie Ledesma into custody. Ronnie Ledesma continued to be uncooperative and resisted arrest. Deputy Perkins deployed his canine partner Volker to apprehend Ronnie Ledesma. Deputies James Melton and Christopher Wong arrived on scene and assisted deputies with trying to apprehend Ronnie Ledesma. Subsequently Ronnie Ledesma was handcuffed behind his back, placed in custody and escorted to the back seat of a patrol car. Ronnie Ledesma received multiple baton strikes by deputies and was bitten by the canine dog while resisting arrest. Deputies transported him to Kern Medical Center for medical treatment. For further details surrounding this incident refer to the Kern County Sheriff's Office case # SR13-23185.

On August 28, 2013 at 1650 hours, Dr. Eugene Carpenter reviewed the decedent's medical records and was provided the circumstances of the death at which time he made the decision to decline One Legacy to perform organ procurement.

On August 28, 2013 at 1700 hours, I called and spoke to R.N. Oblonsky and Cindy Valverde of One Legacy and informed them of Dr. Carpenter's decision to decline organ procurement.

On August 28, 2013 at 2030 hours, I received a call from N.P. Gary Walters of Kern Medical Center Intensive Care Unit. He wanted to confirm that the Coroner's Office was not allowing organ procurement, which I confirmed Dr. Carpenter declined organ procurement. He told me the decedent's family was ready to remove the decedent from life support. Walters told me he planned to withdrawal the decedent from life support on this date at approximately 2200 hours.

On August 28, 2013 at 2220 hours, N.P. Walters called and told me the decedent was extubated and asystole. I responded to the hospital and met with Detective Henry Bravo and Technical Investigator Tom Rickels of the Kern County Sheriff's Office. Rickels photographed the decedent. On August 28, 2013 at 2255 hours, the decedent was placed into a clean black body bag and the bag was sealed with blue lock tab #09317, witnessed by Detective Bravo.

The decedent was transported to the radiology department and full body radiographs were taken of the decedent. The decedent was then transported to the Coroner's Office for a forensic examination and placed in the secured area of the morgue.

I obtained a copy of the decedent's medical records and admission blood from Kern Medical Center and submitted them to toxicology for review. On August 29, 2013, Coroner Manager Dawn Ratliff told me the blood samples received from the hospital were drawn on August 22, 2013, not on the initial date of admission. I called Kern Medical Center Laboratory and spoke to Jocelyn Oats Clinical Laboratory Assistant. She told me on August 27, 2013, a call was received by the Coroner's Office requesting the decedent's admission blood be placed on hold. On that date they held on all of the decedent's blood specimens they had for the Coroner; however, the blood specimens drawn from the decedent on August 19, 2013 to August 21, 2013 already had been destroyed as per hospital policy to destroy blood specimens after five days.

On August 29, 2013, I reviewed the decedent's medical records and obtained the following information. On August 21, 2013 Ledesma was weaned off ventilation and extubated. On August 22, 2013 Ledesma downgraded out of the intensive care unit and was transferred to another room with a lower level of care. On the afternoon of August 24, 2013 Ledesma had an episode of shortness of breath after attempting to ambulate. Subsequently a CT scan of the chest was performed and revealed Ledesma had multiple pulmonary emboli. On August 25, 2013 at 1330 hours, Ledesma stated he could not move his left side and hospital staff noticed facial drooping. A CT scan of the brain was performed which showed a massive infarct on the right side. Ledesma was transferred to the direct observation unit, became obtunded, re-intubated and returned to the intensive care unit. Apnea test were performed and he was later given two brain death pronouncements. A urine drug screen revealed the decedent was positive for amphetamine, benzodiazepine, and PCP.

After completing an investigation in conjunction with the Kern County Sheriff's Office, the death of Ronnie Ledesma was determined to be an accident.

| FINAL DISPOSITION TYPE :<br>Burial | LOCATION OF DISPOSITION :<br>Greenlawn Mortuary | |
|---|---|---|
| ADDRESS : 3700 River Blvd., Bakersfield, CA 93305 | | |
| INVESTIGATING DEPUTY CORONER :<br>Annette Olague | MANNER :<br>Accident | DATE CLOSED :<br>11·13·2013 |
| REPORTING DEPUTY CORONER :<br>(SIGNATURE)  *Annette Olague* | APPROVED BY:<br>(SIGNATURE)  *Regina Mancera* | |



**DONNY YOUNGBLOOD**
**SHERIFF-CORONER-PUBLIC ADMINISTRATOR**

**CORONER SECTION**
**1832 Flower Street**
**Bakersfield, CA 93305**
**Telephone: (661) 868-0100**

**REPORT OF AUTOPSY**

**DECEDENT:** Ronnie Ledesma

**CASE:** C01600-13

**DATE OF EXAMINATION:** August 29, 2013

**TIME:** 0920 Hours

**PERSONS PRESENT AT EXAMINATION:**
**Witnesses:** Kern County Sheriff's Office, Detective Bravo and Technical Investigator's Thompson and Slayton
**Autopsy Assistants:** Laila Shaibi and Carly Strauss

