# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 232-3255
GERAGOS@GERAGOS.COM

MARK J. GERAGOS  SBN 108325
BEN J. MEISELAS  SBN 277412
Attorneys for Plaintiffs ADRIANA LEDESMA, JESSICA LEDESMA, MARISSA LEDESMA, RONNIE MATHEW LEDESMA, and CHRISTINA HERRERA

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIANA LEDESMA, an individual; JESSICA LEDESMA, an individual; MARISSA LEDESMA, an individual by and through her Guardian *Ad Litem* Raquel Sierra; RONNIE MATHEW LEDESMA, an individual by and through his Guardian *Ad Litem* Christina Garcia; CHRISTINA HERRERA;<br><br>Plaintiffs,<br><br>v.<br><br>KERN COUNTY; KERN COUNTY SHERIFF'S DEPARTMENT; WARREN MARTIN; KARENA DE LA GARZA; DWAYNE PERKINS; JAMES MELTON; CHRISTOPHER WONG; AND DOES 1-200, INCLUSIVE;<br><br>Defendants. | Case No.: 1:14-cv-01634-DAD-JLT<br><br>*The Honorable Judge Dale A. Drozd*<br><br>**DECLARATION OF EMMANUEL VELA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>*[Filed concurrently with Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Plaintiffs' Separate Statement of Disputed Facts, and Declaration of Kaylee Stier in Support Thereof]*<br><br>Date: September 6, 2016<br>Time: 9:30 a.m.<br>Dept.: 5 |

## DECLARATION OF EMMANUEL VELA

I, EMMANUEL VELA declare as follows:

1. I am over the age of eighteen and have personal knowledge of the facts stated herein. If called upon as a witness, I could and would competently testify as to the facts stated herein. I am making this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

2. On August 19, 2013, my wife, baby daughter, and I were at the Rite Aid Pharmacy at 2505 Mt. Vernon Ave., Bakersfield, California 93306. We were filling a prescription for my baby daughter, who had just been released from the hospital.

3. I heard someone screaming "Help! Help!" in the Walgreen's parking lot across the street.

4. I could see two men in the Walgreen's parking lot, one attacking the other.

5. My view of the Walgreen's parking lot was unobstructed and the parking lot itself was well lit.

6. I could see an officer hitting another man, who I later found out to be Ronnie Ledesma, who was lying on the ground.

7. The officer was on top of Mr. Ledesma and attacking him to the point where I initially believed Mr. Ledesma was being robbed.

8. The officer continued to strike Mr. Ledesma approximately 15 times with his baton while Mr. Ledesma attempted to shield his face and screamed for help.

9. At no point was Mr. Ledesma resisting arrest by the officer.

10. I could see several other people in the Walgreens parking lot watching the officer beat Mr. Ledesma while he screamed for help.

11. Not long after the officer began to attack Mr. Ledesma, other officers arrived.

12. Those officers immediately began attacking Mr. Ledesma, hitting him with their batons and kicking him all over his body, including in his head.

-2-

13. During the attack, the officer with the K-9 instructed his K-9 to attack Mr. Ledesma, prompting the K-9 to bite Mr. Ledesma's legs.

14. At this point, I ran across the street to the Walgreen's parking lot with the intention of pretending to film the attack in order to get the officers to stop using excessive force on Mr. Ledesma.

15. When I arrived, the officers immediately ordered me to back away from the scene. Many of the officers dropped their batons when they noticed that I was carrying my phone, believing that they were being captured on film using excessive force, though they continued beating Mr. Ledesma with their fists.

16. When it became clear that my presence was not dissuading the officers from attacking Mr. Ledesma, I began filming the incident with my phone. The most violent portions of the attack had already concluded by the time I was filming the officers, though they continued to beat him and the K-9 continued biting Mr. Ledesma.

17. During the entirety of the officers' attack, Mr. Ledesma yelled and screamed for help, and never resisted arrest.

18. The officers' attacks on the defenseless Mr. Ledesma were so violent that it reminded me of gang members jumping and beating a rival.

