1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ADRIANA LEDESMA; JESSICA              No.  1:14-cv-01634-DAD-JLT
     LEDESMA; MARISSA LEDESMA, by
12   and through her guardian ad litem Raquel
     Sierra; RONNIE MATTHEW LEDESMA,
13   by and through his guardian ad litem       ORDER GRANTING IN PART AND
     Christina Garcia; and CHRISTINA           DENYING IN PART DEFENDANTS'
14   HERRERA,                                   MOTION FOR SUMMARY JUDGMENT

15                    Plaintiffs,              (Doc. No. 59)

16          v.

17   KERN COUNTY; KERN COUNTY
     SHERIFF'S DEPARTMENT; WARREN
18   MARTIN; KARENA DELAGARZA;
     DWAYNE PERKINS; JAMES MELTON;
19   and CHRISTOPHER WONG,

20                    Defendants.

21

22          This case arises from an encounter between Ronnie Ledesma, Jr. and several deputies of

23   the Kern County Sheriff's Office ("KCSO")[1] on August 19, 2013, around 8:30 p.m. in the parking

24   lot area of a Walgreens pharmacy in Bakersfield, California.  Mr. Ledesma died eight days

25   following the August 19 incident while in custody following his admission into Kern Medical

26   _____

27   [1]  Throughout this case, defendant Kern County Sheriff's Department has referred to itself as the
     "Kern County Sheriff's Office."  Because defendant does not dispute that these names refer to the
28   same legal entity, the court will refer to this defendant by its preferred moniker.

                                            1

Center.  Plaintiffs—Mr. Ledesma's successors in interest, including his mother and children—bring this civil rights action against Kern County ("County"), KSCO, and Kern County Sheriff's Deputies Warren Martin, Karena DeLaGarza, Dwayne Perkins, Christopher Wong, and James Melton.  (Doc. No. 3.)  Plaintiffs allege constitutional violations under 42 U.S.C. § 1983, as well as state law civil rights and common law causes of action.

This matter came before the court on September 6, 2016, for hearing on defendants' motion for summary judgment.  Attorney Benjamin Meiselas appeared on behalf of plaintiffs. Deputy County Counsel Andrew Thomson appeared on behalf of defendants.  After oral argument, defendants' motion was taken under submission.  For the reasons stated below, defendants' motion for summary judgment will be granted in part and denied in part.

## BACKGROUND

### A.  Factual Background[2]

The evidence before the court primarily consists of testimony from each of the individual defendants and an eyewitness to the events, Emmanuel Vela.  The summary below describes these varying, and sometimes conflicting accounts of the events at issue.

#### 1.  Initial Dispatch and Interaction Between Deputy Martin and Ledesma

On August 19, 2013, at approximately 8:34 p.m., defendant Warren Martin, a Kern County Sheriff's Deputy, responded to a dispatch regarding two suspicious individuals at the

---

[2]  The relevant facts that follow are principally derived from plaintiffs' complaint (Doc. No. 3) ("Compl."); defendants' statement of undisputed material fact (Doc. Nos. 59-1, 62-1, 63-2) ("DUMF"); plaintiffs' statement of disputed material facts (Doc. Nos. 62-2, 63-1); the deposition of Warren Martin, dated January 25, 2016 (Doc. Nos. 59-5, Ex. G; 62-3, Ex. 5; 63-4, Ex. S) ("Martin Dep."); the deposition of Dwayne Perkins, dated January 25, 2016 (Doc. Nos. 59-6, Ex. H; 62-3, Ex. 6; 63-4, Ex. T) ("Perkins Dep."); the deposition of Christopher Wong, dated January 28, 2016 (Doc. Nos. 59-7, Ex. J; 62-3, Ex. 7; 63-4, Ex. U) ("Wong Dep."); the deposition of James Melton, dated January 28, 2016 (Doc. Nos. 59-6, Ex. I; 62-3, Ex. 4) ("Melton Dep."); the deposition of Ryan Dunbier, dated January 27, 2016 (Doc. Nos. 62-3, Ex. 2; 63-4, Ex. W) ("Dunbier Dep."); the deposition of Fred Wheeler, dated January 27, 2016 (Doc. Nos. 62-3, Ex. 3; 63-4, Ex. X) ("Wheeler Dep."); the deposition of Eugene Carpenter, Jr., M.D., dated January 28, 2016 (Doc. Nos. 59-7, Ex. K; 62-3, Ex. 1; 63-4, Ex. V); the declaration of Karena (DeLaGarza) Aquino (Doc. No. 59-7, Ex. L) ("DeLaGarza Decl."); the declaration of Emmanuel Vela (Doc. No. 62-6) ("Vela Decl."); the declaration and accompanying expert report of Scott Defoe (Doc. No. 62-4) ("Defoe Decl."); and the final report of the Kern County Sheriff/Coroner (Doc. No. 59-7, Ex. P) ("Autopsy Report").

1   Walgreens pharmacy located at 2628 Mt. Vernon Avenue, Bakersfield, California.  (DUMF ¶¶ 5–

2   6.)  According to defendant Martin, he saw Ronnie Ledesma, Jr. in the parking lot area of the

3   Walgreens when he arrived on the scene.  (Martin Dep. 41:16–42:4.)  Deputy Martin believed

4   Ledesma fit the description of one of the suspicious individuals described in the dispatch—a

5   heavyset Hispanic male wearing a dark shirt and shorts.  (Martin Dep. 42:5–11.)

6        Martin asked Ledesma what he was doing and was met by a blank stare from Ledesma.

7   (Martin Dep. 42:15–21.)  Martin inquired a second time, and Ledesma responded that he was at

8   the store buying beer.  (Martin Dep. 42:22–23, 43:1–3.)  At this point in time, Martin did not

9   believe Ledesma had committed a crime.  (Martin Dep. 43:20–23.)  Martin then asked Ledesma

10   how much he had to drink, and Ledesma responded that he had one beer.  (Martin Dep. 44:15–

11   21.)  Martin noticed that Ledesma had thick slurred speech, had red watery eyes, smelled of

12   alcohol, and appeared off-balance while walking and standing.  (Martin Dep. 45:1–47:10.)

13   Martin, believing Ledesma was drunk in public, proceeded to arrest him.  (Martin Dep. 46:7–12;

14   *see also* DUMF ¶ 15.)

15        Martin told Ledesma to turn around and place his hands behind his back.  (Martin Dep.

16   47:11–18.)  In response, Ledesma turned away from Martin and walked north.  (Martin Dep.

17   47:19–48:4.)  At this point, Martin estimates that less than five minutes had passed since he first

18   arrived at the scene.  (Martin Dep. 60:3–12.)  Martin told Ledesma to stop and that he was under

19   arrest.  (Martin Dep. 61:25–62:3.)  Ledesma turned back towards Martin and said, "Fuck you."

20   (Martin Dep. 62:10–12.)  Martin began to approach Ledesma, who was then between ten and

21   twenty feet away, to grab his arm.  (Martin Dep. 62:13–15, 62:21–22.)  As Martin approached

22   and grabbed Ledesma by the arm, Ledesma pulled away while raising his right hand and

23   clenching his fist.  (Martin Dep. 66:12–19, 67:2–10.)  In response, Martin pushed Ledesma away.

24   (Martin Dep. 67:13–15.)  Ledesma did not attempt to strike Martin, and Martin did not believe

25   Ledesma was attempting to flee the scene.  (Martin Dep. 67:11–12, 68:24–69:2.)  Martin did not

26   call for additional support.  (Martin Dep. 71:18–72:1.)

27        Martin pulled out his collapsible baton and instructed Ledesma, who was now less than

28   ten feet away, to place his hands on top of his head.  (Martin Dep. 59:19–24; 72:2–7, 72:11–14.)

1   Ledesma responded again by stating, "Fuck you," while continuing to clench his fist near his

2   face.  (Martin Dep. 72:8–10.)  Martin then instructed Ledesma to go down on his knees, but

3   Ledesma did not comply.  (Martin Dep. 72:23–73:1.)  Martin struck Ledesma with his baton in

4   Ledesma's lower leg, but Ledesma did not respond.  (Martin Dep.73:2–3, 74:1–3.)  Martin then

5   struck Ledesma a second time, causing Ledesma to fall to the ground.  (Martin Dep. 74:4–7.)

6   Ledesma rolled onto his back and bent his knees towards his chest in a defensive position.

7   (Martin Dep. 74:8–10, 74:14–23.)  Martin ordered Ledesma to stop resisting, and Ledesma began

8   to kick at Martin.  (Martin Dep. 74:11–13.)  While Ledesma was on the ground and kicking,

9   Martin struck Ledesma's arms and legs with his baton five to seven additional times.  (Martin

10  Dep. 109:2–23.)

11          Around this time, though he is unsure exactly when, Martin put out a "148" message over

12  dispatch, referring to the Penal Code section for resisting, delaying, or obstructing a peace officer.

13  (DUMF ¶ 29.)  Separately, Martin put out a "69" message over dispatch, referring to the Penal

14  Code section for violent resistance to arrest.  (DUMF ¶ 34.)  At some point, Ledesma stopped

15  kicking and sat up.  (Martin Dep. 78:22–79:2.)

16          During defendant Martin's initial interaction with Ledesma, a witness, Emmanuel Vela,

17  was at the Rite Aid pharmacy across the street, at 2505 Mt. Vernon Avenue.  (Vela Decl. ¶ 2.)

18  Vela heard someone screaming "Help!  Help!" in the Walgreens parking lot, and saw two men,

19  one (an officer) attacking the other (Ledesma), who was lying on the ground.  (Vela Decl. ¶¶ 3–

20  6.)  Vela saw the officer positioned atop Ledesma, striking Ledesma with his baton approximately

21  fifteen times, while Ledesma tried to shield his face and screamed for help.  (Vela Decl. ¶ 8.)