---

### FINAL DIAGNOSES

I.   Diagnoses:
1. Severe sequelae of right cerebral hemisphere ischemia from thrombosis of the proximal right middle cerebral artery.
2. No signs of inflammation in the thrombus of the proximal right middle cerebral artery.
3. No signs of blunt force trauma to the brain.
4. No signs of vegetation's on the heart valves.
5. No signs of defects between the atria or the ventricles of the heart.
6. Probable small area of infarction of the spleen.
7. No signs of splinter type hemorrhages at the fingernail beds.
8. Pulmonary thromboembolisation, to the lungs, from the deep veins of the legs.
9. Deep vein thrombosis of the leg veins, residual thrombi found in the popliteal veins bilaterally.
10. Sequelae of dog bites to the lower legs.
11. Sequelae of baton strikes to the lower legs, no bruises to the legs detected.
12. Hospital drug screen positive for Phencyclidine, methamphetamine, and opiates.
13. Hospital day 3 blood confirms Phencyclidine and Lorazepam and Midazolam are also present consistent with hospital administration.
14. Cerebral infarction of much of the right cerebral hemisphere, clinical.
15. Pulmonary thromboembolism, clinical.
16. Suspected deep vein thrombosis of the leg veins, clinical.
17. Moderate congestion of the spleen.
18. Severe hyperplasia of the kidneys.
19. Moderate hyperplasia of the liver.
20. Chronic passive congestion of the liver.
21. Mild to moderate fatty change of the liver.
22. No signs of cirrhosis of the liver.
23. Small tan/white surface lesion of the kidney, unremarkable, no signs of neoplasia, infarction, or inflammation.
24. Barrel-shaped chest consistent with but not specific for chronic obstructive pulmonary disease.
25. Severe obesity.
26. Past medical history of chronic hypertension.
27. Hypertrophic heart disease consistent with hypertensive heart disease.
28. Marked dilatation of the right side of the heart (with chronic passive congestion of the liver).

Ronnie Ledesma                                                                          C01600-13

    29.    No signs of pulmonary infarctions.
    30.    No signs of heart valve vegetation's or a mural thrombi of the endocardial surface of the heart.

II.    Cause of Death:
    A.    Massive right cerebral hemisphere infarction, interval between onset and death is days.
    B.    Thrombosis of the proximal right middle cerebral artery, interval between onset and death is days.

III.    Other Conditions Contributing to Death:  Acute pulmonary thromboembolisation from deep vein thrombosis of the legs; status post blunt force trauma of the legs (baton strikes); status post dog bites to the legs; acute intoxication with Phencyclidine, methamphetamine and opiates; severe obesity; hypertensive heart disease.

IV.    Manner of Death:  Accident.

V.    How Injury Occurred:
    A.    Drugs intake.
    B.    Baton strikes to lower legs.
    C.    Dog bites to lower legs.

VI.    Comment:
    1.    At this time it is not known whether deep vein thrombosis of the legs was present prior to the baton strikes or in part caused by the baton strikes to the lower legs. Dog bites are associated with the deep vein thrombosis of the legs and the pulmonary thromboembolism but whether or not they aggravated or caused the deep vein thrombosis of the legs not known. Detailed histological studies of the pulmonary thromboemboli and the thrombi of the leg veins may or may not be able to give more information as to whether or not the leg vein thrombi were present prior to the leg trauma events.
    2.    There is nothing in the history of the circumstances or in the autopsy findings that can be used to indicate that the police officers acted in a manner outside of their training or outside of community standards for restraining and taking a subject into custody. Death is due to the actions of the decedent together with many severe chronic diseases of the decedent and death is not due, even in part due, to the actions of the police officers.
    3.    The hospital course includes diagnoses and treatment is within medical community standards. There are no history elements or signs that doctors, nurses or technicians contributed in any way to the death of the decedent.
    4.    The manner of death is accident. This means that the primary cause results from an acute intoxication with drugs and with resisting arrest and restraint by the decedent leading to the consequences which include the baton strikes and the dog bites. It means that underlying severe chronic diseases and the tendency to form thrombi are not evident to the police officers and the potential consequences of the consequent leg injuries cannot be anticipated and thereby be avoided.
    5.    In the event of any civil litigation, additional studies of the pulmonary thrombi and the deep vein thrombi can be done in an attempt to "age" the thrombi, mainly to see whether or not the thrombi were present prior to the injuries to the legs or whether the thrombi formed after the injuries to the legs. The usefulness of this information may very well be limited as both possibilities relate to chronic medical conditions of the decedent including drug use, chronic hypertension, severe body obesity, and the very probable innate tendency to form thrombi in the legs and elsewhere.  These additional studies can be done by private pathologists if these studies seem indicated.