19. Eventually, the officers got Mr. Ledesma into a pair of handcuffs, after which they led him to a marked sheriff's car.

20. Following the attack, I attempted to leave the scene to rejoin my wife and transport my sick daughter home, as she had just been released from the hospital.

21. An officer then approached me and refused to let me leave until I gave him the cell phone that I used to record the attack. When I refused, the officer told me that I would be arrested if I did not provide the video.

22. Fearing retaliation or further violence from the officers, I waited for approximately an hour—while my wife and sick baby daughter waited in our car—until an officer arrived with a laptop computer which was used to transfer my video.

Only after the officers had a copy of the video was I allowed to leave to care for my baby daughter.

23. Attached hereto as Exhibit A is a true and correct copy of a report by Kern County Sherriff's Department Deputy Brandon Rutledge summarizing an interview he conducted with me on August 26, 2013. The report accurately reflects my statements, though I would have said more regarding the brutality of the officers' attacks but feared reprisal from the Kern County Sheriff's Department.

24. Attached hereto as Exhibit B is a true and correct copy of the video recording of the officers' attack on Mr. Ledesma that I recorded on August 19, 2013.

I declare under penalty of perjury under the laws of the United States and California that the foregoing is true and correct.

Executed this __19__ day of August, 2016 at Bakersfield, California.

_____
Emmanuel Vela

# Exhibit "A"

## Incident/Investigation Report

Agency: KCSD    Case Number: SR13-23185    Date: 11/14/2013 08:41:55

### Supplement Information

| Supplement Date | Supplement Type | Supplement Officer |
|---|---|---|
| 08/27/2013 08:25:07 | INTERVIEWS/STATEMENTS | (201268) RUTLEDGE, BRANDON |
| Contact Name | | Supervising Officer |
| | | (200692) SIMPSON, AVERY J |
| Location Comment: : @WALGREENS | | |

### Supplement Notes

PHYSICAL EVIDENCE:

Item #BR01 One (1) compact disc containing my recorded interview with EMMANUEL VELA.

CHAIN OF EVIDENCE:

I recorded my interview with VELA. I later transferred the recorded interview to a compact disc, completing Item #BR01. I kept Item #BR01 in my care and custody until I booked it into the Kern County Sheriff's Office Property Room as evidence.

DETAILS:

On 8/26/13 I called EMMANUEL VELA and asked to speak with him in person about the incident he witnessed at Walgreens. VELA agreed to speak with me and asked we speak at his residence. At about 1030 hours, I went to 1027 Quincy Street in Bakersfield, California to interview VELA regarding this investigation. VELA video recorded part of the incident between deputies and RONNIE LEDESMA that occurred on 8/19/13. VELA allowed Sheriff's deputies to copy the video from his cell phone.

I interviewed VELA inside of his residence. I recorded my interview with VELA. I later transferred the recorded interview to a compact disc which I booked into the Kern County Sheriff's Office Property Room as evidence. The following is a summary of my audio recorded interview with VELA. For further details, specifics, exact quotes and wording, refer to compact disc submitted into evidence.

I began my interview with VELA by explaining that this interview was voluntary and if at any time he felt uncomfortable speaking with me I would terminate the interview and leave his residence. VELA told me he understood and agreed to continue with the interview.

I asked VELA if he remembered the day and time the incident at Walgreens occurred. VELA said he believed it happened on Monday but he could not remember the exact date. VELA did remember that the incident occurred at night. During the interview, VELA told me that he had trouble recalling all the details because of a medical condition he has. VELA has lupus and because of that he constantly has to go to the hospital and pharmacy to get new medications.

On the day of the incident VELA said he had just left the hospital and went to the Rite Aid pharmacy located at the northeast corner of Mt Vernon Avenue and Bernard Street. As VELA said he was walking out of the Rite Aid pharmacy, he heard "loud screams" and said his attention was drawn to the Walgreens at the northwest corner of Mt Vernon Avenue and Bernard Street. VELA said he could hear someone screaming, "Help! Help!"