22          2.      Arrival of Deputies DeLaGarza and Perkins

23          Defendants Karena DeLaGarza and Dwayne Perkins, both Kern County Sheriff's

24  Deputies, heard Martin's "148" message and arrived on the scene separately but at approximately

25  the same time.  (DUMF ¶¶ 30, 40, 48.)  As defendant DeLaGarza arrived, Ledesma was sitting up

26  and Martin was attempting to place Ledesma's left arm into a control hold.  (Martin Dep. 78:22–

27  79:10; DeLaGarza Decl. ¶ 7.)  DeLaGarza attempted to grab Ledesma's right arm to place

28  handcuffs on Ledesma.  (DeLaGarza Decl. ¶ 10; *see also* Martin Dep. 81:2–4.)  Ledesma tensed

4

his arms, thrashed his body, lay on his back with his arms underneath him, and began kicking. (Martin Dep. 79:14–19; DeLaGarza Decl. ¶¶ 10, 12.)  While attempting to grab Ledesma's arm, DeLaGarza gave him verbal commands to "give me your hands" and "stop resisting." (DeLaGarza Decl. ¶ 11.)

Defendant Perkins arrived with his canine, named Volker, moments after DeLaGarza's arrival and saw DeLaGarza running toward the scene.  (DUMF ¶ 51.)  Perkins put his canine on a leash and ran toward Martin, DeLaGarza, and Ledesma.  (*Id.*)  Perkins observed defendants Martin and DeLaGarza struggling with Ledesma, with Martin on his left side and DeLaGarza on his right side.  (Perkins Dep. 27:23–28:11.)  At this point, Ledesma was sitting with his legs out in front of him, and Perkins had not observed Ledesma kicking the other deputies.  (Perkins Dep. 28:21–29:8.)  When Martin and DeLaGarza tried to grab Ledesma's shoulder, Ledesma appeared to break free with no effort.  (Perkins Dep. 29:8–12.)  By this time, defendants Martin, DeLaGarza, and Perkins each believed Ledesma was likely under the influence of a controlled substance.  (Martin Dep. 92:19–93:10; DeLaGarza Decl. ¶ 9; Perkins Dep. 49:18–23.)

Perkins approached and yelled "Sheriff's Office" while telling people in the parking lot to get back.  (Perkins Dep. 30:2–7.)  Perkins then yelled at Ledesma to put his hands behind his back and to stop resisting.  (Perkins Dep. 30:7–9.)  Perkins told Ledesma once more to "Stop resisting, or I'm going to send my dog."  (Perkins Dep. 31:14–24.)  Perkins does not recall seeing Ledesma kick or punch the other officers.  (Perkins Dep. 31:25–32:5.)  Perkins then walked up to Ledesma, while Martin and DeLaGarza continued to attempt placing handcuffs on him, and gave Volker the command of "pucken" causing Volker to bite Ledesma on the leg.  (DUMF ¶¶ 76–77; Perkins Dep. 32:6–33:24.)  In Perkins estimation, between thirty and sixty seconds elapsed between Perkins' initial arrival when he observed Martin and DeLaGarza, and Perkins' deployment of his canine.  (Perkins Dep. 70:23–71:4.)

After Volker began biting Ledesma's leg, Ledesma started to kick and swing his arms, placing his hands near Volker's head and mouth in an attempt to pry Volker off of him.  (Perkins Dep. 36:10–16.)  Perkins believed the dog bite had little effect on Ledesma.  (Perkins Dep. 37:15–39:2.)  Upon witnessing Ledesma grab Volker, DeLaGarza struck Ledesma with her

1    collapsible baton three times on his arm and leg, but those strikes did not appear to have an effect

2    on Ledesma.  (DeLaGarza Decl. ¶¶ 13–14.)  DeLaGarza struck Ledesma twice more with little

3    effect.  (DeLaGarza Decl. ¶ 15.)  While on the scene, Perkins personally observed that Ledesma

4    appeared to be under the influence, resisting arrest, and kicking at his dog; but Perkins did not

5    observe Ledesma to be actively resisting arrest in violation of Penal Code § 69.  (Perkins Dep.

6    60:2–61:16.)

7         Still on the other side of the street, Mr. Vela saw other officers arrive not long after the

8    first officer began to attack Ledesma.  (Vela Decl. ¶ 11.)  The officers began attacking Ledesma,

9    hitting him with their batons and kicking him all over his body, including in his head.  (Vela Decl.

10   ¶ 12.)  Mr. Vela observed Perkins instructing Volker to attack Ledesma, prompting the canine to

11   bite Ledesma's legs.  (Vela Decl. ¶ 13.)  Vela then began to make his way across the street and

12   toward the scene.  (Vela Decl. ¶ 14.)

13        3.    Arrival of Deputies Wong and Melton

14        Defendants Christopher Wong and James Melton, travelling together, arrived at the scene

15   shortly after the arrival of defendants DeLaGarza and Perkins.  (Wong Dep. 8:24–9:3; 11:1–5,

16   19:25–20:8; Melton Dep. 16:22–17:9; *see also* Martin Dep. 88:11–16; Perkins Dep. 39:24–40:9.)

17   Upon arriving, both Wong and Melton saw the other deputies struggling with Ledesma on the

18   ground.  (Wong Dep. 19:25–20:8; Melton Dep. 16:22–18:14; *see also* DUMF ¶ 72.)  Melton saw

19   Ledesma sitting on the ground while rotating his body and yelling.  (Melton Dep. 17:1–2, 23:21–

20   24:14.)  Melton observed that Perkins had deployed his canine and that the canine was biting

21   Ledesma's leg.  (Melton Dep. 18:15–19:5; *see also* DUMF ¶ 72.)[3]  Ledesma appeared to be

22   kicking the canine and pulling at the canine's mouth in an attempt to force the canine off of him.

23   (Melton Dep. 25:1–26:5, 58:3–59:1.)  The canine then disengaged.  (Melton Dep. 25:20–21.)

24        Wong approached and attempted to grab onto Ledesma's arm to place a control hold, but

25   Ledesma pulled his arm away from Wong.  (Wong Dep. 22:5–19, 23:2–7.)  Wong then observed

26

27   [3]  This was the first of two dog bites Melton witnessed.  (*See* Melton Dep. 50:4–10.)  In his
     deposition testimony, Wong did not recall whether Perkins' canine had engaged in biting
28   Ledesma when he first arrived.  (Wong Dep. 24:24–25:12.)

Perkins give a warning to Ledesma. (Wong Dep. 23:18–24.) Ledesma continued to resist, and
Perkins deployed his canine. (*Id.*) Melton also tried to grab Ledesma's arm to place a control
hold. (Melton Dep. 26:7–12.) After Perkins' canine bit Ledesma, Wong observed Ledesma kick
the canine with his foot. (Wong Dep. 26:7–27:4.) Melton saw Ledesma punch the canine.
(Melton Dep. 28:25–29:15.) Wong warned Ledesma to "[q]uit resisting, or, [s]top resisting, or
else you are going to get struck with the baton." (Wong Dep. 28:7–18.) Ledesma ignored the
order, and Wong struck Ledesma with his wooden baton three times in Ledesma's right shoulder
area. (Wong Dep. 28:7–18; 29:10–19.) Wong then put his baton away. (Wong Dep. 37:16–18.)
Continuing to struggle while lying down on his back, Ledesma attempted to push his body up
from the ground to get up. (Wong Dep. 37:19–38:9.) Wong redeployed his baton and ordered
Ledesma to stop resisting. (Wong Dep. 38:10–39:9.) Wong then jabbed Ledesma in the left
shoulder area with his baton. (Wong Dep. 38:24–39:1.) Ledesma continued his attempt to stand
up, and Wong placed his right foot in the middle of Ledesma's body and pushed him back to the
ground. (Wong Dep. 39:4–14.)

When Mr. Vela arrived at the Walgreens parking lot, he held up his phone, pretending to
record the incident, and noticed that some of the officers dropped their batons. (Vela Decl.
¶¶ 14–15.) Melton saw a collapsible baton on the ground. (Melton Dep. 41:14–42:3.) Vela then
began to film the incident, and his video recording of the incident has been submitted in support
of plaintiffs' opposition to the instant motion. (Vela Decl. ¶ 16, Ex. B.)

Ledesma turned over onto his stomach. (DeLaGarza Decl. ¶ 17; Wong Dep. 39:15–23;
Melton Dep. 29:23–24.) Ledesma tucked his arms under his body, allegedly trying to avoid being
handcuffed. (DeLaGarza Decl. ¶ 17; *see also* Wong Dep. 37:19–38:5; Melton Dep. 29:18–24.)
Melton ordered Ledesma to show his hands and to stop resisting. (Melton Dep. 30:16–20.) In an
attempt to pull out Ledesma's left arm, Melton punched Ledesma in his left shoulder and then
twice kicked Ledesma on the left side of his ribcage. (Melton Dep. 33:22–36:14, 37:18–38:16;
*see also* Wong Dep. 41:25–42:2.) Ledesma did not appear to be affected by any of these blows.
(Melton Dep. 36:23–37:4, 38:25–39:5.) While Ledesma lay face down on the ground, Martin and
Melton grabbed his left arm and placed it behind his back. (Melton Dep. 43:3–9.) DeLaGarza

7

1   and Wong grabbed Ledesma's right arm and placed it behind his back.  (*See* Melton Dep. 43:10–

2   17; DeLaGarza Decl. ¶ 18.)  Martin and Wong then placed Ledesma in handcuffs.  (DUMF

3   ¶ 111.)  According to defendant Martin, the entire incident lasted less than fifteen minutes, from

4   the time he first arrived at the scene until Ledesma was placed in handcuffs.  (Martin Dep. 91:19–

5   92:10.)