---

**CAUSE OF DEATH:**    Massive Right Cerebral Hemisphere Infarction and Thrombosis of the Proximal Right Middle Cerebral Artery.
**MANNER OF DEATH:**    Accident.

Ronnie Ledesma                                                                              C01600-13

Name:  Ronnie Ledesma

Age:  39

Gender:  Male

Length:  Estimated 70 inches

Weight:  250 pounds

Date and Time of Death Pronouncement:  08/27/2013, 1305 hours

Place of Death:  Hospital

Date and Time of Autopsy:  08/29/2013, 0920 hours

Place of Autopsy:  Kern County Sheriff's Office, Coroner Section

Deputy Coroner:  Annette Olague

Forensic Pathologist:  Eugene Carpenter, Jr., MD

Witnesses: Kern County Sheriff's Office, Detective Bravo and Technical Investigator's Thompson and Slayton

Autopsy Assistant(s):  Laila Shaibi and Carly Strauss

History of Death:  This is the case of a 39 year old Caucasian man who died as an inpatient in the hospital from a massive cerebral infarction.  The infarction was detected clinically and confirmed by CT scan two days prior to the brain death pronouncement.  Earlier on the day of detection of the massive cerebral infarction, pulmonary thromboemboli were detected.  About four days prior to that, the patient had been admitted while in police custody for resisting arrest due to being stopped by a police officer for what seemed to be acute intoxication.  The hospital drug screen detected PCP, methamphetamine and opiates.  While being taken into custody there was resistance and a struggle with police officers.  A baton was used across the legs several times, and a police dog was employed and bit the lower legs above each ankle area.  After restraint was accomplished, the decedent ambulated to the patrol car and was taken to the hospital.  Please see the investigator's report.

External Examination for Identification and for Signs of Natural Pathology:

The body is that of a 39 year old barrel-chested, severely obese Caucasian male an estimated 70 inches in length and weighing 250 pounds.  It has been refrigerated and is not embalmed.  It is identified by identification tags.

Major Identifying Characteristics:

1.  The head hair is black, about 1/4 inch straight, and well groomed.
2.  The eyes are brown.
3.  There is a mustache and a short beard.
4.  The teeth are natural and in okay condition.
5.  There are stretch marks at the upper arms and at the lateral lower anterior abdominal wall.
6.  There are scars at the left antecubital fossa consistent with needle scars (there is a history of plasma donations).
7.  There is a prominent scar over the right upper arm and right forearm.
8.  There are prominent scars at the right knee.  One of them is medial, anterior, and crescent-shaped.
9.  Surgical scars, wrist scars, and needle track scars are lacking.  Deformities other than the barrel-shaped chest are lacking.  Amputations are lacking.

External Natural Pathology Signs:

1.  The chest is barrel-shaped.
2.  The body is severely obese.
3.  No nail-bed cyanosis is seen at the hands.

Ronnie Ledesma                                                                                    C01600-13

4. The hands are edematous consistent with the effects of hospital treatments.
5. No rash and no splinter-type hemorrhages of the nail beds are detected.
6. Otherwise, the skin, head, head hair, eyes, ears, nose, mouth, throat, neck, chest, abdomen, pelvis with external genitalia and anus, back and extremities are unremarkable.

Clothing:  No clothing is examined.

Evidence of Postmortem Changes:

1. Rigor mortis is full.
2. Lividity is posterior.
3. Signs of decomposition are lacking.

Evidence of Medical Intervention:

1. Properly placed endotracheal tube.
2. A curved plastic airway is in the oral cavity.
3. The body is status post EKG pads complete with wires to those pads.
4. There is a splint over the lower portion of the left upper arm and also over the left forearm and proximal hand.
5. There is a line at the right groin and a line (vessel) at the left groin area.
6. Urinary catheter is attached to a reservoir box and the box contains about 50 mL of yellow-brown clear urine.
7. An IV is at the right dorsal wrist.

Evidence Collected at Autopsy:

1. Admission blood from the hospital in several small tubes dated August 22 through August 26.  No blood tubes are found dated August 20 and 21.
2. Vitreous and urine.
3. Heart blood and femoral blood.
4. Bile.
5. Blood tubes from the hospital dated August 23rd through the 26th are held and the blood tubes dated August 21st and 22nd are sent to the lab.
6. Tissues from the major organs including samples of deep vein thrombosis.
7. Separate formalin-filled storage bag containing large portions of the thromboemboli at each hilar region of the lungs.
8. The brain is saved in formalin.  Portions of the midline dura of the vault of the skull are also saved. The rest of the dura is not saved.
9. A blood sample is given to the officers attending the autopsy.
10. Most of the axillary hair at the right side is taped with Scotch tape and then shaved close to the skin. It is saved for potential toxicology.