VELA could not estimate the distance from his position in the Rite Aid parking lot to what he saw in the Walgreens parking lot, but explained that

## Incident/Investigation Report

Agency: KCSD     Case Number: SR13-23185     Date: 11/14/2013 08:41:55

Mt Vernon Avenue has two lanes in both directions and said the incident occurred far away from him. Initially, VELA said he saw two men who appeared to be fighting just outside the entrance to the Walgreens near the pharmacy drive-thru. Although the distance was far away, VELA said he could clearly see the incident, nothing obstructed his view, and northbound and southbound traffic on Mt Vernon Avenue were not an issue. VELA said the parking lot to Walgreens was well lit.

VELA described what he saw. VELA said it appeared there was on person on top of another person. The person on top appeared to be hitting the person who was lying on the ground. VELA thought the person on the ground was getting robbed by the person on top of him, but realized the person on top was a deputy when the deputy stood up. VELA said he could easily recognize the deputy's uniform and duty belt.

Once the deputy stood up, VELA saw the deputy strike the person on the ground several times with a stick. VELA could not describe in what part of the body the deputy struck the man on the ground and could not clearly describe the object that the deputy was holding as he struck the man on the ground. Based on reviewing the incident report associated with this investigation, I determined the man on the ground VELA was talking about was RONNIE LEDESMA.

VELA said as LEDESMA was lying on the ground he continued to yell for help and cry as the deputy on top of him struck him. VELA could never give me an accurate count of how many times LEDESMA was struck by the deputy, but said the deputy struck LEDESMA "several times."

VELA said it looked like LEDESMA was moving and trying to block the blows from the deputy but it did not look like he was resisting the deputy. VELA said it seemed "crazy" to him that the deputy would continue to hit LEDESMA because several onlookers showed up at the Walgreens and watched the incident. VELA believed there were several witnesses to the incident who saw the entire thing.

As the incident progressed, VELA said more deputies arrived and surrounded LEDESMA. VELA said all of the deputies, about four or five, got out their "sticks" and started to strike LEDESMA on his body. VELA said he saw deputies hit LEDESMA in the head with the baton. I asked VELA to further describe the blows he saw to LEDESMA's head. VELA said he never saw any deputy strike LEDESMA in the head, but said the swings were in the area of LEDESMA's head. As deputies were striking LEDESMA, VELA said that LEDESMA continued to scream and cry for help.

VELA said a Sheriff's deputy with a K-9 arrived and the K-9 deputy "unleashed" the canine on LEDESMA. VELA said deputies continued to strike LEDESMA in the body while the canine bit LEDESMA on his legs and arms, but later said deputies moved away from LEDESMA while the canine bit him. VELA also stated once the canine arrived, they dragged LEDESMA from where he was near the awning at the pharmacy drive-thru south into the parking lot.

I asked VELA to describe what type of "stick" the other deputies were using. VELA said he could not give an accurate description of the types of baton deputies were using, but said he believed one of them had a long flashlight. VELA described the flashlight as about a foot and a half long and two inches in diameter. At first, VELA said the deputy struck LEDESMA with the flashlight, but then changed his story and said that he never saw the deputy strike LEDESMA with the flashlight.

VELA said once he saw the canine, he felt like deputies were beginning to use excessive force and decided to run across the street from the Rite Aid parking lot to the Walgreens parking lot to videotape the incident with his cell phone. VELA said he was going to pretend to record the altercation so that deputies would see him and it would force the deputies to change their behavior. Afterward, for fear of retaliation from the deputies, VELA said he decided to record the incident so that it was documented. VELA claimed the deputies were "really into it" and described the deputies' behavior as gang members jumping and beating a rival.

VELA said he was only able to video record the end of the incident. In the video, VELA said you could see one deputy strike LEDESMA with a baton. I asked VELA to describe his position in relation to the deputies. VELA said he was about 10 feet from the deputies as he was video recording, but moved back when deputies ordered him to. VELA said to him it looked like all but one of the deputies threw their batons down when they saw he was recording and there were several batons on the ground next to deputies. VELA felt that the final deputy he recorded striking LEDESMA did not notice him. VELA described the strike he recorded as "jabbing" the baton into LEDESMA's body.