6           Mr. Vela's video recording appears to show the conclusion of the encounter, beginning

7   approximately three and a half minutes before Ledesma is led to the patrol car in handcuffs.  (*See*

8   Vela Decl., Ex. B.)  During the first two minutes of the video recording, four officers can be seen

9   surrounding Ledesma as he is on the ground, while a fifth officer is seen standing to the side with

10  a canine near Ledesma's leg.  One officer appears to be hitting Ledesma with a baton while others

11  are providing commands to "put your hands behind your back," "lay flat on the ground," and

12  "quit resisting."  As the officers struggle to restrain Ledesma, he can be heard yelling in pain and

13  discomfort.  (*See id.*)  During the entirety of the incident, Mr. Vela observed Ledesma yelling and

14  screaming for help, and never resisting arrest.  (Vela Decl. ¶ 17.)  Vela states that the officers'

15  attack reminded him of gang members beating a rival.  (Vela Decl. ¶ 18.)  Defendants Martin,

16  DeLaGarza, and Perkins believed, at various times, that Ledesma "was impervious or immune to

17  pain" and "would not have any physical reaction, would not verbally recognize any pain."  (*See*

18  Martin Dep. 86:15–88:1, 93:11–20; DeLaGarza Decl. ¶ 9; Perkins Dep. 37:15–18.)

19          4.      Ledesma's Death

20          Following his arrest, Ledesma was transported to the Kern Medical Center in a KCSO

21  vehicle.  (DUMF ¶ 117; *see also* Martin Dep. 92:11–18.)  Ledesma remained at the hospital until

22  he died on August 27, 2013.  (*See* Autopsy Report.)  According to the autopsy report, forensic

23  pathologist Eugene Carpenter, Jr., M.D. stated to a reasonable degree of medical certainty that

24  Ledesma's cause of death was "A. Massive right cerebral hemisphere infarction, interval between

25  onset and death is days.  B. Thrombosis of the proximal right middle cerebral artery, interval

26  between onset and death is days."  (Autopsy Report; DUMF ¶ 125.)  The death was identified as

27  an accident.  (Autopsy Report; DUMF ¶ 128.)

28  /////

1    **B.**    **Procedural Background**

2        Plaintiffs commenced this action by filing their complaint on October 15, 2014.  Therein,

3    plaintiffs state the following claims: (1) violation of the Fourth Amendment of the United States

4    Constitution, based on excessive force (first claim); (2) violation of the Fifth Amendment right to

5    due process (first claim); (3) violation of the Eighth Amendment based on cruel and unusual

6    punishment (first claim); (4) violation of the Fourteenth Amendment right to due process (first

7    claim); (5) municipal liability based on unconstitutional customs, policies, and practices (second

8    claim); (6) state law wrongful death and survival, based on assault and battery, negligence, and

9    negligent hiring, training, and supervision theories (third claim); (7) violation of California's

10   Ralph Act and Unruh Act, Civil Code §§ 51, 51.7 (fourth claim); and (8) violation of California's

11   Bane Act, Civil Code § 52.1 (fourth claim).  (Doc. No. 3 ("Compl.").)

12       On August 5, 2016, following the conclusion of discovery, defendants moved for

13   summary judgment, or alternatively, summary adjudication of issues, in their favor as to each

14   claim.  (Doc. No. 59.)  On August 23, 2016, plaintiffs filed an opposition to that motion.  (Doc.

15   No. 62.)  On August 30, 2016, defendants filed a reply.  (Doc. No. 63.)

16                                **LEGAL STANDARD**

17       Summary judgment is appropriate when the moving party "shows that there is no genuine

18   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

19   Civ. P. 56(a).

20       In summary judgment practice, the moving party "initially bears the burden of proving the

21   absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

22   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

23   may accomplish this by "citing to particular parts of materials in the record, including

24   depositions, documents, electronically stored information, affidavits or declarations, stipulations

25   (including those made for purposes of the motion only), admissions, interrogatory answers, or

26   other materials" or by showing that such materials "do not establish the absence or presence of a

27   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

28   Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial, as

                                          9

1    plaintiffs do here, "the moving party need only prove that there is an absence of evidence to

2    support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at

3    325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after

4    adequate time for discovery and upon motion, against a party who fails to make a showing

5    sufficient to establish the existence of an element essential to that party's case, and on which that

6    party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of

7    proof concerning an essential element of the nonmoving party's case necessarily renders all other

8    facts immaterial."  *Id.* at 322–23.  In such a circumstance, summary judgment should be granted,

9    "so long as whatever is before the district court demonstrates that the standard for the entry of

10   summary judgment . . . is satisfied."  *Id.* at 323.

11           If the moving party meets its initial responsibility, the burden then shifts to the opposing

12   party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

13   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

14   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

15   of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

16   admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

17   P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of America, NT & SA*, 285 F.3d 764,

18   773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion

19   for summary judgment.").  The opposing party must demonstrate that the fact in contention is

20   material, i.e., a fact that might affect the outcome of the suit under the governing law, *see*

21   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec.*

22   *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the

23   evidence is such that a reasonable jury could return a verdict for the non-moving party.  *See*

24   *Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

25           In the endeavor to establish the existence of a factual dispute, the opposing party need not

26   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

27   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

28   trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

                                                      10

1  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

2  *Matsushita*, 475 U.S. at 587 (citations omitted).

3        "In evaluating the evidence to determine whether there is a genuine issue of fact," the

4  court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

5  *Central Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's

6  obligation to produce a factual predicate from which the inference may be drawn.  *See Richards*

7  *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902

8  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

9  simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

10  taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

11  'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

12                                    **DISCUSSION**

13  **A.       Federal Section 1983 Claims**

14        Plaintiffs, as successors in interest to decedent Ronnie Ledesma, Jr., allege violations of

15  the Fourth, Fifth, and Eighth Amendments against each of the individual defendants Martin,

16  DeLaGarza, Perkins, Wong, and Melton, and against defendants County and KCSO based on

17  *Monell* liability.  Similarly, plaintiffs allege on their own behalf a violation of their rights under

18  the Fourteenth Amendment against each individual defendant as well as against defendants

19  County and KCSO.[4]

20        The Civil Rights Act provides as follows:

21              Every person who, under color of [state law] . . . subjects, or causes
                to be subjected, any citizen of the United States . . . to the
22              deprivation of any rights, privileges, or immunities secured by the
                Constitution . . . shall be liable to the party injured in an action at
23              law, suit in equity, or other proper proceeding for redress . . . .

24  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

25  ─────────────────────

26  [4]  Plaintiffs additionally allege violations of 42 U.S.C. §§ 1985 and 1986.  (*See* Compl. at 8–12.)
    At the hearing on the pending motion, plaintiffs' counsel indicated that plaintiffs do not intend to
27  proceed on their claims under §§ 1985 and 1986 at trial, given that those claims are based on the
    same underlying factual allegations as plaintiffs' § 1983 claim.  To the extent plaintiffs plan on
28  maintaining those claims at trial, those claims are not currently before the court.

actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

"The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."  *Id.* at 743–44; *see also Tatum v. Moody*, 768 F.3d 806, 817 (9th Cir. 2014), *cert. denied*, ___U.S.___, 135 S. Ct. 2312 (2015).  Alternatively, liability can be based upon a defendant's "integral participation."  *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004).  "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation."  *Id.* at 780; *see also Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009).  Rather, it requires "some fundamental involvement in the conduct that allegedly caused the violation."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).  Liability, however, does not attach to "a mere bystander" who had "no role in the unlawful conduct." *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996); *see also Bravo v. City of Santa Maria*, 665 F.3d 1076, 1090 (9th Cir. 2011); *Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002) (officers held not integral participants simply based on their presence at the scene of an alleged unlawful act).

           1.      Fourth Amendment Claim

Plaintiffs first allege that individual defendants Martin, DeLaGarza, Perkins, Wong, and Melton used unconstitutional excessive force against decedent Ledesma on August 19, 2013.  A claim that a law enforcement officer used excessive force during the course of an arrest is analyzed under the Fourth Amendment's objective reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  Under this standard, "'[t]he force which [i]s applied must be balanced against the need for that force: it is the need for

12

1  force which is at the heart of the *Graham* factors.'" *Liston v. Cty. of Riverside*, 120 F.3d 965, 976

2  (9th Cir. 1997) (quoting *Alexander v. City and Cty. of San Francisco*, 29 F.3d 1355, 1367 (9th

3  Cir. 1994)).  Thus, in light of the facts and circumstances surrounding a law enforcement officer's

4  actions, courts "must balance the nature of the harm and quality of the intrusion on the

5  individual's Fourth Amendment interests against the countervailing governmental interests at

6  stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (citations and internal

7  quotations omitted); *see also Scott v. Harris*, 550 U.S. 372, 383–84 (2007); *Santos v. Gates*, 287

8  F.3d 846, 853 (9th Cir. 2002); *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001); *Liston*,

9  120 F.3d at 976.  "Force is excessive when it is greater than is reasonable under the

10  circumstances." *Santos*, 287 F.3d at 854 (citing *Graham*, 490 U.S. 386). Accordingly,

11
12  > [a]lthough it is undoubtedly true that police officers are often forced to make split-second judgments, and that therefore not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers is a violation of the Fourth Amendment, it is equally true that even where some force is justified, the amount actually used may be excessive.
13
14

15  *Id.* at 853 (citations and internal quotations omitted).

16      In considering the pending motion, it is important to keep in mind the following

17  admonition of the Ninth Circuit with respect to the use of summary judgment in cases involving

18  claims of excessive use of force:

19
20  > Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined by an assessment of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Because this inquiry is inherently fact specific, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1205–06 (9th Cir. 2000), *cert. granted, judgment vacated on other grounds*, 534 U.S. 801 (2001*); see also Torres [v. City of Madera]*, 648 F.3d [1119,] 1125 [(9th Cir. 2011)] (summary judgment "in excessive force cases should be granted sparingly"); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (finding that excessive force is "ordinarily a question of fact for the jury"); *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law.").
21
22
23
24
25
26
27

28  *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).