Tattoos: No tattoos are seen.


Radiographs: Radiographs are available but are not reviewed on the day of the autopsy.


Incisions:

1. Head, coronal.
2. Chest, Y-shaped.
3. Abdomen, midline.
4. Posterior lower extremities, vertical incisions exposing the veins at the area behind each knee.
5. A vertical incision through a large bruise of the lateral upper pelvis region skin.

Examination and Description of Injuries:

1. The upper anterior right cheek has about a 1 inch area, diameter, of a small healing skin tear. It is scabbed. It is about 1/4 inch. It is flat. There is some brown discoloration of the tissues just beneath and lateral to the midline of the right periorbital tissues. Crepitus is not detected.
2. There are scabbed horizontal linear abrasions around each wrist consistent with the effects of restraint from handcuffs.
3. There is an abrasion or adherent blood over the volar radial right wrist that seems mostly consistent with the effects of hospitalization.
4. There are scabbed horizontal and numerous lesions over the lowermost portion of the right lower leg consistent with the effects of dog-biting. Healing seems to be proceeding. There are no signs of complications such as spreading cellulitis, edema, or exudate.
5. There are scabbed abrasions at the left knee and there are numerous small superficial scabbed abrasions at the anterior middle one-third of the left lower leg.
6. At the medial posterior lower portion of the left lower leg there is a healing open wound. Complications are not seen.
7. At the lateral posterior lower right lower leg is an open healing about 2 x 1 inch and complications are not seen. Just below that, at the posterior lowermost portion of the left lower leg, just above the ankle, there is an open healing wound. Complications are not seen.
8. A care examination for baton marks across the calves is done and no such marks are seen. Deep dissection of the lower thighs and all of the calf muscle areas is done and the underlying muscle tissue and subcutaneous tissues are carefully examined and there are no signs of any injury.
9. Baton marks are not seen across the back or elsewhere on the body except for one area and this is photographed. It is not noted on the diagrams.
10. Otherwise, the head, central face, mouth/throat/neck, chest, abdomen, pelvis with external genitalia and anus, back and extremities are free of signs of trauma, the exception being the effects of being hospitalized for several days.

Internal Examination for Signs of Natural Pathology:

A.   Body Cavities

There is mild increase of yellow-brown clear fluid in the chest cavities and in the abdomen. Otherwise, the cavities of the head, chest, abdomen, and pelvis are unremarkable. The brain, however, does appear swollen. It is also soft.

B.   Systems

1.   Central Nervous:

a.   The brain weighs 1600 grams. It has an increased weight than that usually seen. There is slight flattening of the gyri and the sulci are mildly indistinct. There may be signs of herniation at the base of the brain at the brainstem area and this is to be evaluated after fixation. The cranial nerves and blood vessels seem unremarkable to general examination. Careful examination of the right middle cerebral artery is not done at this time. The spinal cord is not dissected.

b.   Fixed brain findings: The brain has been fixed for several weeks in formalin solution. In general, there is the slight flattening of the gyri and indistinctness of the sulci to a mild degree. Signs of herniation in and around the brainstem are not seen. There are no Duret hemorrhages of the brainstem. However, there is a severe right to left midline shift of the cerebral hemispheres. The cut sections are consistent with severe ischemia of much of the right cerebral hemisphere. Most importantly, there is thrombus in the proximal right middle cerebral artery. There are no signs of any blunt traumatic injury. There are no signs of inflammation. The thrombus is free of signs of inflammation.

2.   Cardiovascular: The heart weighs 480 grams and is enlarged due to left ventricular wall hypertrophy. Septal thickness is 1.3 cm. The thickness of the left ventricular wall is 1.0 cm. The right side of the heart is markedly dilated and the thickness of the wall is 0.6 cm.

Ronnie Ledesma                                                                    C01600-13

The mitral valve is 9 cm, the aortic valve is 7.5 cm, the pulmonic valve is 9 cm, and the tricuspid valve is 13.5 cm. The pulmonary artery as it leaves the heart and goes towards the lungs is tense and needle sticks result in brisk oozing of blood out of the pulmonary artery. Otherwise, the heart with its pericardial sac, pericardial fluid, epicardium and coronary arteries, myocardium, endocardium and valves, is unremarkable. There are no signs of vegetations. There are no signs of mural thrombi. There are no signs of thrombosis of the auricles. There are no atrial or septal defects in the heart.