## Incident/Investigation Report

Agency: KCSD    Case Number: SR13-23185    Date: 11/14/2013 08:41:55

After the final deputy jabbed LEDESMA with his baton, VELA said nobody else struck LEDESMA with a baton. The canine continued to bite LEDESMA and VELA said the deputies were still hitting LEDESMA with their fists and trying to gain control of him.

During the entire struggle, VELA said LEDESMA yelled for help and screamed, but did not appear to actively resist. VELA said at one point LEDESMA rolled over from his stomach to his back as the canine was biting him. VELA said when LEDESMA rolled over; it looked like he inadvertently almost kicked a deputy trying to get him into custody. Once LEDESMA rolled onto his back and almost inadvertently kicked a deputy, VELA said it looked like LEDESMA tried to get the canine off of his legs by pushing at the canine's head.

I asked VELA to explain the deputies' behavior. VELA said he heard several deputies yell orders toward LEDESMA. VELA said the deputies told LEDESMA to "stop resisting", to put his hands behind his back, and stop kicking deputies. VELA said he would be able to recognize the deputies that were on scene, but would not be able to accurately explain what each deputy did. VELA was positive that each deputy did utilize a baton but said he would not be able to determine where each deputy struck LEDESMA with their baton. VELA said a deputy had a collapsible baton, but did not know which deputy had one and how it was used.

VELA said the deputies were able to eventually get LEDESMA into handcuffs. VELA could not remember how, but he saw LEDESMA was escorted to the backseat of a patrol vehicle. VELA said he did not think LEDESMA resisted or struggled while getting into the car, but he did not know if LEDESMA was carried or escorted by deputies.

Later, VELA heard from other people that watched the entire incident that LEDESMA had threatened to kill clerks within the Walgreens. VELA said he felt LEDESMA needed to be put under arrest, but the deputies used too much force on him.

After LEDESMA was in a patrol vehicle, VELA said a deputy approached him and tried to take his cell phone from him. VELA said he refused to give his cell phone to the deputies even though they told him to. VELA said another deputy arrived and offered to copy the video from his phone onto a laptop computer. VELA also stated that they wanted his contact information but he initially refused to give it to them. VELA said he was scared that deputies would retaliate against him for videoing the incident. Then VELA jokingly said he was paranoid from watching too many movies. Eventually, VELA said he gave deputies his personal information and they allowed him to leave.

VELA said he no longer has the cellular phone he used to video record the altercation, but saved a copy of the video on his computer. VELA tried to play the video on his computer for me, but was unable to get it to work.

Throughout the course of the interview VELA stated he understood that deputies needed to take LEDESMA into custody but felt that once the canine arrived and started biting LEDESMA, the deputies were using excessive force. VELA said his hope was that by videotaping the incident it would make the deputies stop beating LEDESMA and just take him into custody. Even though VELA said he had a clear unobstructed view of the incident when he was in the Rite Aid parking lot, he could not provide any details on where and how many times LEDESMA was struck with batons. VELA said he could identify deputies that were there, but not exactly what they did. When VELA moved across the street into the Walgreens parking lot, VELA said he only saw and recorded the last moments of the incident. When VELA initially walked out of the Rite Aid and saw what was going on in the Walgreens parking lot he said the incident was already going on and he did not see the very beginning. From beginning to end, VELA said he believed he watched about five to six minutes of the altercation.

Once I determined VELA did not have any new information to offer, I ended the interview with him and stopped my audio recorder. As I walked outside of VELA's residence, VELA commented that even though he felt that deputies used excessive force, he cannot judge their actions because he was not in their shoes and he did not see the entire incident. I ended my conversation with VELA and left his residence with no further action.

End of report.

RUTLEDGE/201268

# Exhibit "B"

See Notice of Lodging Document in Paper by Plaintiffs Christina Herrera, Adriana Ledesma, Jessica Ledesma, Marissa Ledesma, Ronnie Mathew Ledesma: Deposition Transcripts and Video in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, or Alternatively Summary Adjudication of Issues (ECF No. 61)