While many of the facts in this case concerning the quantum of force applied by the defendant officers are uncontroverted, there are nevertheless significant disagreements between the parties as to the facts and circumstances leading up to and surrounding defendants' use of force—such as whether Ledesma resisted arrest or attempted to flee, whether Ledesma appeared to express pain, whether and how Ledesma responded to each application of force—such that a genuine dispute of material fact exists as to the reasonableness with which each use of force was applied.

> a.   *The Nature and Quality of the Intrusion*

The court begins its analysis by assessing both the type and the amount of force used.  *See Bryan*, 630 F.3d at 824; *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007).  While the parties differ to some degree regarding specific details, they generally agree that the individual defendants employed baton blows, dog bites, and hands-on force (such as punching and kicking) against decedent Ledesma.

> i.   Baton blows

Baton blows are "forms of force capable of inflicting significant pain and causing serious injury . . . [and] are regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests.  *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (citing *Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir. 2005); *United States v. Mohr*, 318 F.3d 613, 623 (4th Cir. 2003)).  Moreover, baton blows to the head are recognized as constituting deadly force.  "The standard issue baton 'is a deadly weapon that can cause deep bruising as well as blood clots capable of precipitating deadly strokes.'"  *Mattos v. Agarano*, 661 F.3d 433, 454 (9th Cir. 2011) (quoting *Young*, 655 F.3d at 1162); *see also Young*, 655 F.3d at 1162 ("[H]ead strikes with an impact weapon are prohibited unless circumstances justify the use of deadly force.").  In accordance with KCSO policy, batons are used primarily for self-defense in situations that merit the use of force.  (Wheeler Dep. 32:2–8.)  KCSO officers are instructed to use batons in a number of strike areas, including a suspect's arms, lower legs, mid-section, chest area, and ribcage.  (Wheeler Dep. 51:24–52:6.)  Officers are instructed not to target any part of the suspect's body from the shoulder up.  (Wheeler Dep.

53:19–54:3.)

Here, both parties present evidence that the individual defendants applied multiple baton strikes to Ledesma's body.  Plaintiffs' eyewitness, Emmanuel Vela, states that he saw defendant Martin strike Ledesma approximately fifteen times with his baton.[5]  Mr. Vela also describes the other officers using their batons to hit Ledesma in various parts of his body, including his head.[6]  Several defendants have testified that they individually used their batons to strike Ledesma.  Defendant Martin states he initially used his baton to hit Ledesma two times on the lower leg, and an additional five to seven times on his arms and legs, after Ledesma was on the ground.  Defendant DeLaGarza states she struck Ledesma with her baton a total of five times on his arms and legs.  Finally, defendant Wong states he initially struck Ledesma three times to the right shoulder area and a fourth time to the left shoulder area.

---

[5]  Defendants generally suggest that statements in Mr. Vela's declaration should be discounted or disregarded because they are inconsistent with statements he gave days following the incident according to a police report.  (*See* Doc. No. 63 at 7–8.)  These purported inconsistencies, however, require credibility determinations that this court cannot make on summary judgment.  *See Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015) ("Although the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature."); *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (holding that a district court could not disregard evidence simply because no reasonable jury would believe it); *T.W. Elec. Serv.*, 809 F.2d at 630 ("Nor does the judge [on summary judgment] make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions").  Alternatively, defendants argued at the hearing on the pending motion that Mr. Vela's declaration amounts to a sham affidavit.  *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.") (citation omitted).  The sham affidavit rule, however, is inapplicable here.  Because Mr. Vela's prior statements were made to a law enforcement officer and summarized in a police report, they do not constitute sworn testimony and cannot negate Mr. Vela's declaration signed under penalty of perjury which is currently before the court.

[6]  Mr. Vela does not specify in his declaration which officers he saw strike Ledesma with batons.  However, because the court must draw all inferences in support of plaintiffs as the non-moving party, this evidence is sufficient to create a triable issue that each of the officers on the scene engaged in the use of baton blows upon Ledesma.  *See Walls*, 653 F.3d at 966.  Moreover, even if a specific officer did not apply force with a baton, the evidence before the court on summary judgment at the very least creates a genuine dispute as to whether he or she is nevertheless liable as an integral participant in the conduct.  *See Blankenhorn*, 485 F.3d at 481 n.12.

15

1

### ii.	Dog bites

2	Use of a trained police dog may be regarded as "intermediate force" or "deadly force,"

3	depending on the factual circumstances in the case.  *See Smith*, 394 F.3d at 701–02.  KCSO's

4	canine policy advises against the deployment of a canine for apprehension purposes where a

5	suspect is "resisting arrest" but not "actively fighting."  (*See* Dunbier Dep. 32:23–34:12.)

6	Here, there is no dispute that defendant Perkins instructed his canine to bite Ledesma and

7	that the canine did so on at least two occasions, a first bite following Perkins' command, and a

8	second bite after disengaging from a struggle with Ledesma.  This amount of force was both

9	"intermediate" and "severe" in that it resulted in multiple bite wounds in Ledesma's leg.  *See,*

10	*e.g.*, *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).  Moreover, plaintiffs allege that these

11	wounds caused, in part, Ledesma's death.

12

### iii.	Punching and kicking

13	Punching and kicking are considered non-lethal types of force, though they may be still be

14	used in a constitutionally excessive manner.  *See Bryan*, 630 F.3d at 825 ("Non-lethal . . . is not

15	synonymous with non-excessive; all force—lethal and non-lethal—must be justified by the need

16	for the specific level of force employed.") (citing *Graham*, 490 U.S. at 395); *Garlick v. Cty. of*

17	*Kern*, 167 F. Supp. 3d 1117, 1152–53 (E.D. Cal. 2016) (denying summary judgment as to

18	officers' use of impact blows, including punches and kicks); *Wade v. Fresno Police Dep't*, No.

19	1:09-cv-00599-AWI-BAM, 2012 WL 253252, at *13 (E.D. Cal. Jan. 25, 2012) (characterizing

20	punching as a "non-lethal" level of force, but noting that it "may be employed in a manner that

21	creates a substantial risk of death or serious bodily injury"), *aff'd*, 529 F. App'x 840 (9th Cir.

22	2013).[7]  Here, Mr. Vela declares that he witnessed multiple officers kicking Ledesma in various

23	locations, including his head.   Moreover, defendant Melton admits that he applied one hand

24	strike to Ledesma's left shoulder area, followed by two kicks to the left side of his ribcage.

25	/////

26	/////

27

28	[7]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1

          b.     *The Governmental Interests at Stake*

2         Having identified the quantum of force at issue, the court proceeds to balance the use of

3  force against the need for that force.  *See Bryan*, 630 F.3d at 823; *Liston*, 120 F.3d at 976.  In

4  analyzing the government's interests at issue, courts must consider a number of factors, including

5  (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of

6  the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade

7  arrest by flight, and any other exigent circumstances.  *Deorle*, 272 F.3d at 1280.  Courts may also

8  consider, when appropriate, whether a warning was given before force was used.  *See id.* at 1285

9  ("Less than deadly force that may lead to serious injury may be used only when a strong

10  governmental interest warrants its use, and in such circumstances should be preceded by a

11  warning, when feasible.").  Ultimately, the court must "examine the totality of the circumstances

12  and consider 'whatever specific factors may be appropriate in a particular case, whether or not

13  listed in *Graham*.'"  *Bryan*, 630 F.3d at 826.

14

          i.     Severity of the crimes at issue

15         In examining the government's justification for the use of force, the court first looks to the

16  character of the offense leading to a suspect's arrest.  *Deorle*, 272 F.3d at 1280–81.  The evidence

17  before the court on summary judgment suggests that at the outset, defendant Martin suspected

18  Ledesma only of being intoxicated in public, a nonviolent misdemeanor under California Law.

19  *See* Cal. Penal Code §§ 17 (defining felonies and misdemeanors), 647; Cal. Health & Safety Code

20  § 11550.  Following Martin's decision to arrest Ledesma, defendants contend, Ledesma could

21  have been charged with three additional crimes: resisting arrest, resisting arrest by threat or

22  violence, and willfully or maliciously harming a police dog.  *See* Cal. Penal Code §§ 69,

23  148(a)(1), 600.  For the reasons discussed below and in light of the evidence on summary

24  judgment reflecting a significant dispute as to what occurred, a jury could determine that

25  Ledesma's conduct amounted to no more than reasonable resistance.  Therefore consideration of

26  this factor could be found to weigh against the use of significant force to effectuate Ledesma's

27  arrest.  *See, e.g.*, *Young*, 655 F.3d at 1164–65 (concluding that non-violent disobedience of a

28  police officer will not support the use of significant force); *Bryan*, 630 F.3d at 829 (finding no

1  substantial government interest in using significant force to effect an arrest for misdemeanor

2  violations).

3  ii.    Immediate threat to safety

4  The second and most important governmental interest factor is whether the suspect poses

5  an immediate threat to the safety of the officers or others.  *Bryan*, 630 F.3d at 826; *Smith*, 394

6  F.3d at 702; *Chew*, 27 F.3d at 1441.  "A desire to resolve quickly a potentially dangerous

7  situation is not the type of governmental interest that, standing alone, justifies the use of force that

8  may cause serious injury. . . . [A] simple statement by an officer that he fears for his safety or the

9  safety of others is not enough; there must be objective factors to justify such a concern."  *Deorle*,

10  272 F.3d at 1281.

11  The court finds little evidence before it on summary judgment that Ledesma posed an

12  immediate threat prior to defendant Martin's employment of baton blows.  According to Martin,

13  Ledesma did not hit him or flee the scene.  When defendant Martin first tried to grab and place

14  Ledesma under arrest, Ledesma pulled away with his fist near his head.  Because Martin believed

15  Ledesma possibly could have tried to hit him, he struck Ledesma twice in the leg to gain

16  compliance.  (*See* Martin Dep. 68:6–12.)  However, apart from the stance taken by Ledesma,

17  there is no evidence before the court on summary judgment that Ledesma posed a threat to the

18  safety of defendant Martin or others.  Certainly, a reasonable trier of fact could conclude that

19  Ledesma merely acted defensively.  After falling to the ground, Ledesma tried to kick at Martin,

20  but Martin cannot recall whether any of these kicks made contact.  (Martin Dep. 75:13–14.)