The aorta with its branches, the vena cava with its tributaries and the pulmonary arteries are unremarkable. Thrombi are not seen in the vena cava or in the right side of the heart. Thromboemboli are present bilaterally in the pulmonary artery, right side and left side. They are slippery and not attached to the wall. They seem to occupy about 50% to 75% of the luminal space in which they lie. They appear fresh. Small amounts of fibrin can be seen here and there. There are no signs of any separation of red blood cell mass from plasma. The diameter is consistent with the source being from the deep veins of the legs.

3.   Respiratory: The airway is clear and free of signs of inflammation. There are no signs of froth. The lungs are moderately to severely heavy with the right 600 grams and the left 550 grams. They are congested posteriorly. There are no signs of inflammation. There are no signs of pulmonary infarcts. The popliteal veins have loose thrombi. The rest of the lower extremity leg veins are clear. The samples are saved both of the pulmonary thrombi and the deep leg vein thrombi.

4.   Gastrointestinal:

   a.   GI Tract: The stomach contains brown watery fluid with floating particles of mucus. Food substances are not seen. There are no signs of any pill evidence. The rest of the GI tract is unremarkable to external visualization and palpation.

   b.   Liver: The liver is moderately hyperplastic; it weighs 2520 grams. It is otherwise unremarkable.

   c.   Gallbladder: Unremarkable.

   d.   Pancreas: Unremarkable.

5.   Lymphoid: The spleen weighs 350 grams and mildly enlarged due to congestion. The edges are rounded. The spleen is otherwise unremarkable. The thymus has been replaced by fatty tissues. The lymph nodes are unremarkable. There is an area of discoloration of the upper third of the spleen as seen through its surface that seems consistent with an infarction, but microscopic examination is required to distinguish the lesion.

6.   Genitourinary: The kidneys are severely hyperplastic. Together they are 500 grams. They are similar in size and shape. The right kidney has an anterior upper-third surface area of discoloration. This is sampled for microscopic examination. The lesion is light tan-white and seems about 1 cm across the surface and goes to a depth of about 0.5 cm. The urinary bladder is unremarkable. No urine is present. The urinary bladder is status post urinary catheterization. The prostate is unremarkable to palpation. The testicles are examined and are free of signs of injury and free of signs of natural pathology.

7.   Endocrine: The thyroid and adrenal glands are unremarkable.

8.   Musculoskeletal: Unremarkable except for the barrel-shaped chest.

C.   Toxicology: A basic screen is requested on hospital admission blood dated August 22 and August 23. The 20th and 21st blood vials are not available. They had been discarded at the hospital. Special attention is requested for the presence of PCP, methamphetamine, and opiates. Positive results are not to be expected after 24 hours in the hospital. The attempt to identify

Ronnie Ledesma                                                                              C01600-13

these three substances is made nonetheless.   Occasionally, some positive results can be forthcoming.  Hair from the right axillary region is saved for potential toxicology studies.

D.    Histology:
    1.      Congested spleen with signs of focal infarction.
    2.      Kidney with widespread autolysis over 70% of the section and a small surface section with increased interstitchal pink material, proteinaceous casts, and some edema around the tubules but no signs of neoplasia or inflammation.
    3.      Kidney with a section similar to previously described in Slide #2, much less autolysis. Also the slide has liver with passive congestion signs as well as mild to moderate fatty change. Signs of cirrhosis are not seen.
    4.      Sections of normal thyroid and pancreas are seen. There are sections of spleen with broad areas consistent with infarction.
    5.      Lung with moderate to severe background congestion. No signs of inflammation or neoplasia.  The vessels are congested but free of platelet thrombi.
    6.      Same as #5.
    7.      Sections of pulmonary thrombi consistent with coming from deep leg thrombosis. Fairly well organized.
    1A.     Thrombosis of right middle cerebral artery is confirmed.  The surrounding pieces of brain are unremarkable.
2A, 3A, 4A.     Sections of cerebrum all consistent with the sequelae of severe ischemia.  Blood vessels are filled with blood but there are no signs of organized thrombi.

The autopsy is completed on 08/29/2013 at 1240 hours.

_11-8-13_
**Date Signed**

$\mathcal{E}\,\mathcal{S}\mathcal{H}$

Eugene Carpenter, Jr., MD
**Forensic Pathologist**

EC/tei/lkl
T:  09/10/2013
R:  11/06/2013, 11/07/2013

1/6

**KERN COUNTY SHERIFF-CORONER'S OFFICE**
1832 Flower Street, Bakersfield, CA 93305 (66 868-0100



C01600-13
LEDESMA, Ronnie
08/29/13
EC

| Hair Color | Eye Color |
|---|---|
| Teeth | Beard (Y/N) |
| Weight | Moustache (Y/N) |
| Height | Clothing |
| Rigor | |
| Livor | Seal No. |

# KERN COUNTY SHERIFF-CORONER'S OFFICE
## 1832 Flower Street, Bakersfield, CA 93305 (661) 868-0100



3/6

Nat. path

AP very obese overall

No nail cy.