21  Martin then struck Ledesma's arms and legs five to seven additional times.  Given Martin's

22  characterization that Ledesma was in a defensive position with his knees up in the air, and Mr.

23  Vela's observation that Ledesma attempted to shield his face and screamed for help while being

24  struck on the ground, a reasonable jury could certainly conclude that Ledesma was simply

25  resisting the use of additional force and that he posed no immediate threat to the safety of others.

26  By the time the other officers arrived at the scene—and until Ledesma was finally

27  handcuffed and brought to a patrol car—Ledesma was either sitting or lying on the ground, and,

28  absent provocation, was not attacking the officers prior to each subsequent use of force by the

18

individual defendants.  Each of the arriving defendants heard defendant Martin's "148" message over dispatch, and most heard Martin's "69" message.  (*See* DeLaGarza Decl. ¶¶ 5–6; Perkins Dep. 49:18–50:4; Wong Dep. 11:8–15; Martin Dep. 12:15–17, 13:2–6.)  While some officers were concerned for Martin's safety, the evidence on summary judgment suggests none of them witnessed behavior from which a reasonable officer could objectively conclude Ledesma posed a threat to anyone's safety.  For example, defendant Perkins did not personally see Ledesma violently resist or otherwise initiate contact with the other deputies.  Defendants DeLaGarza and Perkins expressed concern as to whether Ledesma had been searched for weapons, but neither officer communicated such concern or investigated any further before deciding to use force.  (*See* DeLaGarza Decl. ¶ 8; *see also* Perkins Dep. 49:25–50:3.)

Defendant Perkins also believed that because Ledesma was in a public area, he posed a threat to the safety of nearby bystanders, but could not identify any objective basis for that conclusion.  (Perkins Dep. 50:3–4.)  Perkins deployed his canine based only on the belief that there was a potential for danger.  This evidence could reasonably support the finding that because Perkins' expressed fears were objectively unfounded, they are insufficient to justify his use of a canine against Ledesma.

The evidence on summary judgment is that after Volker bit Ledesma's leg, defendants DeLaGarza, Wong, and Melton each saw Ledesma attempting to kick Volker and to pull its mouth away from his leg.  While some officers perceived this to be threatening, a reasonable jury could conclude from that evidence that Ledesma was simply responding to Volker's bites.  Viewing Ledesma's conduct as non-threatening, a reasonable finder of fact could also determine from that evidence that the defendants' subsequent use of force—including at least five baton blows by DeLaGarza and four baton blows by Wong—was greater than that which could be reasonably employed.

The evidence before the court on summary judgment also suggests that defendants used force when Ledesma refused to comply with their commands.  For example, when Ledesma turned over onto his stomach, his arms were tucked in underneath his body.  Some defendants have stated they believed Ledesma was simply avoiding handcuffing.  But such behavior is also

19

1   consistent with defendant Wong's testimony that at one point Ledesma tried to push his body up

2   off the ground to get up.  After ordering Ledesma to produce his hands, Melton punched Ledesma

3   in his left shoulder and twice kicked Ledesma near his ribcage.  Mr. Vela declares, and the video

4   he submits on summary judgment appears to show, that Ledesma yelled in pain while he lay on

5   the ground.  Drawing all inferences from this evidence in plaintiffs' favor, a reasonable jury could

6   find that Ledesma was neither threatening nor affirmatively defying commands, and that his

7   conduct therefore did not justify a significant use of force by the defendant officers.  *See*

8   *Blankenhorn*, 485 F.3d at 479–80 (finding that a suspect's refusal to be handcuffed alone did not

9   justify use of significant force).

10      In sum, on summary judgment, a genuine dispute of material fact exists as to whether

11  Ledesma posed an objective threat to the officers or any others at any point during the incident.

12  Defendants argue that their primary goal in employing the force used was to gain control of and

13  handcuff Ledesma.  However, the evidence before the court suggests that for all but two

14  applications of force, Ledesma was already on the ground, and his conduct could easily be

15  construed as a reasonable response to preceding uses of force by the officers.  Accordingly, based

16  upon the evidence presented on summary judgment, a reasonable jury could conclude this factor

17  weighs against the use of significant force to restrain Ledesma.

18                     iii.     Active resistance or attempts to evade arrest

19      The third governmental interest factor is whether Ledesma actively resisted arrest or

20  attempted to evade arrest by flight.  *Deorle*, 272 F.3d at 1280.  As to a suspect's level of

21  resistance, the Ninth Circuit has drawn a distinction between active and passive resistance to

22  arrest:

23         [Resistance] runs the gamut from the purely passive protestor who
24         simply refuses to stand, to the individual who is physically
           assaulting the officer. . . . Even purely passive resistance can
           support the use of some force, but the level of force an individual's
25         resistance will support is dependent on the factual circumstances
           underlying that resistance.
26

27  *Bryan*, 630 F.3d at 830 (citing *Forrester v. City of San Diego*, 25 F.3d 804, 811 (9th Cir. 1994));

28  *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013) (finding a lack of

1    active resistance where suspect did nothing "particularly bellicose"); *Mattos*, 661 F.3d at 449

2    (finding minimal resistance where the suspect's conduct was defensive or simply amounted to a

3    failure to facilitate an arrest); *Bryan*, 630 F.3d at 830 (finding a suspect's failure to comply with

4    orders to be closer to passive resistance); *Smith*, 394 F.3d at 703 (9th Cir. 2005) (declining to find

5    active resistance where the suspect ignored officers' requests and briefly physically resisted

6    arrest).

7            Here, the evidence on summary judgment may be reasonably viewed to support the

8    conclusion that Ledesma only passively refused to comply with commands, and that his conduct

9    while he was on the ground never rose to the level of active resistance or assaultive behavior.  For

10   instance, according to that evidence, no defendant observed Ledesma affirmatively try to make

11   contact with an officer.  Furthermore, each act viewed as resistance by defendants on the part of

12   Ledesma followed soon after an officer's use force.  Thus, to the extent the evidence indicates

13   Ledesma displayed aggressive behavior, a reasonable jury could conclude that he did so only in

14   response to the preceding uses of force by the officers.  *See Young*, 655 F.3d at 1164 (holding that

15   an officer's conduct can be in some circumstances "sufficiently provocative to trigger [plaintiff's]

16   limited right of resistance") (citing *Blankenhorn*, 485 F.3d at 479–80).

17           Moreover, the court finds no evidence before it on summary judgment suggesting that

18   Ledesma attempted to flee the scene.  Defendant Martin never believed Ledesma attempted to

19   flee, and Ledesma was already on the ground when the other deputies arrived.  While some

20   defendants have testified that they believed it was *possible* that Ledesma could get up to flee (*see,*

21   *e.g.*, Perkins Dep. 74:3–13), the evidence on summary judgment establishes that Ledesma was

22   never actually presented with an opportunity to evade arrest in that manner.

23           Viewing the evidence on summary judgment in the light it must, the court finds that a

24   reasonable jury could conclude that Ledesma neither actively resisted nor tried to evade arrest.

25   Accordingly, consideration of this factor weighs against the use of any significant force.

26                       iv.    Other considerations

27           Several additional considerations could militate against finding the individual defendants'

28   use of force reasonable in this case.  First, "warnings should be given, when feasible, if the use of

force may result in serious injury, and . . . the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle*, 272 F.3d at 1284.  Here, the defendants' own evidence reflects that their use of warnings was varied.  The evidence before the court on summary judgment establishes the following.  In many instances, defendants gave only instructions to Ledesma.  Defendant Martin gave Ledesma several commands, including orders to "stop resisting," before applying baton blows.  Similarly, defendant DeLaGarza gave Ledesma verbal commands to "give me your hands" and "stop resisting," prior to applying force.  And defendant Melton gave only commands, but not warnings to Ledesma.  (*See* Melton Dep. 30:19–20 ("Let me see your hands.  Stop resisting.").)  On the other hand, defendants Perkins and Wong testified that they did give warnings that consisted of both a command (e.g., "stop resisting") and an explanation of the potential consequences of noncompliance (e.g., ". . . or I'm going to send my dog," ". . . or else you are going to get struck with the baton").  Plaintiffs' expert Scott Defoe, a former Riverside County Sheriff's Deputy, opines that a reasonable officer in defendant Martin's shoes would have had the opportunity to give Ledesma adequate warnings before proceeding to use his baton.[8]  (Defoe Decl. at 11.)

The evidence on summary judgment is such that a reasonable jury could find that each of the defendants had ample opportunity to issue warnings before resorting to the use of force.  As additional officers arrived on the scene, defendants faced a diminishing probability that Ledesma posed either an imminent threat to their safety or a risk of flight.  A reasonable fact finder could conclude from this evidence that failure to issue a warning when feasible was unreasonable given the circumstances.  Similarly, where officers did issue warnings, such as in the case of defendants Perkins and Wong, a jury could nonetheless infer from the evidence now before the court that

---

[8] In their reply, defendants contend that Defoe's expert opinions regarding what defendants should have done is "less than helpful" and therefore irrelevant to a determination of reasonableness.  (Doc. No. 63 at 3.)  "Expert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not." *Walton v. U.S. Marshals Service*, 492 F3d 998, 1008 (9th Cir. 2007) (internal quotations omitted).  Other than disagreeing with Defoe's conclusions, defendants offer no reason as to why his expert opinions should be wholly disregarded by the court.

1    Ledesma lacked sufficient time to comply or to alter his conduct.  As Perkins admits, only thirty

2    to sixty seconds elapsed between his initial arrival and his instruction to Volker to attack.