edema, prob 2° Rx effects

No rash, No splinter hems of nail beds

EC 8-29-13

C01600-13
LEDESMA, Ronnie
08/29/13
EC

| Hair Color | | Eye Color |
|---|---|---|
| Teeth | | Beard (Y/N) |
| Weight | | Moustache (Y/N) |
| Height | | Clothing |
| Rigor | | |
| Livor | | Seal No. |

**KERN COUNTY SHERIFF-CORONER'S OFFICE**
**1832 Flower Street, Bakersfield, CA 93305 (66   868-0100**



3/6

Rx

MB

ETT

p. air,

Vx
air
Gauze
+
sewed

S/p E pds
2 wires

splint

line

line

UC

reservoir
Box C
∼ 50 ml of
gel B/r
urine

1 U

EC
8-29-13

C01600-13
LEDESMA, Ronnie
08/29/13
EC

| Hair Color | Eye Color |
|---|---|
| Teeth | Beard (Y/N) |
| Weight 250 | Moustache (Y/N) |
| Height | Clothing |
| Rigor | |
| Livor | Seal No. Black bag #09317 |

C01600-13
LEDESMA, Ronnie
8-28-13  CLAGUE

**KERN COUNTY SHERIFF-CORONER'S OFFICE**
**1832 Flower Street, Bakersfield, CA 93305 (66    868-0100**



C01600-13
LEDESMA, Ronnie
08/29/13
EC

| Hair Color | Eye Color |
|---|---|
| Teeth | Beard (Y/N) |
| Weight | Moustache (Y/N) |
| Height | Clothing |
| Rigor | |
| Livor | Seal No. |

6/16  4/6 6                    No significant
                              STT of Head and throat

ME: _____   DATE OF EXAMINATION: |_____

CASE No.: _____        TIME: |_____



scabbed
old lesion

1/4" brown
area,

flat
no edema

OK

OK

No outer
or inner
signs
of injury
other than
R upper
cheek.

C01600-13
LEDESMA, Ronnie
08/29/13
EC



**KERN COUNTY SHERIFF-CORONER'S OFFICE**
1832 Flower Street, Bakersfield, CA 93305 (661) 868-0100

C01600-13
LEDESMA, Ronnie
08/29/13
EC

| Hair Color | Eye Color |
| --- | --- |
| Teeth | Beard (Y/N) |
| Weight | Moustache (Y/N) |
| Height | Clothing |
| Rigor | |
| Livor | Seal No. |

# KERN COUNTY SHERIFF-CORONER'S OFFICE
## 1832 Flower Street, Bakersfield, CA 93305 (66  868-0100



C01600-13
LEDESMA, Ronnie
08/29/13
EC

| Hair Color | Eye Color |
|---|---|
| Teeth | Beard (Y/N) |
| Weight | Moustache (Y/N) |
| Height | Clothing |
| Rigor | |
| Livor | Seal No. |

| ORGAN WEIGHTS (g) | | | | |
|---|---|---|---|---|
| **HEART** 480 | RV: | LAD: | TCV: | |
| | LV: | RCA: | PV: | |
| | IVS: | LC: | MV: | |
| | | LM: | AV: | |

| **LUNGS**  Left  Right  ~ 550  600 | |
|---|---|

| **Thymus/Neck Organs** | |
|---|---|

| **SPLEEN & Lymphatic** 350 | |
|---|---|

| **LIVER & GB** 2520 ⊕ | |
|---|---|

| **ADRENAL GLANDS** | |
|---|---|

| **PANCREAS** | |
|---|---|

| **KIDNEYS**  Left  Right  500 | |
|---|---|

| **PELVIC ORGANS & Genitalia** | UFOs: _____  Urine (Vol/Color): _____ |
|---|---|

| **G-I TRACT** _____ | Appendix: (Y) / N / U )          Abdominal Fat: 6  (cm)/ in)  Gastric (Volume/Contents): _____ |
|---|---|

| **MUSCULOSKELETAL** | Fractures: |
|---|---|

| **BRAIN** 1600 | |
|---|---|

| **OTHER** | |
|---|---|

| **TOX** *BASIC ATTN TO* | SENT:  Blood 11mL site: admit      Liver _____     Cassettes 7  Blood _____ site: _____   Muscle _____ site:    Other _____  Urine _____                   Vitreous _____  —————————————————————————————  HOLD:  Vitreous 6mL           Gastric _____     Liver _____   Blood 8mL site: fem ♡    Urine 8mL            FTA Cards _____   Blood 20mL site: ♡       Brain _____       Other _____   Bile 10mL               Spleen _____     admit blood |
|---|---|