3    Considering that several officers were giving Ledesma instructions and warnings around the same

4    time, and that force was used several times throughout the incident, a jury could find that

5    Ledesma was merely confused about how to respond, and that any warning given could have

6    been effectively meaningless.  *See Gravelet-Blondin*, 728 F.3d at 1092.  The evidence on

7    summary judgment as a whole could support the conclusion that defendants had no reason not to

8    issue warnings and provide Ledesma with the time and space necessary to comply with those

9    warning.  *See Deorle*, 272 F.3d at 1284.

10          Second, it is appropriate to consider whether alternative tactics for capturing or subduing a

11   suspect were available to the officers.  *Smith*, 394 F.3d at 703 (citing *Chew*, 27 F.3d at 1441 n.5).

12   The evidence before this court on summary judgment could support a finding that several viable

13   alternatives existed.  Plaintiffs' expert Defoe opines that less intrusive tactics were available to

14   defendants, particularly given defendants' ultimate goal of handcuffing Ledesma.  (*See* Defoe

15   Decl. at 10–13.)  According to Defoe, defendant Martin initially should have summoned and

16   waited for additional support before making any physical contact with Ledesma.  (Defoe Decl. at

17   10.)  Defoe further opines that a reasonable officer in Martin's shoes would have formulated a

18   tactical plan before attempting to arrest Ledesma, and that other officers should have done the

19   same when they arrived.  (Defoe Decl. at 11–12.)

20          In addition, there is evidence that several defendants were equipped with alternative tools

21   for subduing a suspect.  (*See, e.g.*, Martin Dep. 59:16–18; Perkins Dep. 72:12–19; Wong Dep.

22   40:13–15, 41:3–4; Melton Dep. 48:17–19, 49:3–4.)  For example, defendant Martin carried

23   oleoresin capsicum ("OC") spray, an immobilizing aerosol the use of which Defoe believes

24   would have resulted in fewer injuries at the outset.  (Defoe Decl. at 11.)  Defoe also opines that a

25   reasonable officer in Martin's shoes could have carried and used a taser to similar effect.  (*Id.*)

26          As to defendant Perkins' decision to deploy his canine, Defoe opines that such a

27   deployment was counterproductive and prolonged the event.  (Defoe Decl. at 12–13.)  A

28   reasonable jury could conclude from the evidence before the court that Perkins' deployment of

1    his canine substantially caused the officers' subsequent uses of force and that a reasonable officer

2    would have decided against using the canine in favor of less dangerous techniques.

3        On balance, there are significant and genuine disputes of material fact regarding the

4    circumstances surrounding defendants' use of force in this case.  Accordingly, because each of

5    the *Graham* factors could be found to militate against the use of significant force based upon

6    which version of the events is believed, defendants' motion for summary judgment as to

7    plaintiffs' claim of excessive force must be denied.  *See Green*, 751 F.3d at 1049.

8        2.    Fifth and Eighth Amendment Claims

9        Plaintiffs also allege that defendants violated Ledesma's right to due process under the

10   Fifth Amendment and right to be free from cruel and unusual punishment under the Eighth

11   Amendment.  Defendants argue that these claims are unsupported by the factual allegations of the

12   complaint.  (Doc. No. 59 at 16–17.)  Plaintiffs do not dispute this contention.  Accordingly,

13   plaintiffs' claims under the Fifth and Eighth Amendments will be dismissed.

14       3.    Fourteenth Amendment Claim

15       Finally, plaintiffs allege on their own behalf a violation of their right to companionship

16   and society of decedent Ledesma under the Due Process Clause of the Fourteenth Amendment.

17   *See Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013)

18   (recognizing due process claims brought by surviving parents and children) (citing *Wilkinson v.*

19   *Torres*, 610 F.3d 546, 554 (9th Cir. 2010)); *Curnow ex rel. Curnow v. Ridgecrest Police*, 952

20   F.2d 321, 325 (9th Cir. 1991)).

21       As the United States Supreme Court has recognized, government conduct may offend due

22   process only when it "'shocks the conscience' and violates the 'decencies of civilized conduct.'"

23   *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Rochin v. California*, 342 U.S.

24   165, 172–73 (1952)); *see also Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  A plaintiff

25   may demonstrate that an officer's conduct shocks the conscience by showing that the officer

26   acted with either (1) deliberate indifference, or (2) a purpose to harm the decedent for reasons

27   unrelated to legitimate law enforcement objectives.  *Porter*, 546 F.3d at 1137; *Moreland v. Las*

28   *Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998).  The appropriate standard of

24

1    culpability in a given case turns on whether the officer had an opportunity for actual deliberation.

2    *Porter*, 546 F.3d at 1138.

3            Where actual deliberation is practical, then an officer's "deliberate
             indifference" may suffice to shock the conscience.  On the other
4            hand, where a law enforcement officer makes a snap judgment
             because of an escalating situation, his conduct may only be found to
5            shock the conscience if he acts with a purpose to harm unrelated to
             legitimate law enforcement objectives.
6

7    *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (quoting *Wilkinson*, 610 F.3d at

8    554); *see also Tatum*, 768 F.3d at 821; *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078,

9    1089 (9th Cir. 2009); *Porter*, 546 F.3d at 1139 (holding that the purpose to harm standard is

10   applied where officers found themselves confronting "fast paced circumstances presenting

11   competing public safety obligations").  "By its nature, the determination of which situation [an

12   officer] actually [finds] himself in is a question of fact for the jury, so long as there is sufficient

13   evidence to support both standards." *Duenez v. City of Manteca*, No. 2:11-cv-01820-LKK-AC,

14   2013 WL 6816375, at *14 (E.D. Cal. Dec. 23, 2013).

15           In this case, the evidence before the court on summary judgment, viewed in the light most

16   favorable to plaintiffs as the non-moving party, creates a genuine dispute about which standard of

17   culpability applies with respect to the conduct of each individual defendant.  Just as one can

18   reasonably infer from that evidence that defendant Martin had adequate time to warn Ledesma

19   before using his baton, a reasonable jury may also conclude that it was practical for Martin to

20   deliberate before resorting to his use of force.  Similarly, a jury could find from this evidence that

21   the other defendants—having arrived on the scene after Ledesma was already on the ground and

22   posing no apparent threat to safety or risk of flight—never encountered the type of emergency

23   situation that would necessitate a snap judgment.  *Cf. Wilkinson*, 610 F.3d at 554 ("Within a

24   matter of seconds, the situation evolved from a car chase to a situation involving an accelerating

25   vehicle in dangerously close proximity to officers on foot."); *Porter*, 546 F.3d at 1135, 1139–40

26   (a "quickly evolving and escalating" situation where the decedent moved his car toward officers

27   while refusing to stop or exit the car); *Moreland*, 159 F.3d at 372 (officers arrived to a "gunfight

28   in progress" which "threatened the lives of the 50 to 100 people who were trapped in the parking

1   lot").  Accordingly, the court must assume that the standard of culpability more favorable to

2   plaintiffs—that of deliberate indifference—applies for purposes of resolving the pending motion

3   for summary judgment.

4        "Deliberate indifference occurs when 'the official acted or failed to act despite his

5   knowledge of a substantial risk of serious harm.'"  *Solis v. Cty. of Los Angeles*, 514 F.3d 946, 957

6   (9th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).  Whether a government

7   official actually knew of a substantial risk "is a question of fact subject to demonstration in the

8   usual ways, including inference from circumstantial evidence," and a jury may so conclude "from

9   the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 842.  "As the very term 'deliberate

10  indifference' implies, the standard is sensibly employed only when actual deliberation is

11  practical."  *Lewis*, 523 U.S. at 851 (citing *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).

12       Here, as discussed above, a jury could reasonably conclude from the evidence now before

13  the court that, in the absence of demonstrable indications that Ledesma posed a threat or was

14  more than reasonably resisting preceding uses of force, the defendant officers had adequate time

15  to deliberate their actions before employing force they knew could cause substantial bodily

16  injury.  The evidence on summary judgment is sufficient to create a genuine dispute of material

17  fact with respect to defendants' mental state under the deliberate indifference standard.  *See, e.g.*,

18  *Garlick*, 167 F. Supp. 3d at 1169–70 (denying summary judgment as to the issue of whether

19  defendant officers knew of and disregarded an excessive risk of serious injury or death); *Morales

20  v. City of Delano*, 852 F. Supp. 2d 1253, 1274 (E.D. Cal. 2012) (denying summary judgment as to

21  a substantive due process claim where evidence tended to show that defendant officers

22  encountered an unarmed and nonthreatening suspect).

23       Because genuine disputes of material fact exists as to a determination of whether

24  defendants' conduct shocks the conscience, summary judgment in favor of defendants as to

25  plaintiffs' Fourteenth Amendment claim must be denied.

26       4.    Qualified Immunity

27       Government officials enjoy qualified immunity from civil damages unless their conduct

28  violates clearly established statutory or constitutional rights.  *Jeffers v. Gomez,* 267 F.3d 895, 910

                                    26

1    (9th Cir. 2001) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  When a court is

2    presented with a qualified immunity defense, the central questions for the court are: (1) whether

3    the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

4    defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

5    was "clearly established."  *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

6         The United States Supreme Court has held that "while the sequence set forth there is often

7    appropriate, it should no longer be regarded as mandatory."  *Pearson v. Callahan,* 555 U.S. 223,

8    236 (2009).  In this regard, if a court decides that plaintiff's allegations do not make out a

9    statutory or constitutional violation, "there is no necessity for further inquiries concerning

10   qualified immunity."  *Saucier,* 533 U.S. at 201.  Likewise, if a court determines that the right at

11   issue was not clearly established at the time of the defendant's alleged misconduct, the court may

12   end further inquiries concerning qualified immunity at that point without determining whether the

13   allegations in fact make out a statutory or constitutional violation.  *Pearson,* 555 U.S. 236–242.

14   Because this court finds that the evidence presented on summary judgment is sufficient to allow a

15   reasonable trier of fact to find in plaintiffs' favor with respect to their Fourth and Fourteenth

16   Amendment claims, it necessarily proceeds to determine whether the rights at issue were clearly

17   established prior to this incident.