C01600-13
LEDESMA, Ronnie
08/29/13
EC

Start Time: 0920 hrs
Stop Time: 1240 hrs

FT Initials:
CS/HC/LS

Revised 06/09/11:cw

DONNY YOUNGBLOOD
Sheriff-Coroner
Public Administrator

**SHERIFF/CORONER'S DEPARTMENT**
COUNTY OF KERN

Telephone (661) 391-7500



1350 Norris Road
Bakersfield, California 93308-2231

## Autopsy Witness List

**Date:** August 29, 2013      **Time:** _____

**Decedent's Name:** LEDESMA, Ronnie      **Case No:** C01600-13

## PLEASE SIGN

| Name (Please Print) | Title | Organization | Purpose of Attendance |
|---|---|---|---|
| DiRADO | DET | SO | INV. |
| Thompson | TI | " | " |
| Slayton | TI | " | " |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**DONNY YOUNGBLOOD**
Sheriff-Coroner
Public Administrator

**SHERIFF'S DEPARTMENT**
**COUNTY OF KERN**

Telephone (661) 391-7500



1350 Norris Road
Bakersfield, California  93308-2231

# Evidence Collection List

**Date:** _August 29, 2013_          **Time:** _____

**Decedent's Name:** ___LEDESMA, Ronnie___          **Case No:** _C01600-13_

| Evidence Collected | Collected By | Released To | Department |
|---|---|---|---|
| BLOOD SAMPLE | DR. CARPENTER | K.THOMPSON | KCSD |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, DABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

# ORIGINAL

## Toxicology Report

**Report Issued**  09/12/2013 20:00

| | |
|---|---|
| Patient Name | LEDESMA Ronnie |
| Patient ID | C01600-13 |
| Chain | 16160 |
| Age | 39 Y |
| Gender | Male |
| Workorder | 13215216 |

Page 1 of 4

**To:**  10362
Kern County Sheriff Coroner
1832 Flower Street

Bakersfield, CA  93305

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Lorazepam | 6.1 | ng/mL | Antemortem Blood |
| Midazolam | 76 | ng/mL | Antemortem Blood |
| Phencyclidine | 17 | ng/mL | Antemortem Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 8051B | Postmortem Toxicology - Basic, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Lavender Vial | 2 mL | 08/29/2013 12:00 | Antemortem Blood | DATE AND TIME ON SAMPLE:  08/22/13 0430 |
| 002 | Green Vial | 0.75 mL | 08/29/2013 12:00 | Antemortem Serum or Plasma | DATE AND TIME ON SAMPLE:  08/22/13 0430 |
| 003 | Lavender Vial | 1.75 mL | 08/29/2013 12:00 | Antemortem Blood | DATE AND TIME ON SAMPLE:  8/23  0530 |
| 004 | Green Vial | 0.6 mL | 08/29/2013 12:00 | Antemortem Serum or Plasma | DATE AND TIME ON SAMPLE:  8/23  0530 |
| 005 | Lavender Vial | 3 mL | 08/29/2013 12:00 | Antemortem Blood | DATE AND TIME ON SAMPLE:  8/25/13  0455 |

All sample volumes/weights are approximations.
Specimens received on 09/04/2013.

ECA
9-20-13

# NMS
LABS

**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 13215216 |
| Chain | 16160 |
| Patient ID | C01600-13 |

Page 2 of 4

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Lorazepam | 6.1 | ng/mL | 5.0 | 001 - Antemortem Blood | LC-MS/MS |
| Midazolam | 76 | ng/mL | 5.0 | 001 - Antemortem Blood | LC-MS/MS |
| Phencyclidine | 17 | ng/mL | 5.0 | 001 - Antemortem Blood | GC/MS |

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

## Reference Comments:

1. **Lorazepam (Ativan®) - Antemortem Blood:**

   Lorazepam is a DEA Schedule IV benzodiazepine used in the treatment of anxiety and for short-term relief of anxiety associated with depressive symptoms. It shares the actions and adverse reactions of other CNS-depressants. This compound does have abuse potential and should be used cautiously with other CNS-depressants.

   Lorazepam can be administered by oral, IV and IM routes; daily divided oral doses of up to 10 mg are generally prescribed for anxiety. Following a single oral dose of 2 mg, lorazepam concentrations in plasma averaged 20 ng/mL, declining to 10 ng/mL by 12 hours. Chronic oral administration of 10 mg dose resulted in an average steady-state plasma lorazepam level of 200 ng/mL (range, 140 - 240 ng/mL). In blood, the maximum therapeutic effect with lorazepam is reported to be within the range of 30 - 50 ng/mL.

   Fatalities with lorazepam are relatively rare and generally have postmortem blood concentrations exceeding 300 ng/mL; however, such concentrations are not necessarily fatal.