18        "A Government official's conduct violate[s] clearly established law when, at the time of

19   the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

20   official would have understood that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*,

21   563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  In this

22   regard, "existing precedent must have placed the statutory or constitutional question beyond

23   debate."  *Id.*; *see also Clement v. Gomez,* 298 F.3d 898, 906 (9th Cir. 2002) ("The proper inquiry

24   focuses on . . . whether the state of the law [at the relevant time] gave 'fair warning' to the

25   officials that their conduct was unconstitutional.") (quoting *Saucier,* 533 U.S. at 202).  The

26   inquiry must be undertaken in light of the specific context of the particular case.  *Saucier*, 533

27   U.S. at 201.  Because qualified immunity is an affirmative defense, the burden of proof initially

28   lies with the official asserting the defense.  *Harlow,* 457 U.S. at 812.

1    Here, the state of the law in 2013 clearly would have given defendants fair warning that

2    their alleged conduct was unconstitutional.  This court need look no further than *Graham* and

3    *Garner* to find decisions that would have put a reasonable law enforcement officer on notice that

4    repeatedly using baton blows, a canine, and other impact blows against a suspect without

5    provocation would be a violation of his Fourth Amendment rights.  *See, e.g.*, *Young*, 655 F.3d at

6    1167 (finding in 2011 that a reasonable officer would have had specific and unambiguous notice

7    that use of baton blows constituted excessive force); *Blankenhorn*, 485 F.3d at 481 (holding that

8    *Graham*'s clear principle would have put a prudent officer on notice that gang-tackling, punching,

9    and using hobble restraints violated plaintiff's rights); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th

10   Cir. 1994) (finding the law concerning use of excessive force clearly established for purposes of

11   determining whether defendants had qualified immunity in their use of a police dog).

12   For these reasons, defendants are not entitled to summary judgment in their favor with

13   respect to their affirmative defense based upon qualified immunity.

14         5.      *Monell* Liability

15   A municipality may be liable under § 1983 where the municipality itself causes the

16   constitutional violation through a "policy or custom, whether made by its lawmakers or those

17   whose edicts or acts may fairly be said to represent official policy."  *Monell v. Dep't of Soc.*

18   *Servs.*, 436 U.S. 658, 694 (1978).  Therefore, municipal liability in a § 1983 case may be

19   premised upon (1) an official policy; (2) a "longstanding practice or custom which constitutes the

20   standard operating procedure of the local government entity;" (3) the act of an "official whose

21   acts fairly represent official policy such that the challenged action constituted official policy;" or

22   (4) where "an official with final policy-making authority 'delegated that authority to, or ratified

23   the decision of, a subordinate.'"  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich*

24   *v. City & Cty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)).

25   "[A] custom or practice can be inferred from widespread practices or evidence of repeated

26   constitutional violations for which the errant municipal officers were not discharged or

27   reprimanded."  *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (citations and

28   internal quotations omitted); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir.

28

2005); *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) ("A section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded."); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ( "Policy or custom may be inferred if, after the shakedown, the prison officials took no steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error.").

a.      Kern County's Liability

In their complaint, plaintiffs allege that defendant County maintained a custom, policy, and practice of condoning the use of excessive force, including the use of dog bites.  (Doc. No. 62 at 18; *see also* Compl. ¶ 46.)[9]  In support of this claim, plaintiffs point to deposition testimony provided by KCSO's designated witnesses regarding the department's use of force policies.  (*See, e.g.*, Wheeler Dep. 32:2–8, 51:24–53:6; Dunbier Dep. 32:23–34:12.)  Plaintiffs also present defendant Perkins's statement that the KCSO policy allows the use of canines where the suspect is "actively resisting" arrest, apparently contradicting the testimony of KCSO officials.  (*See, e.g.*, Perkins Dep. 55:20–56:6.)  This evidence, however, does not support an inference that a widespread pattern of repeated constitutional violations by KCSO deputies.  Nor does it suggest that defendant Perkins' alleged misinterpretation of KCSO policy or his conduct toward Ledesma, viewed in the light most favorable to plaintiffs, represents the County's policy or custom.  At most, this evidence would suggest that defendant Perkins failed to properly implement department policy, which on its face does not condone violative conduct.  (*See* Doc. No. 59-7, Exs. M (use of force – general), N (use of force – baton), O (police dog deployment policy).)  In the absence of evidence from which to infer that the individual defendants' conduct on August 19, 2013 represented official County policy, summary judgment must be granted in defendant

---

[9]  Plaintiffs also allege that defendants County and KCSO are liable under *Monell* as a result of the timing and manner in which defendants notified Ledesma's family of his medical condition after he was admitted to the hospital.  (Doc. No. 62 at 18.)  To the extent this allegation is independent of plaintiffs' theory that defendant County had a custom, policy, or practice condoning the use of excessive force by its law enforcement officers, it has not been adequately pled.  (*See* Compl. ¶¶ 45–49.)  Nor have plaintiffs described or identified any evidence showing how such alleged conduct amounts to a violation of § 1983.

1   County's favor as to plaintiffs' § 1983 claims against it.[10]

2            b.      KCSO Not Amenable to Suit Under § 1983

3       Plaintiffs have named the KCSO as a defendant in this action.  However, KCSO is not a

4   proper defendant in a § 1983 action.  Although municipalities, such as cities and counties, are

5   amenable to suit under *Monell*, 436 U.S. at 690–91 & n.54, sub-departments or bureaus of

6   municipalities, such as KCSO, are not generally considered "persons" within the meaning of

7   § 1983.  *Hervey v. Estes*, 65 F.3d 784, 791 (9th Cir. 1995); *see also United States v. Kama*, 394

8   F.3d 1236, 1240 (9th Cir. 2005) (Ferguson, J., concurring); *Pellum v. Fresno Police Dept.*, No.

9   1:10-cv-01258-OWW-SKO, 2010 WL 3516346, at * 2 (E.D. Cal. Sept.2, 2010) (holding that

10  Fresno Police Department is not a proper defendant in a § 1983 action because it is a sub-division

11  of the City of Fresno).  Therefore, all claims brought by plaintiffs pursuant to § 1983 against

12  KCSO will be dismissed.

13  **B.      State Law Claims**

14      In addition to their federal claims, plaintiffs, as successors in interest to decedent Ledesma

15  and on their own behalf, present the following state law claims in their complaint: (1) wrongful

16  death and survival, (2) violation of the Ralph Act and Unruh Act, and (3) violation of the Bane

17  Act.

18            1.      Wrongful Death and Survival Claim

19      A wrongful death cause of action requires (1) a wrongful act or negligence, (2) which

20  causes (3) the death of another person.  *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390 (1999).

21  Here, plaintiffs bring their wrongful death claim based on three theories with respect to the first

22  element: (a) assault and battery; (b) negligence; and (c) negligent hiring, training, and

23  supervision.

24  /////

25  /////

26

27  _____

[10] Similarly, to the extent plaintiffs maintain a *Monell*-based claim on Fourteenth Amendment
grounds, the court finds no evidence before it to support the conclusion that the individual
28  defendants' alleged conduct constitutes the County's standard procedure.

1             1.      *Assault and Battery*

2             To prevail on a claim based on assault and battery against a law enforcement officer, the

3    plaintiff bears the burden of proving the officer used excessive force.  *Edson v. City of Anaheim*,

4    63 Cal. App. 4th 1269, 1273–74 (1998); *see also Johnson v. Cty. of Los Angeles*, 340 F.3d 787,

5    794 (9th Cir. 2003); *Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999).  An officer's use

6    of excessive force is analyzed under the Fourth Amendment's reasonableness standard.  *Munoz v.*

7    *City of Union City*, 120 Cal. App. 4th 1077, 1102 & n.6 (2004) ("Federal civil rights claims of

8    excessive force are the federal counterpart to state battery and wrongful death claims; in both, the

9    plaintiff must prove the unreasonableness of the officer's conduct.") (citing *Graham*, 490 U.S. at

10   395; *Edson*, 63 Cal. App. 4th at 1274), *modified on denial of reh'g* (Aug. 17, 2004); *see also*

11   *Johnson*, 340 F.3d at 794 (holding a state law claim of assault and battery depends on the

12   reasonableness of force used by defendant officer).

13           Because, as outlined above, a genuine dispute of material fact exists as to the

14   reasonableness of the individual defendants' actions, defendants' motion for summary judgment

15   with respect to this theory underlying plaintiffs' state law claim will be denied.

16            2.      *Negligence*

17           The traditional elements of a negligence-based claim are "duty, breach of duty, causation,

18   and damages."  *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal. 3d 583, 588 (1989).

19   Under California law, officers have a duty to use reasonable care in employing excessive force.

20   *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013); *Munoz*, 120 Cal. App. 4th at 1102.  The

21   reasonableness of an officer's actions is evaluated in light of the totality of circumstances.  *Hayes*,

22   57 Cal. 4th at 629.  This standard is "broader than federal Fourth Amendment law" and includes

23   consideration of an officer's conduct prior to moment when force is applied.  *Id.* at 632, 639.

24           Here, plaintiffs' negligence theory is based on the same set of facts giving rise to their

25   Fourth Amendment claim.  Because, as noted above, a genuine dispute of material fact exists as

26   to the reasonableness of the individual defendants' actions, defendants' motion for summary

27   judgment with respect to this theory underlying plaintiffs state law claim will also be denied.  *See,*

28   *e.g.*, *Young*, 655 F.3d at 1170 (reversing dismissal of a state law negligence claim where a Fourth

1   Amendment violation suffced to establish breach of the officer's duty of care).

2               3.      *Negligent Hiring, Training, and Supervision*

3       Plaintiffs also allege that defendants County and KCSO negligently hired, trained, and

4   supervised the individual defendants, despite knowing that each of them was dangerous, violent,

5   and prone to use unnecessary force.  Under the California Tort Claims Act, public entities are

6   generally immune from liability for injuries unless there exists a statute holding otherwise.  Cal.