2. **Midazolam (Versed®) - Antemortem Blood:**

   Midazolam is a short acting benzodiazepine (a DEA Schedule IV controlled compound) with strong central nervous system depressant/hypnotic properties. It is usually utilized for preoperative sedation, as a sedative hypnotic, and as an agent for the induction of anesthesia. It has significant abuse potential. Effects noted following use may include sedation, somnolence (drowsiness or sleepiness), visual disturbances (diplopia or double vision), dysarthria (slurred speech), ataxia (shaky movements and unsteady gait), and intellectual impairment and coma may result.

   Oral doses of 10 mg given to 20 subjects produced average peak plasma concentrations (at 1 hr post dose) for midazolam of 69 ng/mL in males and 53 ng/mL in females. As a preoperative medication, intramuscular injection of midazolam at 0.13 mg/Kg body weight (9.1 mg/70 Kg body weight) produced peak plasma concentrations of 68 ng/mL.

   At high concentrations, confusion, impaired coordination, diminished reflexes, respiratory depression, apnea, hypotension and coma may result.

3. **Phencyclidine (Angel Dust; PCP; Sherm) - Antemortem Blood:**

   Phencyclidine (PCP) is a DEA Schedule II controlled dangerous hallucinogenic drug. There exists a dearth of pharmacokinetic data of PCP usage in humans; however, it has been reported that blood levels of phencyclidine ranged from 7 - 240 ng/mL (mean, 75 ng/mL) in individuals stopped for driving under the influence of drugs or for being intoxicated in public.

   Ataxia, agitation, combativeness, seizures, spasticity, coma and respiratory depression are associated with phencyclidine concentrations ranging from 90 - 220 ng/mL plasma.

 NMS
LABS

CONFIDENTIAL

| | |
|---|---|
| Workorder | 13215216 |
| Chain | 16160 |
| Patient ID | C01600-13 |

Page 3 of 4

**Reference Comments:**

The physiological effects of PCP can be classified as low or high dose. In low doses, PCP can elicit visual disturbances, drowsiness, agitation, hallucinations, aggressiveness, increased pulse rate and blood pressure, bronchospasm, increased respiratory rate and hyperthermia. In high doses, PCP can elicit convulsions, opisthotonos, coma, arrhythmias, decreased blood pressure and respirations and rhabdomyolysis.

There appears to be no relation between plasma levels of phencyclidine and degree of intoxication. Even so, death has been reported following the use of only 120 mg of phencyclidine. Blood concentrations in phencyclidine-related fatalities have been reported to range from 300 - 25000 ng/mL (mean, 5000 ng/mL).

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 13215216 was electronically signed on 09/12/2013 19:30 by:

*William H. Anderson*

William H. Anderson, Ph.D., DABFT
Forensic Toxicologist

**Analysis Summary and Reporting Limits:**

Acode 50012B - Benzodiazepines Confirmation, Blood (Forensic) - Antemortem Blood

-Analysis by High Performance Liquid Chromatography/Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 7-Amino Clonazepam | 5.0 ng/mL | Flurazepam | 2.0 ng/mL |
| Alpha-Hydroxyalprazolam | 5.0 ng/mL | Hydroxyethylflurazepam | 5.0 ng/mL |
| Alprazolam | 5.0 ng/mL | Hydroxytriazolam | 5.0 ng/mL |
| Chlordiazepoxide | 20 ng/mL | Lorazepam | 5.0 ng/mL |
| Clobazam | 20 ng/mL | Midazolam | 5.0 ng/mL |
| Clonazepam | 2.0 ng/mL | Nordiazepam | 20 ng/mL |
| Desalkylflurazepam | 5.0 ng/mL | Oxazepam | 20 ng/mL |
| Diazepam | 20 ng/mL | Temazepam | 20 ng/mL |
| Estazolam | 5.0 ng/mL | Triazolam | 2.0 ng/mL |

Acode 50017B - Phencyclidine Confirmation, Blood (Forensic) - Antemortem Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Phencyclidine | 5.0 ng/mL | | |

Acode 8051B - Postmortem Toxicology - Basic, Blood (Forensic) - Antemortem Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 20 ng/mL | Methadone | 25 ng/mL |
| Barbiturates | 0.040 mcg/mL | Opiates | 20 ng/mL |
| Benzodiazepines | 100 ng/mL | Phencyclidine | 10 ng/mL |
| Cannabinoids | 10 ng/mL | Propoxyphene | 50 ng/mL |
| Cocaine / Metabolites | 20 ng/mL | | |

v.8

 **NMS** LABS

CONFIDENTIAL

| | |
|---|---|
| **Workorder** | 13215216 |
| **Chain** | 16160 |
| **Patient ID** | C01600-13 |

**Page 4 of 4**

## Analysis Summary and Reporting Limits:

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Buprenorphine / Metabolite | 0.50 ng/mL | | |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

v.8