7   Gov't Code § 815.  Consequently, public entities are not directly liable for negligent hiring,

8   training, and supervision in the absence of a statutory or other basis for such liability.  *See de*

9   *Villers v. Cty. of San Diego*, 156 Cal. App. 4th 238, 252–53 (2007) ("We find no relevant case

10  law approving a claim for direct liability based on a public entity's allegedly negligent hiring and

11  supervision practices.") (citing *Munoz*, 120 Cal. App. 4th at 1110–15).

12      In opposition to defendants' motion for summary judgment in this respect, plaintiffs argue

13  instead that defendants County and KCSO are vicariously liable for the negligent acts of the

14  individuals who presumably had the power to hire, train, or supervise the individual defendants.

15  (*See* Doc. No. 62 at 22–23) (citing *C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861

16  (2012)).)  Indeed, California law does create liability for public entities for "injur[ies] proximately

17  caused by an act or omission of an employee of the public entity within the scope of his

18  employment . . . ."  Cal. Gov't Code § 815.2; *see also San Mateo Union High Sch. Dist. v. County*

19  *of San Mateo*, 213 Cal. App. 4th 418, 432–33 (2013) ("In addition to limited statutory liability for

20  their own conduct and legal obligations, public entities may incur liability, based on *respondeat*

21  *superior* principles, for the misconduct of their employees that occurred in the scope of their

22  employment.").  Here, however, plaintiffs have failed to identify any evidence before the court on

23  summary judgment sufficient to support a claim of negligent hiring, training, and supervision

24  against defendant County of KCSO.  For instance, plaintiffs have not identified in their complaint

25  or on summary judgment which employees had such supervisory powers over the individual

26  defendants.  Nor have plaintiffs come forward with any evidence from which to infer that an

27  employee of the County or KCSO acted negligently with respect to the hiring, training, and

28  supervision of defendants Martin, DeLaGarza, Perkins, Wong, and Melton.  In the absence of any

1    evidence to support plaintiffs' case, summary judgment in favor of defendants as to this theory

2    underlying plaintiffs' wrongful death claim under state law is appropriate.[11]

3              2.        Ralph Act and Unruh Act Claim

4              California Civil Code § 51.7 protects a person's right to be free from violence or

5    intimidation on account of "their sex, race, color, religion, ancestry, national origin, disability,

6    medical condition, genetic information, marital status, sexual orientation, citizenship, primary

7    language, or immigration status."  Cal. Civil Code §§ 51(b), (e); 51.7.  Here, plaintiffs point only

8    to evidence that decedent Ledesma was a Hispanic man who appeared to fit the description of a

9    suspect broadcast over dispatch.[12]  Based on this evidence alone, however, no reasonable jury

10   could conclude that a motivating reason for the individual defendants' conduct was their

11   perception of Ledesma's race, color, ancestry, or national origin.  *See Austin B. v. Escondido*

12   *Union Sch. Dist.*, 149 Cal. App. 4th 860, 880–81 (2007).  Accordingly, summary judgment will

13   be granted in defendants' favor as to plaintiff's claim brought pursuant to California Civil Code

14   § 51.7.

15             3.        Bane Act Claim

16             California's Bane Act permits individuals to bring private actions for damages whenever

17   the exercise or enjoyment of their constitutional rights under state or federal law is interfered with

18   by threat, intimidation, or coercion.  Cal. Civil Code § 52.1.  It appears that claims under § 52.1

19   may be brought against public entities.  *See, e.g.*, *Shoyoye v. County of Los Angeles*, 203 Cal.

20   App. 4th 947, 950 (2012).  "Section 52.1 does not provide any substantive protections; instead, it

21   enables individuals to sue for damages as a result of constitutional violations."  *Reynolds v. Cty.*

22   *of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other grounds by Acri v. Varian*

23

---

[11]  The court notes that the granting of summary judgment in favor of defendants as to this theory
does not preclude vicarious liability against defendants County and KCSO with regard to the
conduct of the individual defendants under the theories of assault and battery, and negligence, as
alleged by plaintiffs in their complaint and discussed above.

[12]  Plaintiffs also argue that "[t]his repeated pattern of violence perpetrated against Hispanic
males from a predominately white group of officers presents, at the very least, a triable issue of
fact as to a racial animus."  (Doc. No. 62 at 24.)  However, plaintiffs have offered no evidence of
such animus, individually or on the basis of some broader custom or practice.

1    *Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997).

2          In moving for judgment in their favor with respect to this claim, defendants first argue that

3    plaintiffs lack standing to sue under the Bane Act, relying on a California Court of Appeal's

4    decision in *Bay Area Rapid Transit District v. Superior Court*, 38 Cal. App. 4th 141 (1995).  In

5    *BART*, parents brought several causes of action under the Bane Act related to the killing of their

6    son by a police officer.  *Id.* at 142.  In one of those causes of action, plaintiffs sought damages on

7    their own behalf for violations of their constitutional rights to enjoy the society and

8    companionship of their deceased son.  *Id.* at 143.  The state appellate court held that under the

9    Bane Act, the surviving parents could not establish derivative liability for conduct they did not

10   personally witness.  *Id.* at 144.  The court in *BART*, however, did not address whether or how the

11   Bane Act claims of a decedent, such as claims based upon the alleged excessive use of force

12   under the Fourth Amendment, survive the decedent's death pursuant to California Code of Civil

13   Procedure §§ 377.20 and 377.30.  This court thus reads the holding in *BART* to bar only a

14   surviving parent's own claims under the Bane Act.  *See, e.g.*, *Estate of Crawley v. Kings Cty.*, No.

15   1:13-cv-02042-LJO-SAB, 2014 WL 2174848, at *11–12 (E.D. Cal. May 23, 2014) (declining to

16   bar a Bane Act claim brought on behalf of a decedent), *report and recommendation adopted*,

17   2014 WL 2801046 (E.D. Cal. June 19, 2014); *Medrano v. Kern Cty. Sheriff's Officer*, 921 F.

18   Supp. 2d 1009, 1015–16 (E.D. Cal. 2013) (holding that plaintiffs, as successors in interest, had

19   standing to bring Bane Act claim alleging excessive force in violation of decedent's rights under

20   California Constitution); *Dela Torre v. City of Salinas*, No. C-09-00626 RMW, 2010 WL

21   3743762, at *6 (N.D. Cal. Sept. 17, 2010) (holding that a successor in interest has standing to

22   bring a survival cause of action under the Bane Act based on the decedent's rights) (citing *Moore*

23   *ex rel. Moore v. Cty. of Kern*, No. 1:05-cv-01115-AWI-SMS, 2007 WL 2802167, at *6–7 (E.D.

24   Cal. Sept. 23, 2007)).  Thus, plaintiffs, as decedent Ledesma's successors in interest, have

25   standing to bring a claim on his behalf under the Bane Act.

26   /////

27   /////

28   /////

34

As to the substance of the Bane Act claim, plaintiffs allege that defendants interfered with the decedent's right to be free from excessive force under the Fourth Amendment.[13]  Thus the same evidence presented on plaintiffs' § 1983 claims is sufficient to support their Bane Act claim.  *See Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013) (holding "the elements of the excessive force claim under § 52.1 are the same as under § 1983"); *see also Garlick*, 167 F. Supp. 3d 1117 at 1179 ("[I]f a plaintiff makes factual allegations showing a constitutional violation based on excessive force, a plaintiff need not, in addition, introduce independent evidence showing threats, intimidation, or coercion."); *Johnson v. Shasta Cty.*, 83 F. Supp. 3d 918, 934 (E.D. Cal. 2015) ("Where Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force.") (quoting *Dillman v. Tuolumne Cty.*, No. 1:13-cv-00404-LJO-SKO, 2013 WL 1907379, at *21 (E.D. Cal. May 7, 2013)).  Accordingly, summary judgment in favor of defendants will be denied as to this claim.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment (Doc. No. 59) is granted in part.  Summary judgment is entered in favor of defendants with respect to the following claims which will be dismissed: (1) plaintiffs' § 1983 claims under the Fifth and Eighth

---

[13]  Defendants argue that plaintiffs' Bane Act claim should be dismissed in part because they were not explicitly presented in plaintiffs' administrative claims to the County.  (*See* Doc. No. 59 at 17.)  Under the California Tort Claims Act, a plaintiff may not maintain an action for damages against a public employee unless a written claim has first been presented to the appropriate state entity and has been acted upon by that entity.  *See* Cal. Gov't Code §§ 900.2, 910, 915(c)(2) & 945.4.  "The purpose of these statutes is 'to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.'"  *Stockett v. Ass'n of California Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 446 (2004) (quoting *City of San Jose v. Superior Court*, 12 Cal. 3d 447, 455 (1974)).  "Only where there has been a 'complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim,' have courts generally found the complaint barred."  *Id.* at 447 (citing *Blair v. Superior Court*, 218 Cal. App. 3d 221, 226 (1990)).  Here, plaintiffs' administrative claims, while not citing directly to the Bane Act, did provide facts sufficient to put the County on notice of the alleged Fourth Amendment violations—the same facts on which plaintiffs' Bane Act claims now depend.  (*See* Doc. Nos. 59-4, Exs. A–D; 59-5, Ex. E.)  Accordingly, defendants are not entitled to summary judgment in their favor on plaintiffs' Bane Act claim based upon any alleged failure to properly exhaust or comply with the claims presentation requirements.

35

Amendments; (2) plaintiffs' § 1983 claims against defendants County and KCSO; (3) plaintiffs' state law wrongful death and survival claim only with respect to their theory based upon alleged negligent hiring, training, and supervision; and (4) plaintiff's state law claim under the Ralph Act and Unruh Act.  Defendants' motion for summary judgment is denied in all other respects.

IT IS SO ORDERED.

Dated:   **November 10, 2016**                                  _____

UNITED STATES DISTRICT JUDGE